**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHASE WILLIAMS AND WILLIAM ZHANG, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>BLOCK.ONE, BRENDAN BLUMER, and DANIEL LARIMER,<br><br>          Defendants. | Civ. No. 1:20-cv-02809-LAK<br><br><u>CLASS ACTION</u> |
| CRYPTO ASSETS OPPORTUNITY FUND LLC and JOHNNY HONG, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br>    v.<br><br>BLOCK.ONE, BRENDAN BLUMER, DANIEL LARIMER, IAN GRIGG, and BROCK PIERCE,<br><br>          Defendants. | Civ. No. 1:20-cv-03829-LAK<br><br><u>CLASS ACTION</u> |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
<u>OF THE FEDERAL SECURITIES LAWS</u>**

TABLE OF CONTENTS

Page

I.      SUMMARY OF THE ACTION ............................................................................. 1
II.     THE PARTIES ................................................................................................... 9
III.    JURISDICTION AND VENUE ........................................................................... 12
IV.     BACKGROUND FACTS ................................................................................... 13
        A.    Cryptocurrencies and Blockchain Technology ..................................... 13
        B.    The EOS Project and Ensuing ICO ....................................................... 15
        C.    Defendants Aggressively Marketed EOS Securities in the United States ............... 20
        D.    Investors Purchased EOS Securities in the United States ...................... 22

PART I: DEFENDANTS DID NOT REGISTER THE EOS TOKENS IN
VIOLATION OF THE SECURITIES ACT ................................................................. 24
V.      THE EOS TOKENS WERE SECURITIES ........................................................ 24
        A.    EOS Token Purchasers Invested Money ............................................... 24
        B.    EOS Token Purchasers Invested in a Common Enterprise ..................... 25
        C.    EOS Purchasers Expected to Profit from Owning EOS Securities ......... 26
        D.    EOS Token Purchasers Expected Profits to be Derived from
              Defendants' Managerial Efforts ........................................................... 29
        E.    Defendants Repeatedly Falsely Stated that the EOS Tokens Were
              Not Securities ..................................................................................... 32

PART II: DEFENDANTS MADE FALSE STATEMENTS IN VIOLATION OF THE
SECURITIES ACT AND THE EXCHANGE ACT ...................................................... 34
VI.     THE DEFENDANTS' UNLAWFUL CONDUCT ................................................. 34
        A.    The EOS Blockchain Used 21 Block Producers in a Supposed Effort
              to Maintain Decentralization ............................................................... 34
        B.    Problems in the EOS Blockchain Surfaced Almost Immediately ........... 37
        C.    Arbitrators Stripped Block Producers of Power, Undermining the
              Decentralized Features of the EOS Blockchain ..................................... 37
        D.    Corruption in the Election of Block Producers Concentrated Power
              in the Hands of a Few ......................................................................... 38
        E.    Through their Misleading Statements, the Individual Defendants
              Raised $4 Billion for Themselves ......................................................... 41
VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................ 42
        A.    Statements Made Prior to and During the ICO ...................................... 42
        B.    Statements Made Subsequent to the ICO .............................................. 48

VIII.     THE TRUTH IS GRADUALLY REVEALED THROUGH A SERIES OF PARTIAL CORRECTIVE DISCLOSURES ................................................................. 50

IX.     CONFIDENTIAL WITNESSES HAVE PROVIDED FURTHER DETAIL ON THE PROBLEMS WITH EOS AND AT BLOCK.ONE ................................................. 55

X.     DEFENDANTS' FALSE STATEMENTS WERE MADE WITH SCIENTER....... 57

    A.    Motive and Opportunity........................................................................... 59

    B.    Core Operations ...................................................................................... 61

XI.     CLASS ALLEGATIONS................................................................................ 61

    A.    Definition of Classes.............................................................................. 61

    B.    The Classes Satisfy the Requirements of Rule 23 ................................. 62

    C.    Presumption of Reliance: Fraud on the Market ..................................... 64

PART III: COUNTS ................................................................................................... 66

XII.     SECURITIES ACT COUNTS AND DEFENDANTS ................................... 66

    A.    Count One: Violation of Sections 12(a)(1) and (5) of the Securities Act Asserted Against Block.one........................................................................ 66

    B.    Count Two: Violation of Section 12(a)(2) of the Securities Act Asserted Against All Defendants ................................................................................ 67

    C.    Count Three: Violation of Section 15 of the Securities Act Asserted Against the Individual Defendants.................................................................. 69

XIII.     EXCHANGE ACT COUNTS AND DEFENDANTS ................................... 71

    A.    Count Four: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Asserted Against All Defendants.................................. 71

    B.    Count Five: Violation of Section 20(a) of the Exchange Act Asserted Against the Individual Defendants.................................................................. 74

XIV.     PRAYER FOR RELIEF ................................................................................. 77

DEMAND FOR JURY TRIAL ................................................................................. 77

Lead Plaintiff Crypto Assets Opportunity Fund LLC ("Plaintiff"), on behalf of itself and all others similarly situated, by its undersigned attorneys, brings this action against Defendants block.one (also sometimes referred to herein as the "Company"), Brendan Blumer, Daniel Larimer, Ian Grigg, and Brock Pierce (collectively, "Defendants"). With knowledge of its own acts and acts occurring in its presence, and upon information and belief as to all other matters, Plaintiff alleges the following:

## I.   SUMMARY OF THE ACTION

1.      This is a federal securities class action that asserts claims under the Securities Act of 1933 (the "Securities Act") and the Exchange Act of 1934 (the "Exchange Act"). This action asserts claims arising under Sections 5 and 12(a)(1) of the Securities Act for failure to register the EOS Securities (defined below) pursuant to the federal securities laws; Section 12(a)(2) of the Securities Act for issuing the EOS Securities pursuant to a materially false and misleading prospectus; Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for disseminating materially false and misleading statements concerning the EOS Securities during the Class Period; and Section 15 of the Securities Act and Section 20(a) of the Exchange Act for control person liability.  For purposes of the Securities Act claims, this action is brought on behalf of all investors who purchased securities issued by Block.one called "EOS Tokens" (the "EOS Securities") in or traceable to the initial coin offering ("ICO") as described herein.  For purposes of the Exchange Act claims, this action is brought on behalf of all investors who purchased EOS Securities during the period of June 26, 2017 to June 4, 2019.

2.      This case arises out Defendants' plan, fueled by a global frenzy over cryptocurrencies and unchecked human greed, to raise billions of dollars through sales of a cryptocurrency called EOS – an unregistered security – to investors in violation of the federal securities laws.  To drive the demand for and increase profit from the sales of EOS Securities,

Defendants also violated the securities laws by making materially false and misleading statements about EOS, which artificially inflated the prices for the EOS Securities and damaged unsuspecting investors.

3.      Block.one was founded in early 2017 by Brock Pierce, Brendan Blumer, and Daniel Larimer. They sought to capitalize on the investor fervor for cryptocurrencies by promising that they would develop software to run a new highly decentralized blockchain (the "EOS Blockchain").   Blockchains are ledgers that record digital transactions between two parties.   Access rights to the assets in those transactions are represented by cryptographic tokens, which are commonly referred to as "cryptocurrency."   The most prominent cryptocurrency is bitcoin, but many others exist, including ether.

4.      The most important feature of blockchains is that they are "decentralized." Centralized platforms are controlled by a single authority. Some prominent digital examples are Yahoo! and Facebook. The centralized authority has the power to collect and store user data, can set the rules of engagement for the platform, and can make unilateral determinations that affect all users. Centralization requires inherent trust in the authority controlling the platform, including that it will ensure that users' data remains secure. Since all the information flows through a single, central authority, however, centralized platforms are relatively easy to hack.

5.      Decentralized systems spread the power and authority among many users. The more users that are tied to a particular system, the more decentralized the platform typically becomes. Specifically, decentralized platforms such as blockchain depend on many users to verify information, and information flows directly from person to person, rather than through a centralized authority. The main benefits are efficiency (from the elimination of transaction

intermediaries); transparency (from ability to access entire record of transactions by any user); and security (from lack of central point of failure).

6.    Decentralization occurs in degrees, and block.one hyped its ability to create a more decentralized system that was superior to the blockchains already in existence: the EOS Blockchain. Ostensibly, in order to fund the development of software that would underlie its new blockchain (i.e., the "EOSIO software"), block.one began to devise a plan to offer and sell EOS Securities in an "initial coin offering," or "ICO." Defendants first publicly announced this plan on or about May 22, 2017, at a conference in New York City. The announcement was accompanied by a flashy ad purchase displayed prominently on a large billboard overlooking Times Square.

7.    On June 5, 2017, block.one published a White Paper, which touted "a new blockchain architecture designed to enable vertical and horizontal scaling of decentralized applications. This is achieved by creating an operating system-like construct upon which applications can be built. . . . The resulting technology is a blockchain architecture that may ultimately scale to millions of transactions per second, eliminates user fees, and allows for quick and easy deployment and maintenance of decentralized applications, in the context of a governed blockchain." The White Paper included a section called "Governance," which highlighted the features of control over the EOS Blockchain that would purportedly enhance its decentralization.

8.    One of the most important features of the EOS Blockchain is its block producers. In a YouTube video produced by block.One and posted on its website on June 20, 2018, Blumer described block producers as "21 elected delegates by the token holders that are actually confirming the transactions of the network."  Larimer further elaborated: "they're basically the sequencers or the witnesses that say … this is the priority someone has.  You can almost view

the block producers like the DJs at the radio station, they are deciding . . . what goes on the air and which callers to take."  In the same video, Brad Wyatt, a block.one engineer, described block producers as "the custodians of the network" whose role is to "generate the chain that the rest of the network would see and be able to independently validate, independently verify and build apps on."  In fact, they are so important, Wyatt described them as the "central brain of that blockchain." He elaborated that the EOS Security owners would be able to "elect producers to fulfill their own vision of what the EOSIO Blockchain should be." Block.one promised investors that the block producers would be elected by fair and democratic means. This was critical to the decentralized functioning of the EOS Blockchain, and was a key reason why investors purchased the EOS Securities.  Block producers were given significant financial rewards, including a stake in the inflation of the EOS Securities.

9.     On June 26, 2017, Defendants began selling the EOS Securities in a year-long ICO aimed at both wealthy investors and the general public. Block.one did not set a fixed price for the tokens sold in the ICO, but instead sold the tokens at a price set by a Dutch auction.  The Company sold 200 million tokens during the first five days of the ICO, and thereafter, the Company sold another 700 million tokens in 350 consecutive day-long auction periods of 2 million tokens each.  Block.one kept ten percent (10%) of the EOS Securities for itself and solicited online exchanges of digital assets (known as "cryptocurrency exchanges") to list EOS Securities on their platforms and encourage purchases by a wide universe of investors. Block.one offered and sold EOS Securities using the "EOS Purchase Agreement," which did not comply with the requirements for a registered offering of securities.  Further, the EOS Securities did not (and do not) qualify for an exemption to the registration requirements under the federal securities laws. By failing to prepare and file a registration statement, Block.one did not provide

critical information to purchasers of EOS Securities, such as information about block.one's financial condition, future plans of operation and budget, the proposed uses of investor proceeds, and detailed disclosures of material trends and the most significant factors that made the ICO speculative and risky. Block.one thus failed to disclose information that was relevant to investors' evaluation of block.one's promises about the EOS Securities and EOSIO software.

10.     Following their initial sale, the EOS Securities also traded in a secondary market, including on several cryptocurrency exchanges based in the United States, such as Coinbase, Poloniex, and Kraken. Since July 2017, just one month after the start of their first public sale, EOS Securities have been trading on numerous cryptocurrency exchanges, and their price soared to a high of $22.89 on April 29, 2018.

11.     Although block.one did not file a registration statement, the Individual Defendants, who promoted the sale of EOS Securities, made a host of materially false and misleading statements to induce investors to purchase EOS Securities. These statements were disseminated prior to the launch of the ICO, throughout its duration, and subsequent to its close, inflating the price of EOS Securities sold both in the ICO and in the secondary market. The false statements concerned the capabilities of the anticipated EOSIO software that block.one was developing, including its ability to support a "decentralized" blockchain.   Contrary to Defendants' false statements, as was revealed throughout the period following the ICO, the EOS Blockchain was highly *centralized* and was *not superior* to the other blockchains already in use.

12.     Defendants' efforts to generate demand for, and inflate the price of, the EOS Securities through their false and misleading statements were successful. By the end of the offering and sale of EOS Securities, block.one had raised over $4 billion from investors. According to cnbc.com, this was the largest initial public offering of 2018 to the date of this

filing, and it more than doubled the next largest offering of cryptocurrency.  At least one prominent cryptocurrency investor, William Mougayar of JM3 Capital, opined that block.one had "set the bar very high for themselves in terms of delivery expectations" owing to the enormity of the proceeds of the ICO.  In an article dated June 4, 2018, *Business Insider* echoed that sentiment, noting that "[w]ith investors putting so much faith in the startup, it will now be under serious pressure to deliver the technology and returns its backers are looking for."

13.     On June 8, 2018, block.one hosted a software developer conference call to discuss the launch of the EOS Blockchain. Although the ICO had been going on for nearly a year at this point, on a daily basis, the Company still had not produced any product, as the EOSIO software underlying the EOS Blockchain was being developed.   A transcript posted on Reddit.com revealed significant infighting among the developers regarding the launch of the EOS Blockchain. The developers could not agree on issues both large and small, including philosophical questions and arcane technical issues. Some threatened to launch a competing version of the software.

14.     On June 9, 2018, it was decided that the EOS Blockchain would go live once 15% of EOS Security holders voted in favor of going live. This prerequisite for going live occurred on June 14, 2019. However, the launch was not smooth. Almost immediately, users discovered a bug that caused major glitches, requiring block.one to resort to an earlier version of the code and raising questions about how much testing was being performed on the new code.

15.     Additional problems soon began to ensue, particularly as users (and investors) began to discover that the EOS Blockchain was not, in fact, decentralized, as Defendants represented.  On June 22, 2018, it was reported that EOS block producers froze seven accounts, causing some to question EOS's decentralized system and to label the move as "power abuse."

16.     On November 1, 2018, a blockchain testing company called Whiteblock published results of the "first independent benchmark testing of the EOS software." Shockingly, the investigation concluded that "EOS is not a blockchain," but "rather a distributed homogenous database management system," because its transactions were not "cryptographically validated." It further stated that the "foundation of the EOS system is built on a flawed model that is not truly decentralized."

17.     On November 15, 2018, Cointelegraph.com published an article titled, "EOS Proves Yet Again that Decentralization Is Not Its Priority." It explained that an "arbitrator" reversed a transaction that had been verified by the block producers. This was described as a "decentralization supporters' nightmare," and questioned whether "EOS [is] even trying to be decentralized."

18.     Block.one began to face another serious problem that further undermined any notion that it was truly decentralized.  Although Defendants stated that block producers would be elected fairly and democratically, thus enabling the most worthy block producers to hold that title, rumors of vote-buying began to percolate.  The effect of this undermined the entire EOS Blockchain.  Specifically, the most technically proficient block producers were not being rewarded for their efforts, and eventually they abandoned these efforts altogether, leading to a deterioration in the quality of the EOS Blockchain.  Further, because certain block producers were buying votes, they were able to concentrate their power: certain entities owned or controlled multiple block producers.  Thus, in reality, there were fewer than 21 block producers.

19.     On October 1, 2018, Blumer issued a statement concerning the rumors of vote-buying.  He stated that Block.one would use its 10% stake in the EOS Securities to vote responsibly for the most worthy and proficient block producers. However, according to a

September 19, 2019 article in Coindesk, block.one had not cast a single vote as of that date, even though its voting prowess enabled it to prevent the concentration of power that was occurring through vote-purchases.

20.     On June 1, 2019, facing criticism that the EOS Blockchain was not decentralized as promised, block.one announced that it was shifting gears away from support of the EOS Blockchain, and instead would be turning its attention to developing a social media outlet called "Voice," which would be used on its blockchain. News of this divergence did not sit well with investors, who had believed that block.one would continue to support the EOS Blockchain after its launch.

21.     In addition, in early June 2019, Brock Pierce attended the "Tulip Conference" in San Francisco and stated that the EOS Blockchain was largely governed by a "Chinese oligarchy."   This solidified the rumors concerning vote-purchasing and demonstrated that statements that the EOS Blockchain block producers would be selected by fair and democratic means were false.   The most technically, key block producers soon abandoned the project, allowing the "Chinese oligarchs" to further centralize their control over the EOS Blockchain.

22.     From that point on, faith in the EOS Blockchain continued to deteriorate.   As reported in a Coindesk article dated September 19, 2019, EOS Tribe, which was an original block producer, announced in September 2019 that it was "leaving EOS altogether, complaining corruption and back-room vote-buying deals had led to a 'mediocre performance' and failed transactions."   The article further reported that "the lion's share of entities that govern the chain are in China, prompting fears of state intervention."

23.     In November 2019, EOS New York, once a prominent block producer, said it had discovered that six block producers—29% of the top 21 block producers—were all controlled by

one entity.  Despite that fact, vote-buying continued to flourish, with new developments "popp[ing]-up making it easier for BPs to distribute block rewards with those who voted for them."

24.     Indeed, it is not surprising that Defendants had abandoned the EOS Blockchain, both in terms of failing to ensure that it maintained decentralized properties and in terms of turning their attention to other projects such as Voice.  They raised $4 billion from the ICO, and funneled a large portion of that into an investment fund located in Hong Kong, which invests heavily in, among other things, other cryptocurrencies and more traditional investments. Investors who thought they were supporting the development of a new blockchain that was more decentralized than any of its predecessors were essentially handing their money over to Larimer, Pierce and Blumer for their own investment purposes.

25.     On September 30, 2019, the United States Securities and Exchange Commission (the "SEC") issued a Cease-and-Desist Order in the Matter of block.one, ordering the company to cease and desist its violations of the Securities Act. The SEC has made it clear that the EOS Securities were securities when issued and should not have been sold (and should not continue to be sold) without SEC registration or pursuant to an exemption from registration.

26.     When the problems underlying the EOS Blockchain became manifest, investors suffered losses as they watched the price of the EOS Securities decline from a high of $22.89 on April 29, 2018 to a trading price of $2.70, as of the date of this Complaint.

## II.   THE PARTIES

27.     Plaintiff Crypto Assets Opportunity Fund LLC ("CAOF") is an entity formed under the laws of Illinois with principal place of business in Northbrook, Illinois. CAOF purchased the EOS Securities during the Class Period on the secondary market.

28.     Defendant block.one is a limited liability company formed under the laws of the Cayman Islands with offices, operations, and employees in New York City, California, Virginia, and Hong Kong.  Block.one has described itself as "a software publisher specializing in high-performance blockchain technologies," yet it does not sell any software.

29.     Block.one is operated and owned by a small group of individuals who were instrumental in block.one's widespread misconduct, described below in paragraphs 30-33 (the "Individual Defendants").

30.     Defendant Brendan Blumer is a co-founder and CEO of Block.one. He remains the Company's CEO to this date.  He resides in Hong Kong, where he moved in 2005 to head operations at an internet gaming company he founded and sold to Brock Pierce-owned Internet Gaming Entertainment ("IGE").   In 2010, Blumer founded Okay Property Agency Limited ("Okay"), a collaborative data sharing ecosystem focusing on the Asian real estate market.  He managed the company until 2013, when he founded a new business project, ii5, which focused on real estate listings in India.  Blumer met Defendant Larimer in 2016, and together with Defendant Pierce, they formed Block.One in March 2017.  Blumer was integral to the marketing of Block.one's EOS Securities.  Blumer made public statements about Block.One, including YouTube videos and other statements published on the Company's website.

31.     Defendant Daniel Larimer is a co-founder and Chief Technology Officer ("CTO") of block.one. He was integral to the marketing of block.one's EOS Securities. Larimer resides in Blacksburg, Virginia.   The block.one website describes Larimer as "one of the leading innovators, engineers, and thought leaders in the blockchain space."   Prior to his time at block.one, he had been the "co-founder of an array of successful blockchain companies, most notably the decentralized exchange BitShares [and] the social media network Steemit."   At

block.one, according to the website, he was the "publisher of the EOSIO protocol."  He is "[r]ecognized as an industry pioneer," and is "one of the most high-profile figures in the blockchain arena," with his "decade's worth of entrepreneurial and technical experience in the field."  The Company's website further states that "he is the lead architect behind the EOSIO software, which is engineered to run highly scalable blockchain applications."  Larimer made public statements about block.one, including YouTube videos published on the Company's website.  He was also the author of the White Paper.

32.     Defendant Ian Grigg and block.one characterized Grigg's relationship to block.one as a "partner" of block.one.  Grigg disseminated information about EOS Securities to the general public to drive demand and increase price. Grigg resides in Hong Kong.

33.     Defendant Brock Pierce is a co-founder of Block.one. Pierce and block.one characterized Pierce's relationship to block.one as a "partner" of block.one.  He served as its Chief Strategy Officer from its inception through March 2018.  He is a former child actor and prominent bitcoin investor who talked often about Block.one at conferences and promotional videos, including in the United States. Pierce resides in Puerto Rico.  In 1998, following his career as a child actor, Pierce was brought on as an executive at a now-infamous company called Digital Entertainment Network ("DEN"), co-founded by Marc Collins-Rector and Chad Shackley. Just prior to DEN's IPO, DEN filed for bankruptcy, shut down, and was later investigated for fraud. Next, Pierce launched International Gaming Entertainment ("IGE"), trading virtual property used in multiplayer online games.  Pierce met Blumer in 2005, when IGE acquired Blumer's company Gamecliff. At that point, Blumer relocated to Hong Kong, where IGE was headquartered. In 2007, Steve Bannon replaced Pierce as IGE's CEO, and Pierce turned his attention toward bitcoin, eventually becoming a board member at the Bitcoin Foundation and

co-founding cryptocurrency Tether, which is currently under investigation by the New York Attorney General.

## III.    JURISDICTION AND VENUE

34.    This Court has subject-matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. §1331, 28 U.S.C. §1337, Section 22 of the Securities Act (15 U.S.C. §77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

35.    Venue lies within this District under Section 22 of the Securities Act (15 U.S.C. §77v(a)), Section 27 of the Exchange Act (15 U.S.C. §78aa) and 15 U.S.C. §22, 18 U.S.C. §1965, and 28 U.S.C. §1391(b) because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in New York City.

36.    Prior to and during the period following the ICO, Defendants used the instrumentalities of interstate commerce, including interstate wires, to effectuate their illegal scheme.

37.    Defendants' willful violations of securities law and other unlawful conduct alleged herein had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiff's claims.

38.    This Court has personal jurisdiction over Defendants because each Defendant transacted business, promoted the offering of EOS Securities, maintained substantial contacts, and/or they or their co-conspirators committed overt acts in furtherance of their illegal conspiracy and breach of fiduciary duty in the United States, including in this District. The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in New York City.

39.     Personal jurisdiction over all Defendants comports with the United States Constitution and the New York long-arm statute, N.Y. C.P.L.R. §302.

## IV.     BACKGROUND FACTS

### A.     Cryptocurrencies and Blockchain Technology

40.     Cryptocurrencies are digital assets that act as a medium of exchange or a store of value, or both. They are designed to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets. Bitcoin was the world's first, and most popular, cryptocurrency. It currently has a market capitalization of more than $200 billion, and investor enthusiasm surrounding bitcoin has generated a broad market for other cryptocurrencies with some varying features.

41.     The core technical feature of most cryptocurrencies is the "blockchain," which is essentially a ledger that tracks ownership and transfer of the cryptocurrency at issue. As the SEC explained in a July 2017 investor bulletin:

> A blockchain is an electronic distributed ledger or list of entries – much like a stock ledger – that is maintained by various participants in a network of computers. Blockchains use cryptography to process and verify transactions on the ledger, providing comfort to users and potential users of the blockchain that entries are secure.

Information held on a blockchain exists as a shared and continually reconciled database. The blockchain database is not stored in any single location; rather, it is distributed – or decentralized – because it is hosted and perpetuated by a large network of computer "nodes." This means that, for a widely distributed blockchain network, it would be extremely difficult, if not impossible, to submit a false or malicious transaction because a malicious actor would have to gain control of the majority of the nodes on the blockchain to achieve its purpose. Once a transaction is recorded

on the blockchain, it cannot be cancelled, changed, or reversed, and all transaction records are available all the way back to the blockchain's inception.

42.     Each blockchain is subject to different technical rules devised by their creators, but they all seek to attain the goal of decentralization. To achieve this, they provide a framework of incentives to encourage users to do the work of validating transactions, which often requires significant computational mechanics. This has the effect of making the blockchain more accurate and secure. In the instance of the Bitcoin network, users who validate transactions on the Bitcoin blockchain are rewarded with newly minted bitcoin. In bitcoin parlance, this process is referred to as "mining," and those who validate information in exchange for bitcoin are thus called "miners."

43.     Those who do not acquire bitcoin through mining may purchase it through an online cryptocurrency exchange. These exchanges provide a convenient and accessible marketplace for buyers and sellers to meet and transact, similar to traditional exchanges.

44.     Ethereum is another type of blockchain, and it functions similarly to the Bitcoin blockchain with regard to miners' validation of the network, except in this case, they are rewarded with newly minted ether. Ethereum differs from Bitcoin, however, because it enables "smart contracts," which are programs that verify and enforce the negotiation or performance of binary contracts. They are thus self-executing and self-enforcing, making the transactions more secure and less costly.

45.     To understand a smart contract in more concrete terms, consider a contract between two parties where they are hedging the value of ether.  They may agree that each party will dedicate $1,000 worth of ether, and at the end of the month, one will receive back $1,000 of ether at the dollar exchange rate, while the other receives the remainder of the ether. Depending

on whether ether's value has increased, the party receiving the remainder of the ether may have an asset worth more or less than the $1,000 originally committed. A smart contract enables these parties to submit the ether to a secure destination, which will automatically distribute the ether in accordance with the terms of the hedging contract at the end of the month, without any third-party action.

46.     To facilitate widespread adoption of smart contracts, the Ethereum community has developed Ethereum Request for Comments ("ERCs"). ERCs are application standards and may be created by anyone. If an ERC is adopted by the Ethereum community, it provides for uniform transactions, reduced risk, and efficient processes. The most widespread use of ERCs is to allow individuals to create and launch new digital tokens.

47.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015. ERC-20 allows for the creation of smart-contract tokens on the Ethereum blockchain, known as ERC-20 tokens. A key distinguishing feature of ERC-20 tokens is that they do not operate on their own, independent blockchain; instead, they operate on the Ethereum blockchain. Certain features of the many varieties of ERC-20 tokens vary, such as the total supply and ticker symbol, but they are all compliant with the ERC-20 application standard. Because they are easy to create and deploy, anyone with a basic understanding of Ethereum can create ERC-20 tokens and sell them to investors. The EOS Securities at issue in this action began as ERC-20 tokens.

### B.     The EOS Project and Ensuing ICO

48.     Initially, investors' appetite for cryptocurrencies fluctuated, as many were unfamiliar with the properties and benefits that underscored cryptocurrencies.  By the end of 2016, however, demand for cryptocurrencies was growing at an unprecedented rate. ICOs became a popular way for entrepreneurs to capitalize on this unbridled enthusiasm.

49.     ICOs are typically announced and promoted via online public channels and social media, including the issuer's website and popular online forums such as bitcointalk.org, Reddit, Twitter, Telegram channels, and others. Many of these postings encouraged trading in cryptocurrencies, such as EOS, for profit. After the completion of the issuance, the issuer would deliver its tokens to the participant's unique address on the blockchain.

50.     In advance of the ICO, issuers typically release technical white papers and other marketing materials that describe the allegedly new, revolutionary blockchain architecture and the terms of the issuance. None of those materials address the information required to be included in a registration statement filed with the SEC, such as a plain English description of the offering, key risk factors, and a description of important information and management incentives.

51.     In May 2017, block.one announced its existence and purpose: to generate a superior decentralized EOS Blockchain. This news was heralded with much fanfare through a series of conferences and events attended by block.one, including the flagship Consensus Conference in New York City on May 22, 2017. The New York conference was punctuated by a large billboard sign prominently displayed in Times Square:



52.     On June 5, 2017, block.one released *The EOS.IO Technical White Paper* (the "EOSIO White Paper"), authored by Daniel Larimer, describing the concept for the EOSIO blockchain:

> The EOS.IO software introduces a ***new blockchain architecture*** designed to enable ***vertical and horizontal scaling of decentralized applications***. This is achieved by creating an operating system-like construct upon which applications can be built. The software provides accounts, authentication, databases, asynchronous communication and the scheduling of applications across hundreds of CPU cores or clusters. The resulting technology is a ***blockchain architecture that scales to millions of transactions per second, eliminates user fees, and allows for quick and easy deployment of decentralized applications***.

53.     On June 22, 2017, block.one announced that it would commence its ICO four days later on June 26.  In its press release, the Company said it would "distribute one billion EOS ERC-20 compatible tokens . . . over 341 days."  The Company added that 20 percent of the tokens—200 million tokens—would be sold during the first five days of the start of the ICO. The next 70 percent of the tokens—700 million tokens—would be split evenly into 350 consecutive 23-hour periods of 2 million tokens each, starting on July 1, 2017.  Finally, the

Company said it would retain 10 percent of the tokens—100 million tokens—for itself.  In the same announcement, the Company said its EOS team was "being led by blockchain veterans," namely, Defendants Blumer, Larimer, Pierce, and Grigg.  Block.one conducted the ICO purportedly to develop and launch EOSIO.

54.     In July 2017, Defendant Grigg published *EOS – An Introduction*, describing EOSIO as "a performance-based and self-governing blockchain that provides an operating system for building large-scale consumer-facing distributed applications." The publication explains the purpose and technology behind the EOS project and sets forth block.one's vision to launch a competitor to the Bitcoin and Ethereum blockchains, intended to solve many of the problems faced by those popular iterations of the blockchain technology. EOSIO was pitched by block.one as intended for "high-performance messaging with business logic. Popular use cases will include supply chain, resource management, user-messaging such as social media, asset issuance and trading, accounting for remittances, and gaming."

55.     On March 17, 2018, *The Roanoke Times* published an article profiling Defendant Larimer and describing Block.one's EOS project.  At the time, the ERC-20 tokens representing EOS were already worth close to $4 billion.  The article described block.one's operations, stating that "most of the engineering work happens out of Blacksburg," Virginia, where "a team of about 10 people are building a new cryptocurrency called EOS," i.e., the EOS Securities.

56.     As was typical for ICO issuers at that time, block.one did not provide any information that is usually disclosed in connection with an initial offering of securities. Its 14-page white paper posted on its website described new software that promised to handle millions of transactions per second and linked to videos and blog posts describing how the company could use decentralized "blockchain" technology for various purposes, but it did not explain how

the proceeds from the ICO would accomplish those goals, or even if they would be used to develop the new blockchain software.

57.     As planned, block.one held the ICO between June 26, 2017 and June 1, 2018 and sold 900 million EOS Securities. The Company retained 100 million EOS Securities, and thus owns to this day, nearly ten percent (10%) of the EOS Securities that were issued.[1]  Defendants marketed  EOS Securities to the general public purportedly pursuant to an "EOS Token Purchase Agreement," described in more detail below, which represented a facial attempt by Defendants to persuade investors that EOS Securities are not, in fact, securities. To participate in the token sale, the purchasers of EOS Securities transferred their funds to the public sale contract address. From there, block.one transferred funds to the presumably more secure "funding wallet," owned by block.one.

58.     In a typical ICO, the funds remain in the "funding wallet" until after the ICO ends. Issuers often spent the time between the end of the token sale and the first withdrawal of funds performing crucial tasks like setting up the company to receive the funds, ensuring know-your-customer ("KYC") on all contributors, or working with exchanges to make tokens available for trading. After the end of the ICO, the company typically transfers the contributed funds from the designated funding wallet to other accounts.

59.     Block.one's ICO did not follow this usual pattern. Instead, throughout the duration of the EOS ICO, Defendants continuously withdrew funds from the funding wallet, beginning as early as five days after the beginning of the ICO.  In total, Defendants permitted

---

[1] Block.one liquidated the equivalent of USD $24 million EOS Securities to pay penalties for conducting an unregistered sale of securities, pursuant to a September 2019 settlement with the SEC described below.

funds to be withdrawn nearly a hundred times, accounting for close to 90% of the total funds raised throughout the ICO period and averaging one withdrawal every 3-4 days.

60.     Although withdrawal of funds during an ICO is not expressly prohibited, there are significant concerns about how the withdrawn funds might be used, *e.g*., to buy tokens on cryptocurrency exchanges, resulting in artificially inflated demand for EOS, increasing market price, and fueling speculation and interest in the sale. Thus, there was some concern over block.one's withdrawal of funds. Responding to these concerns, Block.one announced in August 2017 that it was "finalizing an engagement with a third-party auditor to release a public audit designed to provide comfort that block.one has not participated in the EOS token sale in anyway [sic], with any funds." Yet, no audit report has been made public, despite the ease of doing so with the transaction records that the blockchain inherently provides.

61.     At the conclusion of the ICO in June 2018, block.one had raised over $4 billion, which it classified as "revenue of block.one."

62.     In addition, and as noted, block.one retained 10% of the initial EOS Securities allocation, permitting it to participate as an active minority voting member.

### C.     Defendants Aggressively Marketed EOS Securities in the United States

63.     From 2017 through the present, to drive demand for EOS Securities, Defendants have aggressively courted investors throughout the United States. Block.one first announced itself at a May 2017 conference in New York City, and punctuated its arrival with expensive ad space on a Times Square billboard, as shown in the preceding section.

64.     Block.one's executives and representatives, including, but not limited to, Pierce, Blumer, and Larimer, have spoken at myriad conferences and met potential investors at informal meetups, including in New York. For example, on May 22, 2017, Larimer and Blumer discussed

EOSIO software and EOS token distribution as speakers at Consensus, a blockchain industry conference in New York City, and hosted a post-conference reception.

65.     Block.one also promoted its proposed business and ICO to U.S.-based persons on the EOS.IO website and through various social media and forum posts. The EOS.IO website, White Paper, and other promotional statements were accessible to purchasers and potential purchasers, and viewable by U.S. persons.

66.     On June 5, 2017, block.one released the White Paper, which included a section called "Governance," promising that "power [would] originate[] with the token holders who delegate [their] power to block producers." The block producers would be "given limited and checked authority to freeze accounts, update defective applications, and propose hard forking changes to the underlying protocol." Users were also required to sign a "constitution," which included a detailed protocol for changing the constitution and any source code. These are key features that underscore the purported "decentralized" nature of the EOS Blockchain.

67.     On March 12, 2018, before Defendants had any functional software, Pierce said about EOS:

> Everything will be better, faster, and cheaper. Everything will be more connected. Everything will be more trustworthy. Everything will be more secure. Everything that exists is no longer going to exist in the way that it does today. Everything in this world is about to get better.

68.     On May 3, 2018, in a video titled "The Story of the EOSIO Brand," Brendan Blumer said about block.one: "We build practical blockchain solutions that are designed to interact with humanity in a way that takes into account the way that we really operate."

69.     Defendants worked to promote EOSIO as the next, superior version of the existing blockchains, like Bitcoin and Ethereum. To highlight the superiority of the EOS Blockchain, Defendants told prospective investors that "EOS" stood for "Ethereum on steroids."

70.     In an interview with *Roanoke Times* in early 2018, Daniel Larimer said, "[EOS] will be better than bitcoin and all the rest. EOS could fundamentally change the way society operates." Despite announcing its grandiose plans to create world-changing tools, block.one declined to reveal more details "to prevent copycats."

71.     Block.one further promoted EOS Securities by publicizing a series of equity investments in block.one by prominent institutional and high-net-worth individual investors like PayPal's founder Peter Thiel, Jihan Wu of crypto mining hardware giant Bitmain, Alan Howard, Louis Bacon, Christian Angermayer, Lansdowne Investment Company, and Galaxy Digital's Mike Novogratz. By publicizing the news, block.one suggested that those investors' interest in owning block.one's equity reflected on the value of EOS Securities. Those investors, however, did not purchase EOS Securities; instead, they purchased shares in block.one the entity, and not the EOS Blockchain.  Block.one recorded over $4 billion in revenue from the sale of EOS Securities. On May 22, 2019, Bloomberg reported that block.one offered to repurchase its shares at a price that returned as much as 6,567% on their initial investments.

### D.     Investors Purchased EOS Securities in the United States

72.     As described in the SEC's Cease-and-Desist Order described above in paragraph 25, to effect the ICO, block.one launched the EOS.IO website in May 2017.  Through that website, which is hosted on a server in California, investors were able to purchase placeholder ERC-20 Tokens in exchange for ether.

73.     As explained above, ERC-20 Tokens exist on the Ethereum Blockchain.  When a new block is added to the blockchain, transactions on the Ethereum Blockchain are validated by thousands of computer nodes, which cryptographically verify that the new block is valid and determine whether to accept or reject the block.  Once a block is accepted and added to the

blockchain, it cannot be reversed—that is, the transactions that the new block represents become irrevocable.

74.     Websites such as etherscan.io show the locations of the nodes running on the Ethereum Blockchain.  According to the etherscan.io website, the plurality of nodes running on the Ethereum Blockchain are located in the United States.  As of September 14, 2020, approximately 28% of nodes are in the United States.  Thus, the validation process that confirms and finalizes transactions on the Ethereum Blockchain—including the transactions that took place as part of the ICO—is largely focused in the United States.

75.     Following the ICO, when the EOS Blockchain went live and block.one replaced the investors' placeholder ERC-20 EOS tokens with EOSIO-native EOS tokens, the responsibility for validating transactions transferred to the 21 elected block producers.  Historically, multiple block producers have been located in the United States.  EOS Tribe, one of the original block producers, was headquartered in Wyoming until it announced in September 2019 that it was leaving EOS over concerns that other block producers were buying votes.  EOS New York, a prominent block producer until March 2020, when its founders joined block.one, was also located in the United States.  Infinity Stones, a current block producer, is based in Palo Alto, California.  EOS Rapid, another current block producer, is based in the United States.  Block.one, itself based in the United States, also continues to hold approximately 100 million EOS tokens, and thus has the ability to exercise considerable voting power in selecting block producers.

76.     In addition to the block producers being located in the United States, the major cryptocurrency exchanges are also located in the United States.  Prominently, EOS Securities

traded (and continue to trade) on the Coinbase, Kraken, and Poloniex cryptocurrency exchanges, which are all located in the United States.

## PART I: DEFENDANTS DID NOT REGISTER THE EOS TOKENS IN VIOLATION OF THE SECURITIES ACT

## V.   THE EOS TOKENS WERE SECURITIES

77.   The SEC recognized in the Cease-and-Desist Order that EOS Securities are securities within the meaning of the federal securities laws:

> "Based on the facts and circumstances set forth below, the ERC-20 Tokens were securities under the federal securities laws pursuant to *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), and its progeny, including the cases discussed by the Commission in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO (Exchange Act Rel. No. 81207) (July 25, 2017) ("DAO Report"). A purchaser in the offering of ERC-20 Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains. Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

### A.   EOS Token Purchasers Invested Money

78.   From June 26, 2017 through June 1, 2018, the purchasers of EOS securities paid, and block.one accepted, approximately 7.12 million ether (ETH), or the equivalent of USD $4.1 billion, in exchange for 900 million EOS securities sold publicly on the EOS.io website.

79.   Shortly after the beginning of the EOS ICO, block.one contacted several online cryptocurrency exchanges, including United States-based exchanges Coinbase, Kraken, and Poloniex, to facilitate trading of EOS securities on those platforms and allow investors to purchase EOS securities on secondary open markets with United States dollars as well as bitcoin and ether cryptocurrencies, which are themselves exchangeable for United States dollars.

## B.      EOS Token Purchasers Invested in a Common Enterprise

80.      As the SEC concluded, based on Defendants' conduct, the purpose of the EOS ICO, like other types of investment, was to raise capital to develop EOSIO software and promote the launch of EOSIO-based blockchains.

81.      Block.one organized and ran the EOS ICO and pooled and controlled investors' contributions. Block.one used a portion of the money it received during the ICO to develop the EOSIO software. Investors were passive participants in the EOS ICO, and their ability to profit was dependent on the successful launch of the EOSIO software and the appreciation in the value of the EOS token.

82.      In a press release dated July 1, 2017, block.one explained that Defendants' financial interests were aligned with the interests of EOS investors because block.one had retained 10% of the total pool of EOS securities as "founder's tokens" to "ensure that block.one [sic] has aligned interests with those participating in the EOS Token distribution."

83.      Block.one further described the proceeds of its sale of EOS securities as "revenue" it would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software." That money, in return, "will be returned value for the network."

84.      During and after the ICO, EOS Securities were tradeable on online cryptocurrency exchanges.

85.      On June 2, 2018, block.one launched the EOSIO software and converted the investors' ERC-20 tokens to native EOS tokens, which continue to trade on online cryptocurrency exchanges and represent the token purchasers' pooled funds.

86.      Upon the launch of EOSIO and delivery of the native EOSIO tokens to the ERC-20 token holders, both initial and subsequent purchasers of EOS Securities possess an identical

instrument, the value of which depends on the success or failure of EOSIO and EOSIO-based blockchain.

87.     Similarly, block.one's own fortunes depend on the success of the EOSIO because block.one suffered reputational harm, and the value of EOS Securities declined, when news of bugs in the EOSIO spread shortly after its launch.

88.     Block.one also relied on the funds raised during the ICO to pay for its expenses developing the EOSIO software and to buy back its equity shares, and it retained 10% of EOS as "founder's tokens" thereby linking block.one's financial fortunes to the price of EOS and the success of the EOSIO.

89.     Accordingly, Plaintiff and others in the Class participated in a common enterprise by purchasing the EOS Securities.

C.     **EOS Purchasers Expected to Profit from Owning EOS Securities**

90.     Purchasers of EOS Securities expected to reap substantial profits from their investment.

91.     As the SEC concluded in the Cease-and-Desist Order:

> Block.one offered ERC-20 Tokens in order to raise capital and build a profitable enterprise, and ERC-20 Token purchasers would reasonably have understood that if Block.one was successful in doing so, their token purchase would be profitable.

92.     First, Defendants themselves recognized, both implicitly and explicitly, that investors in the ICO have a reasonable expectation of profit. Block.one stated that the ICO proceeds were "revenue" of the Company, and that it would use the proceeds to build a profitable enterprise by, among other things, developing the EOSIO software and promoting the widespread adoption of EOSIO and launch of anticipated EOSIO-based blockchains. Purchasers thus would have understood that block.one's success in building and promoting EOSIO and

promoting the launch of one or more EOSIO-based blockchains would make their token purchase profitable.

93.     Second, the contributions received from investors were being pooled and managed by Defendants (and specifically, block.one) to fund projects that would increase the adoption of the EOSIO-based blockchains, thereby increasing the value of the EOSIO software and EOS Securities:

> In January 2018, seven months into the 12-month ERC-20 Token offering, Block.one announced that it would invest $1 billion from the offering proceeds to "offer[] developers and entrepreneurs the funding they need to create community driven businesses leveraging EOSIO software." In describing Block.one's plans to invest the proceeds of the ERC-20 Token sale to fund businesses that would use, directly or indirectly, an EOSIO-based blockchain, Block.one stated that "the money we spent on those initiatives will be returned value for the network" and that the money raised in the ICO would be spent wisely to fund development of EOSIO-based blockchains.

94.     Third, the investors who purchased EOS Securities openly stated that they were investing in EOS Securities to make a profit. Defendants, in turn, actively promoted the EOS Securities' appreciation potential in the Technical White Paper:

> A blockchain using EOS.IO software also awards block producers tokens every time they produce a block. The value of the tokens will impact the amount of bandwidth, storage, and computation a producer can afford to purchase; this model naturally leverages rising token values to increase network performance.

95.     At the time of the EOS ICO, purchasers of EOS securities explored various cryptocurrency exchanges, public forums, and social media sites that promoted the ICO and encouraged trading EOS securities for profit.  For example, on the popular forum Bitcointalk.org, one poster asked, "I'm still on the fence with EOS and I'm not too sure why.  I remember looking at it around $1.80 and thinking I'll leave it, then it took off and thought well it's too late now and it's been on my watch list ever since.  Is it still a worthwhile investment?"  One of the responses

stated, "the decline in EOS prices from the end of April from $21 to the present price of $5, *this is the right time to buy as much as possible, never hesitate to invest in EOS, the future is waiting*." (Emphasis added.)

96.     Defendants promoted EOS and the ICO to the audiences that they knew would want to take advantage of increasing prices. Block.one founders and executives appeared at the Consensus conference aimed at cryptocurrency investors to announce and promote EOSIO and actively engaged prospective investors at various other conferences and events, on social media, online message boards, and other outlets.

97.     Finally, Defendants sold EOS Securities to investors before block.one developed the network, or ecosystem, in which the tokens could be used.

98.     Even before year-long EOS ICO concluded, EOS securities were available for trading on major online cryptocurrency exchanges, including to United States investors. Of note, within a month of the beginning of the ICO, EOS began trading on the cryptocurrency exchange Bitfinex, with which Defendant Pierce is affiliated.

99.     Subsequently, block.one reached out to several other exchanges, including United States-based Coinbase, Kraken, and Poloniex, making EOS securities even more widely available for purchase by investors in the United States.

100.    The ability to sell investments in liquid markets is an important consideration for investors because it represents one way in which they can realize profits from their investments. Indeed, even before the official launch of EOSIO, the EOS securities sold for as high as $22.89 each on secondary trading markets.

### D.     EOS Token Purchasers Expected Profits to be Derived from Defendants' Managerial Efforts

101.    Plaintiff and the Class have entirely passive roles vis-à-vis the success of the EOSIO.  Investors expected that the project's success and the profits they reasonably expected to be derived from the project would depend solely on Defendants' entrepreneurial and managerial efforts.

102.    From the outset, Defendants conceived the EOSIO software, organized and managed the capital raise, set up block.one to develop software, and chose block.one's directors, executives, and all persons critical to EOS's success.  Through their conduct and marketing materials, Defendants repeatedly represented that they would be relied on to provide significant managerial efforts required to make EOS a success.

103.    In January 2018, block.one announced plans to invest a portion of its ICO proceeds to "offer[] developers and entrepreneurs the funding they need to create community driven businesses leveraging EOSIO software." The goal of the plan was to boost the value of the network by funding development of EOSIO-based blockchains. Brendan Blumer, in an interview with Bloomberg Markets and Finance on September 27, 2018, reiterated block.one's commitment to financing the development of the EOS ecosystem, stating that, "the first billion dollars of capital [will be invested into] developers building on the EOSIO application itself."

104.    Defendants actively promoted the EOS Token Offering, conducting interviews on social media and at conferences across the United States and advertising the EOS Token Offering in Times Square.

105.    Thus, Plaintiff and the Class reasonably expected Defendants to provide significant managerial efforts, develop EOSIO software, sustain a supportive network after its launch, and maintain stable token prices on cryptocurrency exchanges. Daniel Larimer's

commitment to block.one in particular has been raised as a crucial factor in whether EOSIO would succeed.  For example, one of the users on the popular online forum reddit.com posted: "I think Dan [Larimer] should commit to block.one for 10 years.  For one reason, block.one is Dan Larimer, if he leaves they [sic] will be no more block.one. This is a massive project that needs some level of certainty."  Indeed, on November 28, 2018, the cryptocurrency market reacted negatively, and immediately, to Larimer's announcement that he was interested in working on a new cryptocurrency project, sending EOS price on a 32% decline from before the announcement.

106.    Block.one's website holds both Blumer and Larimer out as integral parts of the success of EOS.  The website touts Blumer as an "early investor in blockchain" who has been "building disruptive technology since 2001."  Similarly, block.one's website refers to Larimer was promoted as "one of the leading innovators, engineers, and thought leaders in the blockchain space."

107.    Defendants have also expressly acknowledged the importance of block.one's team to the success of the project.  For example, in response to a question about departures of some of block.one's early partners in 2018, Brendan Blumer emphasized block.one's team's commitment to the success of the EOS Project and EOSIO, stating that, "none of the core team has left, none of the people who have actually been building the technology since the beginning."

108.    Following the launch of EOSIO, block.one's perceived lack of effort to support EOSIO and EOS reflected negatively on its adoption, vibrancy, and utility that would allow EOS investors to earn their expected profits. EOS purchasers continue to publicly lament block.one's lack of focus on the development and promotion of EOS mainnet and regularly ask the team to put more effort into accruing value to EOS. As recently as August 21, 2020, a Twitter user PenPaperCoffee1 said to Larimer, "I understand if u have to do the legal dance. It is a necessary

evil. I hope that this is not your true mindset though. U r better than this. . . . without b1s support the eos mainnet will have a hard time competing." [Sic] Publicly reassuring the user of block.one's commitment to the success of EOS, Larimer responded: "Block one is heavily engaged in contributing to #EOS development and is working to bring staking pools and new resource model to #EOS as well as improving the quality of block producers." Similarly, on August 5, 2020, Larimer stated that block.one is "actively collaborating with big tech companies and looking forward to sharing our results. Lots going on behind the scenes."

109.    Block.one also structured post-launch financial incentives to ensure that the link between EOS and block.one was unmistakable to investors. As part of its promotion of the ICO, block.one publicized that it reserved 10% of the total EOS supply to ensure that its interests with fundamentally aligned with the success of EOS.

110.    The EOS Securities were securities at issuance because profits from EOS would be derived from the managerial efforts of block.one in developing the associated network on which EOS might function. Unlike a commodity such as gold or bitcoin, or even *Howey's* oranges, EOS had no inherent value or even historical existence; EOS Securities existed and could gain value only through block.one's efforts to develop EOSIO and EOS-based ecosystem to drive up the demand for the securities.

111.    On September 30, 2019, the SEC concluded that block.one had violated the Securities Act through its unregistered sale of EOS to, among others, investors in the United States.

112.    The SEC concluded that EOS ERC-20 tokens were securities notwithstanding block.one's attempt to structure the EOS ICO to avoid registration obligations. The fact that EOS ERC-20 tokens were not the same tokens that would eventually be used on the EOSIO-based

blockchains was irrelevant to the SEC's analysis. As the SEC explained, "Block.one offered ERC-20 Tokens in order to raise capital and build a profitable enterprise, and ERC-20 Token purchasers would reasonably have understood that if block.one was successful in doing so, their token purchase would be profitable."  Moreover, the SEC determined that "Block.one encouraged U.S. purchasers to rely on the founders' expertise and vision to secure the widespread adoption of the EOSIO software and anticipated launch of one or more EOSIO blockchains."

113.    The SEC also concluded that block.one engaged in the widespread promotion of the EOS securities in the U.S.:

> Block.one also undertook efforts for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the U.S. for the ERC-20 Tokens, including by engaging in directed selling efforts. Among other things, Block.one participated in blockchain conferences in the U.S., including a prominent conference held in New York City in May 2017, to promote Block.one and which at times also promoted its ICO. In connection with the May 2017 Conference, Block.one advertised EOSIO on a large billboard in Times Square on May 22, 2017, promoted EOSIO in informal informational sessions, and hosted a post-conference reception. Block.one also promoted its proposed business and ICO to U.S.-based persons on the EOS.IO Website and through various social media and forum posts. The EOS.IO Website, White Paper, and other promotional statements were accessible to purchasers and potential purchasers, and viewable by U.S. persons.

114.    As a result of the SEC's enforcement action, Defendant block.one consented to a $24 million settlement with the SEC.

### E.    Defendants Repeatedly Falsely Stated that the EOS Tokens Were Not Securities

115.    Throughout their unlawful raise of $4 billion of capital, Defendants continued to mislead investors – who had neither sufficient information about Defendants and the EOS ICO nor clear understanding of the applicable legal framework – that the EOS Securities offering was

not subject to federal and state securities laws. Considering the limited available information about how EOS was designed and intended to operate, EOS investors lacked sufficient bases to interpret the relevant legal framework and determine – let alone allege in court – that EOS tokens were securities. It was only after the passage of some significant time and as more information about block.one's intent, management, and lack of success in allowing decentralization to arise, that the investors could reasonably determine that EOS was a security all along.

116.    At issuance, Defendants and their representatives expressly stated the EOS tokens were not securities and did not file a registration statement with the SEC, which would have provided important disclosures to investors of the risks inherent in these investments, including their speculative nature.  Defendants' decision not to register the EOS securities offering with the SEC conveyed the message to investors that EOS securities were not actually securities.

117.    The Token Purchase Agreement expressly states that:

> "The Sales of EOS Tokens and EOS Tokens themselves are not securities, commodities, swaps on either securities or commodities or a financial instrument of any kind.  Purchases and sales of EOS Tokens are not subject to the protections of any laws governing those types of financial instruments.  This Agreement and all other documents referred to in this Agreement including the White Paper do not constitute a prospectus or offering document, and are not an offer to sell, nor the solicitation of an offer to buy an investment."

118.    Block.one also attempted to expressly disclaim in its FAQ that EOS securities were, in fact, securities: "block.one does not believe that the distribution of EOS Tokens or the EOS Tokens themselves are securities, commodities, swaps on either securities or commodities, or similar financial instruments. The EOS Tokens are not designed for investment or speculative purposes and should not be considered as a type of investment."

119.    Brendan Blumer, in January 22, 2018, posted publicly on his Twitter account that "The #EOS token should not be purchased as an investment. It's [sic] sole purpose is to fairly assemble an open source community."

120.    Defendants also emphasized the "utility" of the EOS securities, to distinguish them from coins or tokens that might be securities.  The "security versus utility token" topic was hotly debated among participants in the cryptocurrency markets, with authorities like the SEC Chairman Jay Clayton opining in the December 11, 2017 "Statement on Cryptocurrencies and Initial Coin Offerings" that, while most of the ICOs he has seen are securities, some tokens may not be:

> For example, a token that represents a participation interest in a book-of-the-month club may not implicate our securities laws, and may well be an efficient way for the club's operators to fund the future acquisition of books and facilitate the distribution of those books to token holders.

121.    Defendants' claims that EOS is anything but a security are false, and were false when made.  Further, given Defendants' misrepresentations of EOS tokens as non-securities, at the time of the ICO, a reasonable investor would not have known, or been able to know, that EOS securities were in fact securities, subject to securities laws.

## PART II: DEFENDANTS MADE FALSE STATEMENTS IN VIOLATION OF THE SECURITIES ACT AND THE EXCHANGE ACT

## VI.    THE DEFENDANTS' UNLAWFUL CONDUCT

### A.    The EOS Blockchain Used 21 Block Producers in a Supposed Effort to Maintain Decentralization

122.    The key feature of the EOS Blockchain that was to set it apart from its predecessors such as Bitcoin was that it would be even more decentralized than those prior blockchains.   Decentralization was the primary reason why many investors invested in cryptocurrency, and thus, block.one's ability to build and maintain a highly decentralized EOS

Blockchain was critical both to its ability to raise funds and to the success of the enterprise – and consequently the value of the EOS Securities.

123.    To increase the appearance of decentralization on the EOS Blockchain, block.one employed the use of 21 "block producers," who are entities elected by EOS token-holders "through a continuous approval voting system," according to the White Paper.  The rationale for instituting 21 block producers was to ensure that control would not be placed in any one entity's or individual's hands.  Thus, the 21 block producers provided the critical decentralization feature of the EOS Blockchain.  Block producers were meant to enjoy a certain amount of power over the blockchain: they would be responsible for verifying the transactions and governing the blockchain.

124.    EOS's 21 block producers stand in contrast to Bitcoin and Ethereum, which were dominated by fewer than ten large mining entities. The more block producers, and the more widely dispersed they are, the more decentralized the system is. Voting power on the EOS Blockchain is directly proportional to the amount of tokens held; thus the larger token-holders have more sway in electing block producers. Further, there would be frequent elections to select the block producers, ensuring that the 21 block producers would be constantly revolving, further enhancing the decentralization features of the EOS Blockchain.

125.    Block producers, and their role, were described by Larimer, Blumer, and Wyatt in a YouTube video released on June 20, 2018.  Blumer explained that they are "21 elected delegates by the token holders that are actually confirming the transactions of the network," and Larimer described them as "the sequencers or witnesses that say, 'hey, I saw this, this was said at this time and therefore this is the priority someone has."  Finally, Wyatt, an engineer at block.one, stated that block producers are the "custodians of the network. . . . they will . . .

generate the chain that the rest of the network will see and be able to independently validate, independently verify and build Dapps[2] on.  So the producers in the EOSIO network kind of become the central brain of that block chain."  Importantly, Wyatt stressed that "the number of producers and the size of producers [would] fluctuate over time, as the community sees value in the kind of meta information about those producers changing…."  The inference that investors drew was that block producers would be elected according to their skills and abilities, through a democratic process, in which all EOS Securities holders could participate fairly and equally according to the size of their investment stake.

126.    Separately, the White Paper included a "Governance" section that explained how the EOS Blockchain would purportedly deliver superior decentralization features. It explained that "[g]overnance is the process by which people reach consensus on subjective matters that cannot be captured entirely by software algorithms," and that the EOS.IO software would "implement[] a governance process that efficiently directs the existing influence of block producers." It further states that "before any change can be made to the blockchain, these block producers must approve it. If the block producers refuse to make changes desired by the token holders then they can be voted out. If the block producers make changes without permission of the tokenholders, then all other non-producing full-node validators (exchanges, etc.) will reject the change."

127.    Block producers were also given a very limited ability to freeze accounts, in the instance where, for example, "a smart contract behaves in an aberrant or unpredictable manner." The ability to freeze accounts was meant to be used sparingly, and required approval of 17 out of

---

[2] "Dapps" is an abbreviation for "decentralized applications," or computer applications that run on a blockchain.

21 block producers. "If the producers abuse the power they can be voted out and an account will be unfrozen."

**B.     Problems in the EOS Blockchain Surfaced Almost Immediately**

128.    Problems underlying the EOS Blockchain began to surface even before it went live. On June 8, 2018, the online technology news outlet *TNW* reported that toward the end of May 2018, hackers had breached block.one's internal system and sent phishing emails to investors. A Chinese internet security firm also identified a number of vulnerabilities in the EOS network.

129.    Additional problems were reported in a *Wall Street Journal* article dated June 12, 2018, which described "infighting among the software's fragmented developers," stating that it "still has a way to go before the platform lives up to the hype." In particular, a transcript of a conference call hosted on June 8, 2018 revealed "wrangl[ing] over issues big and small, from philosophical questions to technical arcana."

**C.     Arbitrators Stripped Block Producers of Power, Undermining the Decentralized Features of the EOS Blockchain**

130.    Shortly after the ICO was concluded and the EOSIO software was launched, additional problems manifested themselves, which demonstrated that the EOS Blockchain was not decentralized, as promised.  Specifically, arbitrators overstepped their power to undermine the independence of the block producers by reversing transactions that block producers had verified.

131.    First, shortly after the EOS Blockchain went live on June 9, 2018, arbitrators directed EOS block producers not to process transactions from 27 different addresses, seriously undermining the independence and decentralized authority of the EOS Blockchain.

132.    Second, on November 8, 2018, an ECAF arbitrator issued an order reversing certain EOS transactions. The community was outraged that "a single individual [could] make this kind of judgment call" on the EOS Blockchain, which had been heralded as providing superior decentralization.

### D.    Corruption in the Election of Block Producers Concentrated Power in the Hands of a Few

133.    In addition to the problems associated with arbitrator interference, the EOS Blockchain quickly faced problems associated with voting corruption.  In particular, certain individuals who held larger amounts of EOS Securities began to purchase the votes of other EOS Security holders so that they could be elected as block producers.  Eventually the votes became concentrated, as single entities took multiple block producer positions.  Far from ensuring the decentralization that investors sought, corruption in the block producer voting process led the power over the EOS Blockchain to be concentrated in the hands of a few.

134.    Defendants recognized early on that it would be important to maintain integrity in the process of electing block producers.  At the close of the ICO, block.one had retained 10% of the EOS Security allocation.  It issued a statement on June 28, 2018 regarding its "responsibility to participate as an active minority voting member."  It stated that it would "soon begin allocating votes to block producers that share the core values necessary to maximize the integrity and potential of the EOS public blockchain network."  Block.one highlighted that there were several "values and considerations" that would "guide Block.one's participation in the block producer election process," including "honesty, integrity, and fairness;" "transparency of identity, activities, and decision-making," and compliance with the EOS Constitution."

135.    Although Defendants claimed that the EOS Blockchain would elect block producers through fair and democratic processes, in fact rumors quickly began to surface that

some token holders were selling their votes, which tainted the block producer selection process and allowed power to be concentrated, completely undermining the decentralization features of the EOS Blockchain.  Blumer addressed these claims in a statement issued on October 1, 2018, called "EOS Public Blockchain Governance," stating: "We are aware of some unverified claims regarding irregular block producer voting, and the subsequent denials of those claims. We believe it is important to ensure a free and democratic election process within EOS and may, as we deem appropriate, vote with other holders to reinforce the integrity of this process.  We continue working on our potential involvement with the goal of empowering the intent of the greater community through a transparent process that incorporates community feedback."

136.    Ultimately, at the "Tulip Festival" held on June 3 and 4, 2019 in San Francisco, Brock Pierce, described the EOS block producers as largely governed by a "Chinese oligarchy," which is the exact opposite of the decentralized platform that investors were promised.

137.    Defendants knew how important democratically-elected block producers are to a functional, decentralized EOS Blockchain.  Even as recently as August 21, 2020, in responding to a tweet, Larimer stated, "Block one is heavily engaged in contributing to #EOS development and is working to bring staking pools and new resource model to #EOS *as well as improving the quality of block producers*."

138.    Several large block producers, including U.S.-based EOS NY and EOS Tribe, eventually abandoned efforts to work on the EOS Blockchain.  Coindesk reported on September 19, 2019 that EOS Tribe, one of the early participants in the EOS Blockchain, was leaving, and noted that it "ha[d] never participated in the game of vote trading and stayed true to [its] principles, and hence while we leave EOS as a Block Producer, we are also free to speak truth and give warnings to the rest."  EOS Tribe left because it was "no longer possible to earn funds

for maintaining the blockchain without support from major EOS whales, the colloquial term for those with very large token holdings.  Those whales are overwhelmingly supporting BPs located in China."

139.    Many block producers that had been often seen in the top 21 were no longer even considered "standby BPs," including EOSSphere, ShEOS, EOSAmsterdam, EOS Detroit, EOS Dublin, and EOS Venezuela, according to September 19, 2019 Coindesk article.

140.    The concentration of block producers in China undermined the very essence of what block.one stood for: decentralization.  Further, it raised censorship concerns.  Finally, the most technically proficient contributors were "relegated to lower-tier rewards or no rewards at all," which resulted in a "brain-drain."

141.    Despite being the largest holder of the EOS Securities, and despite promises that it would cast its vote for the most deserving block producers, block.one had not cast a single vote as of September 19, 2019, according to Coindesk.

142.    Interest in the EOS Blockchain had been flagging for some time in the face of these problems. Confronted with the apparent truth that block.one's EOS Blockchain would not deliver a superior decentralized platform, block.one sought to move in a new direction and enter the social media fray. Thus, it announced on June 1, 2019 that it would develop a blockchain-based social media application. This application, named "Voice," promised to be a "more transparent social media platform for the world, where the value of good content gets circulated right back into sustaining the community, not corporate bottom lines." Block.one further stated that Voice would "cultivate creation, sharing, discovery and promotion of content on social media platforms by real users, not bots and fake accounts. Through a truly self-sustaining economy of ideas, users will directly benefit from their ideas and engagement on the platform."

143.    As described in more detail in Section VIII, *infra*, each piece of news demonstrating that block.one's EOS Blockchain lacked the decentralization that was promised caused the value of the EOS Securities to decline, causing harm to investors who had purchased EOS Securities in reliance on these materially false statements about block.one.

### E.    Through their Misleading Statements, the Individual Defendants Raised $4 Billion for Themselves

144.    The ICO raised $4 billion.  Investors believed these funds were being used to develop EOSIO and decentralized applications that would work on the EOS Blockchain. Instead, the funds were funneled to Defendants' personal piggybank, an investment fund located in Hong Kong.

145.    On June 1, 2018, block.one issued a press release announcing that it had partnered with SVK Crypto, a Cayman Islands-based investor in cryptocurrencies, to launch a $50 million fund.  The purported purpose was to "accelerate the growth and development of the EOSIO blockchain ecosystem."

146.    The Company explained that this was the "fifth injection of capital through block.one's EOS VC initiative."  The previous projects included "a joint venture to create the $325 million EOSIO Ecosystem Fund with Mike Novogratz's Galaxy Digital LP; a partnership to create US$100 million Europe-focused fund with FinLab AG . . . and a partnership with industry specialists Michael Cao and Winnie Liu to create a US$200 million fund to make strategic investments in Asia-focused EOSIO projects."  Thus, as of June 1, 2018, block.one had committed a minimum of $675 million in its Hong Kong venture capital fund.

147.    By March, 2019, at least $1 billion of the funds raised in the ICO were in the Hong Kong fund.  According to an article by *DigFin* dated March 11, 2019, no person associated with block.one would elaborate on how the funds at EOS VC were deployed, "other than to say

they run a diversified book."  At least two of its partners, Galaxy and FinLab, "focus[ed] more on explicitly on finance-related projects," suggesting that the Company did little to make good on its promises to fund development of EOS Blockchain projects.

148.    Defendants remained tight-lipped about where the $4 billion raised in the ICO had been deployed.  However, on May 21, 2019, Bloomberg.com reported about a March 19, 2019 email sent to shareholders, in which the Company disclosed that its assets were approximately $3 billion at the end of February.  $2.2 billion were in "liquid fiat assets, with the majority of that invested in U.S. government bonds."  Its "cryptocurrency portfolio" stood at approximately $500 million.  Block.one held approximately 140,000 bitcoins.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    Statements Made Prior to and During the ICO

149.    In the weeks leading up to the ICO, and throughout the Class Period, Defendants issued a series of materially false and misleading statements regarding block.one's ability to generate software that would truly create an EOS blockchain that was more decentralized than the existing blockchains. These statements were disseminated to increase investor demand for the EOS Securities, both in the ICO and in the secondary market as the EOS Securities began to trade on cryptocurrency exchanges. As would later be revealed, block.one did not have the ability to create a decentralized EOS blockchain.

150.    On June 5, 2017, block.one issued the "EOS.IO Technical White Paper" to tout the sale of the EOS Securities, authored by Defendant Larimer. In it, block.one made the following false statements regarding its ability to generate a decentralized blockchain that would be superior to other available blockchains:

- ***EOS.IO software utilizes the only decentralized consensus algorithm capable of meeting the performance requirements of applications on the blockchain, delegated proof of service.*** Under

this algorithm, those who hold tokens on a blockchain may select block producers through a continuous approval voting system and anyone may choose to participate in block production and will be given an opportunity to produce blocks proportional to the total votes they have received relative to all other producers.

- The EOS.IO software is designed from experience with proven concepts and best practices, and *represents fundamental advancements in blockchain technology.* The software is part of a holistic blueprint for a globally scalable blockchain society in which *decentralized applications can easily be deployed and governed*.

- *The EOS.IO software introduces a new blockchain architecture designed to enable vertical and horizontal scaling of decentralized applications*. This is achieved by creating an operating system-like construct upon which applications can be built. The software provides accounts, authentication, databases, asynchronous communication and the scheduling of applications across hundreds of CPU cores or clusters. The resulting technology is a blockchain architecture that scales to millions of transactions per second, eliminates user fees, and *allows for quick and easy deployment of decentralized applications*.

151.    These statements were false and misleading because they falsely represent that the EOS Blockchain is decentralized. In fact, the EOS Blockchain was not decentralized, and Defendants failed to disclose that the EOS Blockchain governance system consisted of a revolving door of "block producers" and could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts. In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared – contrary to Defendants' false claims that EOS Blockchain was "decentralized" – to be controlled by a small group of "Chinese oligarchs." Further, the EOS Blockchain was not a "fundamental advancement in blockchain technology." In fact, it nearly did not launch following a fraught call held on June 8, 2018, among software developers expressing concerns over bugs in the software.

152.    On June 22, 2017, block.one issued a press release stating that "EOS is being designed to support distributed applications that have the same look and feel of their centralized counterparts." This statement is false and misleading because it falsely represents that, in contrast to its counterparts, the EOS Blockchain would not be "centralized" (*i.e.*, it would be "decentralized"). Contrary to this representation, the EOS Blockchain *was* "centralized." Defendants knew, but failed to disclose, that the EOS Blockchain governance system consisted of a revolving door of "block producers" and could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts. In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared not to be "decentralized" but, rather, to be controlled by a small group of "Chinese oligarchs."

153.    On July 5, 2017, Ian Grigg published "EOS-An Introduction," describing EOSIO as a "performance based and self-governing blockchain that provides an operating system for building large-scale consumer-facing distributed applications." Grigg touted features of block.one's governance framework, by explaining the block producer system as follows:

> Block producers are elected into a round of 21, each producer get one block per round, and is rewarded for the validation of incoming messages and production of the block messages. A block released by one producer is validated by the next and the next and so forth; if not validated, it is not built upon. Similar longest-chain mechanics to Bitcoin are followed, and in short order, the producers converge on a longest chain. ***A block that is accepted by a quorum of producers is declared immutable, and the chain of immutable blocks becomes in effect a checkpoint***.

154.    These statements were false and misleading because, contrary to the assertion that a block was "declared immutable" after being accepted by a quorum of producers, a block could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts. In addition, the voting framework of the EOS Blockchain made it susceptible to

placing power in large token-holders, as ultimately happened when it was declared to be controlled by a small group of "Chinese oligarchs."

155. On January 13, 2018, block.one issued a press release updating investors on certain developments regarding EOS. Notably, the Company announced the "formation of EOS VC, block.one's program to deploy over 1 billion USD in partnership capital with leading venture capital firms to develop the EOS ecosystem." In that vein, Blumer stated that "Block.one is making a formal commitment to deploy over $1 billion through leading global venture capital firms to deploy capital back to entrepreneurs to create innovation in the EOS ecosystem." Blumer added that the "scale of investment for EOS VC is unprecedented for blockchain technology."

156. This statement was false and misleading because block.one did not plan to give $1 billion dollars of capital to third parties for the purpose of fostering innovation on the EOS Blockchain. In fact, block.one siphoned the money to Hong Kong to invest in other cryptocurrencies and ordinary stock markets, and the Company has failed to make any substantial contributions to third parties for the development of applications of EOSIO.

157. On May 15, 2018, block.one posted a video on YouTube titled "#AskBlockone: Is EOSIO Centralized?" In that video, Defendant Blumer claimed:

> Centralization is something that EOS.IO is designed to *solve*. If you take a look at proof of work, which is really the incumbent way of processing blockchain transactions today, both electricity and hardware are cheaper in bulk. What that ends in, is centralized mining pools controlling the network, and if you look at the largest platforms today, less than two or three mining pools control those networks. *And so, in EOS.io blockchains, the tokenholders are able to elect 21 block producers in order to process transactions, and that restores power or distributes the power amongst the tokenholders and aligns the interests of all the parties involved*.

158.    During the same video, Bart Wyatt, a block.one engineer, added that "EOSIO as a blockchain, as a technology, as a community, is probably one of the most decentralized versions of this technology we have ever seen, and I think most the community itself is even catching up on this idea."  He said that the "biggest difference between us and any of the competitors in the field, is how much we have decentralized even some of the core concepts of the chain."

159.    These statements were false and misleading because, in fact, the EOS Blockchain did not solve the centralization problem. In particular, Defendants failed to disclose that the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared to be controlled by a small group of "Chinese oligarchs."  Further, although block.one held 10% of the tokens, and could have used them to prevent the collusion that ultimately occurred, they never voted their tokens.

160.    In addition to false statements concerning EOS Blockchain's purported superior decentralization features, block.one also falsely announced in August 2017 that it was "finalizing *an engagement with a third-party auditor to release a public audit* designed to provide comfort that block.one has not participated in the EOS token sale in anyway [sic], with any funds." This statement was released in response to concerns that block.one insiders were manipulating the price of the EOS Securities.

161.    In fact, this statement was false and misleading. On October 27, 2018, an article was published in the *Bitcoin Exchange Guide*, reporting that the audit report had yet to be made public. To this day, the audit report has never been made public.

162.    Defendants also sought to assure investors that block.one would support the EOS Blockchain by supporting third-party efforts to create applications for the EOS Blockchain.  For instance, during a May 17, 2018 video published by block.one on YouTube, Defendant Blumer

claimed that block.one had "taken a billion dollars of capital" and was "deploying it to leading VCs throughout the world so that they can start to foster the innovation of this technology." Blumer said that those receiving the funds "are groups that are already involved in the deal flow, that are already close to the developers that are building those leading applications, that allows them to educate these developers and then offer them resources so that they can push forward."

163.    This statement was false and misleading because block.one had not at that point given a billion dollars of capital to third parties for the purpose of fostering innovation on the EOS Blockchain.   In fact, block.one siphoned the money to Hong Kong to invest in other cryptocurrencies and ordinary stock markets, and the Company failed to make any substantial contributions to third parties for the development of applications of EOSIO.

164.    Relatedly, block.one sought to bolster the appearance of widespread interest in its new blockchain, posting a video on May 24, 2018 to list the sorts of entities who were purportedly already working toward building applications for EOSIO.   In the video—titled "#AskBlockone: What Projects are Building on EOSIO?"—Blumer said that the Company gets "several groups reaching out to us every day," including "individual developers to small businesses to publicly-traded companies across all different types of sectors, from biotech, financial industries, to new types of consumer-driven applications that reinvent the way we do things."   Serg Metelin, a block.one employee in "Developer Relations," said in the video that "[e]ven before the software is actually released, they are building on our test net, which anyone can join and try to build their project on.  We see existing businesses trying to migrate their business model to [a] decentralized model, as well as new innovative businesses trying to bring their ideas to life."

165.    This statement was false and misleading because Defendants did little to support applications on EOSIO.   Even if third parties were approaching Defendants with ideas for EOSIO, the platform was ill-suited for enterprise applications, the Company did not actually make substantial investments in third-party development of applications for the EOS Blockchain, and to date, the EOS Blockchain has failed to garner applications that add meaningful value to EOS holders.

166.    Furthermore, Defendants issued false and misleading statements concerning their efforts to address concerns that the voting for block producers was unfair and tainted, and that certain token holders were purchasing votes from others in order to be elected as block producers.

167.    In a YouTube video produced by block.one and launched on June 20, 2018, Bart Wyatt stated that block producers would be selected by EOS Security holders according to certain criteria.   Specifically, he stated that "*as the community sees value in the meta about the producer changing – so if the community sees value in certain hardware requirements. . . . Those kinds of things will be the community electing the producers to fulfill their own vision of what the blockchain should be*."   Defendants Larimer and Blumer also spoke in the video.

168.    This statement was false and misleading because, in fact, block producers were not elected according to what would work best for the blockchain.   Instead, block producers were elected by purchasing votes from EOS Security holders, which resulted in a high concentration of block producers within a few entities.

**B.    Statements Made Subsequent to the ICO**

169.    On June 28, 2018, block.one issued a statement regarding its "responsibility to participate as an active minority voting member."   It stated that it would "*soon begin allocating votes to block producers that share the core values necessary to maximize the integrity and*

48

***potential of the EOS public blockchain network*.**"  Block.one highlighted that there were several "values and considerations" that would "guide block.one's participation in the block producer election process," including "honesty, integrity, and fairness;" "transparency of identity, activities, and decision-making," and "compliance with the EOS Constitution."

170.    This statement was false and misleading.  In fact, block.one did nothing to select block producers that "share the core values necessary to maximize the integrity" of the EOS Blockchain, or who shared values of "honesty, integrity, and fairness," or "transparency of identity."  Rather, as Pierce stated in June 2019, the governance of the EOS Blockchain was concentrated in the "hands of a few Chinese oligarchs."  According to Coindesk, although block.one held enough tokens "that it could all but handpick the top 21BPs (or at least exclude any BP that did not get its nod)," it had not cast a single vote as of September 19, 2019.

171.    On October 1, 2018, Blumer made additional false statements concerning the problems associated with vote-buying among block producers.  He issued a statement called "EOS Public Blockchain Governance," stating: "We are aware of some unverified claims regarding irregular block producer voting, and the subsequent denials of those claims.  We believe it is *important to ensure a free and democratic election process within **EOS*** and may, as we deem appropriate, vote with other holders to reinforce the integrity of this process.  ***We continue working on our potential involvement with the goal of empowering the intent of the greater community through a transparent process that incorporates community feedback***."

172.    Blumer's October 1, 2018 statement was false and misleading because block.one did not, in fact, do anything to "ensure a free and democratic election process within EOS," and did not become involved to "empower[] the intent of the greater community."  Instead, as Pierce

noted in June 2019, the governance of the EOS Blockchain was concentrated in the "hands of a few Chinese oligarchs."

## VIII.   THE TRUTH IS GRADUALLY REVEALED THROUGH A SERIES OF PARTIAL CORRECTIVE DISCLOSURES

173.    The truth that the EOS Blockchain was not superior to those already existing, and that it did not deliver enhanced decentralization, was revealed slowly through a series of partial corrective disclosures occurring over a year, from June 2018 through June 2019.

174.    On June 8, 2018, the online technology news outlet TNW published an article titled "*The EOS mainnet nightmare: How not to launch a blockchain network*," highlighting that although EOS was supposed to launch on June 2, 2018, the token was "still not live." The article explained that toward the end of May 2018, hackers had breached block.one's internal system and sent phishing emails to investors in an attempt to trick investors to give up their ERC-20 tokens. At the same time, an internet security firm in China had identified a number of vulnerabilities in the EOS network that made it susceptible to certain types of attacks. Although block.one initially denied that those issues would delay the EOS launch, by June 8, 2018 the launch still had not occurred, and the Company had even instituted a bounty program whereby hackers could be paid to identify and fix bugs in the EOSIO software.

175.    Indeed, during a meeting of candidate EOS block producers on June 8, 2018, a vote to launch EOS failed largely due to concerns over a specific bug that could potentially prevent investors from making transactions. As the TNW article pointed out, "if blockchain companies can't launch an actual product after raising millions (or billions in case of EOS) of dollars, then enthusiasts can hardly complain" when critics argue that blockchain is "crappy" technology.

176.    As the market digested this news, a portion of the inflation in the price of EOS Securities was eliminated, as the price of the EOS Securities fell $$3.00 per token, or more than

21%, from a price of $14.09 per token on June 9, 2018, to a price of $11.09 per token on June 10, 2018.

177.   On June 22, 2018, the ECAF issued an order directing the block producers that maintain the EOS ledger not to process transactions from 27 different wallet addresses suspected of fraudulent activity. The ECAF did not explain its order, compounding criticism from observers who viewed the move as being akin to government interference and demonstrating that EOS is not, in fact, a decentralized network. As explained in an article by CoinDesk, the ECAF and its ability to issue orders to block producers is "anathema to the kind of censorship-resistant, distributed network pioneered by bitcoin," in which collective decision-making is a core feature. One commentator even quipped of the order, "Civil asset forfeiture meets blockchain."

178.   On this news, the price of EOS fell $1.52 per token, or nearly 15%, from a price of $10.27 per token on June 21, 2018, to a price of $8.75 per token on June 22, 2018.

179.   On October 27, 2018, cryptocurrency news website Bitcoin Exchange Guide published an article decrying block.one's lack of transparency and highlighting that the Company had never issued a promised audit report to quash accusations that it had engaged in wash trading in late 2017. As the article observed, block.one's "lack of communication" had caused the issue to "snowball[] from idle gossip into a genuine concern that Block One might have engaged in EOS wash trading during their ICO."

180.   As investor frustrations over block.one's lack of transparency swelled, the price of EOS fell $0.31 per token, or nearly 6%, from a price of $5.43 per token on October 28, 2018, to a price of $5.12 per token on October 29, 2018.

181.   On November 8, 2018, an ECAF arbitrator issued an order reversing certain EOS transactions to restore control over a hacked account to its original owner. That decision went

largely unnoticed until a screenshot of the order was posted to Reddit on November 10, 2018 and subsequently picked up by the cryptocurrency press beginning on November 13, 2018. In its article on the latter date, BREAKERMAG wrote that commentators were "ridiculing the mutability of the EOS blockchain" and were critical of the "governance processes that allowed a single individual to make this kind of judgment call." The article continued that the "ability to reinstate ownership of a hacked account by decree speaks to a degree of centralized governance that's unheard of in the bitcoin network."

182.    In reaction to this partial corrective disclosure, the price of EOS Securities declined $0.91 per token, or early 17%, from a price of $5.42 per token on November 13, 2018 to a price of $4.51 per token on November 14, 2018.

183.    On November 28, 2018, Larimer posted on the messaging app "Telegram" that he had "stumbled upon" a new idea for a potential token separate from EOS, and was "exploring whether there is a market" for the "tradeoffs" underlying the new token idea.  Although Larimer denied that he planned to leave block.one or shift his focus away from EOSIO, he also posted a list of features that the new token would have, including "[c]omplete privacy," "[n]o staking or voting," and security that would "likely take nation state level resources to crack."

184.    Amid concerns that Larimer was, as one outlet put it, following his "tendency to hop between projects and simply create a new coin if the previous one fails," the price of EOS Securities fell $0.48 per token, or 14.5%, from a price of $3.29 per token on November 28, 2018, to a price of $2.81 per token on November 30, 2018.

185.    On June 1, 2019, block.one announced that it planned to launch a new social media platform, "Voice," on the EOS Blockchain. While criticizing existing social media platforms as being "designed to use their users" and sustain "corporate bottom lines," the

Company touted Voice as a "more transparent social media platform for the world." In that vein, Defendant Blumer said in block.one's press release that "[b]y design, [social media platforms] run by auctioning our information to advertisers, pocketing the profit, and flooding our feeds with hidden agendas dictated by the highest bidder." By using EOS's public blockchain, the Company said that transparency would "be a core part of the experience" with Voice and there would be "no invisible interests." At an event hosted by block.one that day, Blumer added that "[s]ocial media has not been a good friend to us" and further promised that Voice would not use algorithms to determine what content users see, unlike existing social media platforms.

186.    Block.one invested over $100 million of ICO proceeds and $50 million of intellectual property into Voice, which spent $30 million of the cash investment to purchase the domain name voice.com from a business analytics and mobility platform MicroStrategy, making it one of the top five biggest domain sales of all time.

187.    The shift away from creating a decentralized blockchain to focusing on social media was not well received by investors. Indeed, despite the massive resources at block.one's disposal to invest in applications for EOSIO—and despite Defendants' promises that they were indeed making massive investments both internally and with third parties—the announcement of Voice was the only notable result of that purported billion-dollar effort.  Investors questioned the value of Voice and asked why the Company was launching a social-media product when that market already had dominant competitors.  In that vein, investors questioned the value that block.one's purportedly large investments in EOSIO were creating.  Thus, the price of EOS Securities declined $0.73 per token, or nearly 9%, from a price of $8.51 per token on May 31, 2019, to a price of $7.78 per token on June 1, 2019.

188.    Days later, during the Tulip Conference in San Francisco, California, which was a conference focused on new and emerging technologies, Defendant Pierce made the startling admission that the EOS "ecosystem is a little bit of a Chinese oligarchy right now" in that much of the power over the EOS Blockchain was focused in a relatively small number of block producers in China. Pierce indicated that it was a problem to have the power so centralized, and spoke to a number of proposals on how to "solve this issue."

189.    On that news, the price of EOS Securities suffered a two-day slide of $1.68 per token, or more than 21%, from a price of $7.95 per token on June 2, 2019 to a price of $6.09 per token on June 4, 2019.

190.    Even after the end of the Class Period, Defendants' statements have been further exposed as false and misleading.

191.    Despite previous promises that Voice would be launched on the EOS Blockchain, on January 17, 2020, the cryptocurrency news outlet *CoinDesk* reported that block.one planned to run Voice on a "purpose-made EOSIO blockchain."  That meant that Voice would not in fact run off the public EOS Blockchain, but a separate blockchain bearing similarities to EOS. Indeed, the FAQ page on Voice's website confirms that Voice will use the EOSIO protocol, but users will instead receive "Voice Tokens" for using the platform.  Similarly, the "Privacy Notice" on Voice's website explains that Voice will operate on a blockchain referred to as the "Voice Chain."  As such, not even Voice—what appeared to be the only serious effort by block.one to develop an application for the EOS Blockchain—will actually benefit holders of EOS Securities.

192.    More recently, Larimer admitted that block.one has no serious plans to continue providing applications or uses for the EOS Blockchain.  During an interview on September 11,

2020, titled the "Greatest EOS Interview in the History of the World featuring Dan Larimer" and hosted by the EOS-focused podcast *Everything EOS*, Larimer was asked why the EOS VC fund was investing in projects that are not related to EOS. Referencing EOS holders, Larimer stated that "they've already received everything" when they acquired EOS. Larimer reiterated that block.one viewed the funds received in the sale of EOS as revenue to the Company. In effect, Larimer admitted that Block.one sees no obligation to support EOS for the benefit of investors.

## IX. CONFIDENTIAL WITNESSES HAVE PROVIDED FURTHER DETAIL ON THE PROBLEMS WITH EOS AND AT BLOCK.ONE

193.    Confidential witnesses have confirmed that EOS was not a truly decentralized blockchain, that the voting procedures for block producers was corrupt, and that block.one has failed to meaningfully add value to the EOS Blockchain.

### *CW1*

194.    CW1 worked at block.one as a full stack engineer from December 2019 through June 2020. CW1 was part of a software engineering team that did "front end web work" for Voice. CW1 worked out of block.one's office in Blacksburg, Virginia. He reported directly to Brian Walter, who was a software engineering manager.

195.    According to CW1, approximately 120 individuals worked in the Company's Blacksburg office. Roughly half of the staff there was dedicated to Voice and the other half was dedicated to blockchain support. CW1 was also aware of a block.one office in Northern Virginia outside of Washington, D.C., which CW1 thought was considered its U.S. headquarters.

196.    According to CW1, Voice was founded as a pet project by Larimer. Though he never discussed the origins of the social media platform with Larimer, CW1 believed that Larimer was interested in starting a new social media network because he was "sick of Facebook and Twitter." CW1 said that splitting Voice from block.one was the typical model Larimer

employed with the companies he created. Larimer "creates a project, gets it going and then just dumps it. . . . leaving it to rot." For example, CW1 mentioned that Larimer had previously started—and then abandoned—another blockchain-based social network called Steemit that was a "clone of Reddit."

197.    CW1 said that Voice invited thousands of people in the United States who had expressed interest online to sign up for its six-month closed beta launch that began in February 2020, but only about 1500 public users ultimately accepted the invitations and created accounts. CW1 thought that Voice "really didn't bring anything to the table." In other words, it was nothing particularly special or new that could "add value to the social network ecosystem." Moreover, the fact that it was "written on a blockchain" meant absolutely nothing for the end product. CW1 said that the social network would be the exact same experience for users if it was written on a traditional database.

198.    CW1 also provided information about the Hong Kong venture capital business. He heard through discussions with his colleagues that it was block.one's "biggest business" and its only source of revenue besides the money made from the ICO. CW1 learned that "most of the money" block.one took in was made through investments in various cryptocurrencies as well as in traditional stock markets.   Further, CW1 recalled that at the beginning of his tenure, CW1 attended a small "lunch-and-learn" hosted by a block.one finance employee who had come to the Blacksburg office from Hong Kong. The finance department employee discussed his responsibilities in Hong Kong, which consisted of investing the Company's capital in stock markets.

*CW2*

199.     CW2 was employed at block.one as a Vice President of Product from September 2017 through June 2018. CW2 reported directly to David Moss, who was the Senior Vice President of Tech Operations. Moss reported to Daniel Larimer. CW2 was recruited to work for block.one by David Moss in August 2017, and was among block.one's earliest employees in the United States. CW2 remained employed by block.one until June 2018, approximately when the company released EOSIO.

200.     CW2 was hired to support Moss and Larimer as they worked to the launch of EOSIO in June 2018.

201.     CW2 further explained that block.one's claim that EOS was a truly decentralized blockchain was undermined when it became clear that "so many of the tokens were owned by so few players." Once rumors of collusion began to percolate, block.one executives were "studiously silent" on these issues, and made no attempts to intervene or provide guidance to the mainnet about "what should happen."

202.     CW2 left block.one before it established Voice, but he has watched the development of the social network. He considers Voice, which was the brainchild of Daniel Larimer, to be "personal hobbyhorse type stuff."

203.     Prior to June 2018, there were discussions among the employees about "what do we all do" after EOSIO launched, as several individuals did not want to move to closer to the Company's office in Blacksburg. A group of employees—including David Moss—decided to form a separate company, StrongBlock, that would build upon EOSIO.

## X.   DEFENDANTS' FALSE STATEMENTS WERE MADE WITH SCIENTER

204.     For the purposes of Plaintiff's Exchange Act claims, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and

statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

205.    Defendants, by virtue of their association with and control over block.one, which made them privy to confidential information, participated in the fraudulent scheme designed to mask the truth underlying the capabilities of the EOS Blockchain and its decentralization capabilities.  Defendants are also charged with knowledge of the truth underlying their Class Period statements.

206.    Prior to the launch of the EOS Blockchain, Larimer was the primary author of the code underlying EOS and EOSIO.  Moreover, Larimer wrote the EOSIO White Paper, which described in detail the functionality of the EOS Blockchain.  Larimer's role as the author of the relevant code and the EOSIO White Paper describing what the code would do uniquely positioned him to understand the capabilities and limitations of the EOS Blockchain, and to understand the falsity of his Class Period statements.

207.    Defendant Blumer, for his part, made statements touting block.one's commitment to supporting the EOS ecosystem, and specifically promised that the first billion dollars of capital raised would be used to support third parties building on EOSIO.  As the Company's Chief Executive Officer, Blumer is ostensibly in control of the Company's plans and strategy, and would have known at the time that the Company in fact had no intention of investing that amount of capital in third-party EOSIO projects.

208.    In addition, Defendants Pierce and Grigg made affirmative statements regarding the value of the EOS Securities and the functionality of EOSIO, and are therefore charged with knowledge of the truth underlying those statements.

209.    The Individual Defendants had actual knowledge that their statements were false. They conceived the EOS Blockchain.   They co-founded the Company and were the chief architects of the ICO and the EOS Blockchain technology, as well as its governance structure. For approximately the first year of its existence, block.one had few employees.  According to the *Roanoke Times*, as of May 17, 2018, block.one employed only ten software engineers who were building the EOS Blockchain, thus demonstrating the central involvement of the Individual Defendants. In addition, they made statements confirming their knowledge of the problems associated with the EOS Blockchain after it went live.

### A.    Motive and Opportunity

210.    Defendants had the motive and opportunity to inflate the price of the EOS Securities.

211.    As an initial matter, the sale of EOS Securities in the ICO was considered "revenue" to block.one.  Defendants had every incentive to ensure that the price of the securities sold in the ICO was as high as possible in order to maximize the revenue to the Company.

212.    Indeed, at least 90% of the $4 billion raised in the ICO was withdrawn from block.one's funding wallet during the course of the ICO, with no explanation for how these funds were used.

213.    In an effort to assuage concerns over how Defendants were using the funds raised in the ICO, Defendants promised in August 2017 to publish the results of an audit that would show how the funds were used.  But to date, Defendants have never issued the results of any such audit, nor is it clear that the audit ever took place.  Defendants' conspicuous failure to

provide the promised audit suggests that the results would have confirmed investor concerns over how funds from the ICO were used by Defendants.

214.    Defendants have also used funds from the ICO in ways entirely unrelated to EOS, and to enrich themselves and block.one without providing any benefit to EOS holders.  For instance, block.one set up an office in Hong Kong to act as the Company's investment arm. Block.one uses its Hong Kong office—where Blumer is based—to make investments in various cryptocurrencies as well as in traditional stock markets.  Any gains on those investments will not accrue to the benefit of EOS holders: essentially, block.one took money from EOS investors on the promise of what the EOS Blockchain could achieve, and used the vast majority of the proceeds instead to start a hedge fund that will pay dividends to block.one, not the EOS investors.

215.    Even after the ICO, Defendants had every interest in maintaining the appearance of a valuable and useful blockchain.  The 100 million EOS Tokens that block.one kept for itself were valuable only insofar as Defendants could convince investors that the EOS Blockchain was superior to other blockchains and would host popular applications.  In order to maximize the sale value of those 100 million EOS Tokens, Defendants thus needed to continue to tout the EOS Blockchain and block.one's purported efforts to develop applications for the blockchain.

216.    Aside from their abandoned plan to put the "Voice" social network on the EOS Blockchain, however, Defendants have failed to provide any significant application for the Blockchain.  As described above, Larimer admitted as much recently when he said that EOS holders "already received everything" they would get when they acquired EOS.  In effect, Larimer conceded that block.one sees no obligation to support EOS for the benefit of investors.

217.    Despite their promises regarding the benefits and possibilities the EOS Blockchain offered, the only possible inference is that Defendants have used the ICO to benefit themselves.

### B.    Core Operations

218.    In addition, the false statements concerned the development of the EOSIO software and resulting EOS Blockchain, which was ostensibly the sole core operation of block.one.

219.    Defendants represented during the Class Period that block.one's chief business function was to develop the EOSIO software and EOS Blockchain for the stated purpose of creating a platform that was superior to those offered by other cryptocurrencies.  In that vein, block.one's long-term viability and ability to generate income, as well as the EOS Blockchain's ability to achieve the lofty goals publicly set by Defendants, would have depended entirely on Defendants' efforts to develop the EOSIO software and subsequently support the EOS Blockchain through the creation of new applications and uses.

220.    Defendants have largely abandoned that effort, instead focusing on pet projects and investments in cryptocurrency and the stock market.  As block.one's top executives and former partners, Defendants are charged with the knowledge that the Company would not actually commit itself to pursuing the goals it publicly held itself out to pursue.

## XI.    CLASS ALLEGATIONS

### A.    Definition of Classes

221.    Plaintiff brings this action as a class under Fed. R. Civ. P. 23 and seeks certification of a Class defined as follows:  All persons or entities who purchased or otherwise acquired EOS Securities at any time during the period of June 26, 2017 through May 18, 2020.

222.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of block.one, members of the block.one's Board and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of block.one.

223.    Plaintiff reserves the right to amend the definition of the Class if further investigation or discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

**B.      The Classes Satisfy the Requirements of Rule 23**

224.    The members of the Classes are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff at this time, but by virtue of the fact that Defendants issued approximately 900 million EOS Securities, the potential number of Class members is quite vast. Members of the Classes may be identified by publicly accessible blockchain ledger information. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in class actions.

225.    Defendants' wrongful conduct applies generally to all the Class members, so that final relief is appropriate respecting the Classes as a whole.

226.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the members of the Classes are:

(a)      Whether Defendants violated Sections 5 and 12(a)(1) of the Securities Act by failing to file a registration statement for the EOS Securities with the SEC;

(b)     Whether Defendants violated Section 12(a)(2) of the Securities Act by promoting the sale of the EOS Securities pursuant to a prospectus which included material false statements or omitted to disclose material facts;

(c)     Whether Defendants violated Section 10(b) of the Exchange Act by disseminating material false statements, or omitted to disclose material facts, concerning the EOS Securities throughout the Class Periods;

(d)     Whether Defendants' statements to the investing public during the Class Periods omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)     Whether the price of the EOS Securities was artificially inflated; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

227.    Plaintiff's claims are typical of the claims of the other members of the Class they seek to represent. Defendants' practices have targeted and affected all members of the Class in a similar manner, i.e., they have all sustained damages arising out of Defendants' practices.

228.    Plaintiff will continue to fully and adequately protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in class actions and securities law. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

229.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the

courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action on the other hand, would achieve substantial economies of scale with regards to time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Furthermore, the interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Finally, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

### C.       Presumption of Reliance: Fraud on the Market

230.    For the purposes of Plaintiff's Exchange Act claims, it will rely on the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

> (a)      Defendants made public statements or failed to disclose material facts required to be disclosed;
>
> (b)      The omissions and misrepresentations were material;
>
> (c)      The EOS Securities traded on an efficient market;
>
> (d)      The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the EOS Securities; and
>
> (e)      Plaintiff and the other members of the Class purchased the EOS Securities between the time Defendants misrepresented or failed to disclose material facts

and the time the true facts or their consequences were disclosed, without knowledge of the misrepresented or omitted facts.

231.    At all relevant times, the market for EOS Securities was efficient for the following reasons, among others:

(a)    Defendants regularly communicated with public investors via widely dispersed public media, including regular dissemination of press releases;

(b)    EOS Securities traded on the Coinbase, Kraken, and Poloniex cryptocurrency exchanges, among others, which are efficient markets; and

(c)    News about block.one, the EOS.IO blockchain, and the EOS Securities quickly impacted the price of the EOS Securities on the cryptocurrency exchanges.

232.    As a result of the foregoing, the market for EOS Securities promptly digested current information regarding EOS Securities from all publicly available sources and reflected such information in the price of EOS Securities. Under these circumstances, all purchasers of EOS Securities during the Class Period suffered similar injury through their purchases of EOS Securities at artificially inflated prices, and a presumption of reliance applies.

233.    In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

**PART III: COUNTS**

**XII.   SECURITIES ACT COUNTS AND DEFENDANTS**

**A.   Count One: Violation of Sections 12(a)(1) and (5) of the Securities Act Asserted Against Block.one**

234.    Plaintiff repeats and realleges every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class.

235.    Count One is brought on behalf of all Class members who acquired EOS Securities in or traceable to the ICO.

236.    This Count is brought pursuant to Sections 5 and 12(a)(1) of the Securities Act, 12 U.S.C. §§ 77e and 77l(a)(1), on behalf of the Class, against block.one.

237.    The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

238.    Block.one promoted, offered, or sold securities through and after the EOS ICO.

239.    Block.one was the issuer of EOS Securities in the EOS ICO.

240.    No Defendant or other person filed with the SEC a registration statement for the offer and sale of EOS securities through or following the EOS ICO, no registration statement was in effect at the time of the EOS ICO, and no exemption to the registration statement was available.

241.    By virtue of the foregoing, without registration statement in effect as to the EOS securities, block.one, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to offer to sell, through the use of means of a prospectus, securities for which no registration statement has been filed and no exemption to the registration statement was available.

242. Defendant block.one has already admitted to the above violations.

243. By virtue of the conduct alleged herein, block.one is liable for the wrongful conduct complained of herein and is liable to the Plaintiff and the Class for rescission and damages suffered.

**B.    Count Two: Violation of Section 12(a)(2) of the Securities Act Asserted Against All Defendants**

244. Plaintiff repeats and realleges every allegation contained above as if fully alleged in this Count.

245. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

246. Count Two is brought on behalf of all Class members who acquired EOS Securities in or traceable to the ICO.

247. The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), and block.one is the issuer of the securities purchased by Plaintiff and the Class.

248. Defendants offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) the EOS Securities within the meaning of the Securities Act, by means of a prospectus, as that term is broadly construed.

249. In addition, Blumer offered, sold and/or solicited the purchase (or assisted in the offer, sale, or solicitation of the purchase of) the EOS Securities within the meaning of the Securities Act by means of their oral representations made prior to and during the ICO, including his statement referred to in paragraphs 159, 164 and 166.

250. Likewise, Larimer offered, sold and/or solicited the purchase (or assisted in the offer, sale, or solicitation of the purchase of) the EOS Securities within the meaning of the

Securities Act by means of their oral representations made prior to and during the ICO, including his statement referred to in paragraph 152.

251.    And Grigg offered, sold and/or solicited the purchase (or assisted in the offer, sale, or solicitation of the purchase of) the EOS Securities within the meaning of the Securities Act by means of their oral representations made prior to and during the ICO, including his statement referred to in paragraph 155.

252.    Defendants' statements made in connection with the offer, sale or solicitation of the purchase of the EOS Securities included untrue statements of material fact, and/or omitted to state material facts, necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

253.    Defendants acted negligently in that they did not exercise reasonable care to ensure that the statements they made in connection with the offer, sale or solicitation of the purchase of the EOS Securities did not include untrue or misleading statements or omissions of material fact.

254.    This Count does not sound in fraud. Rather, this Count is based solely on negligence. For purposes of asserting this and its other claims under the Securities Act, Plaintiff does not allege that any Defendant acted with intentional, reckless or otherwise fraudulent intent with regard to their statements made in connection with the ICO.

255.    The statements Defendants made in connection with the ICO – including statements made in the White Paper, and at all associated conferences, YouTube videos, press releases, interviews, and other statements made for the purpose of offering and/or selling the EOS Securities – fall within the broad definition of "prospectus" in Section 12(a)(2) of the Securities Act.

256.    When they acquired the EOS Securities, Plaintiff and the other members of the Class did not know, nor could they have known in the exercise of reasonable care, of the untruths or omissions contained (and/or incorporated by reference) in the statements Defendants made in connection with the ICO.

257.    Plaintiff and the Class acquired EOS Securities pursuant or traceable to the offering conducted by Defendants and without knowledge of the untruths and omissions alleged herein. Plaintiff sustained damages, and the price of EOS Securities declined substantially due to those material misstatements and omissions.

258.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to the Plaintiff and the Class for rescission and damages suffered.

**C.    Count Three: Violation of Section 15 of the Securities Act Asserted Against the Individual Defendants**

259.    Plaintiff repeats and realleges every allegation above as if fully alleged in this Count.

260.    This Count is asserted against the Individual Defendants under Section 15 of the Securities Act, 15 U.S.C. §77o.

261.    Count Three is brought on behalf of all Class members who acquired EOS Securities in or traceable to the ICO.

262.    The Individual Defendants, by virtue of their offices, share ownership, agreements and specific acts, were at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act.  The Individual Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of EOS securities as described herein.

263.    The Individual Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of block.one, through their ownership of voting shares of the Company, by contract, subscription agreement or otherwise.

264.    Defendant Blumer controlled block.one through his position as the Chief Executive Officer of the Company.  Further, Blumer was integral in the development of the design and conception of the EOSIO software that underlie the EOS Blockchain, as well as the governance structure of the EOS Blockchain.  Blumer also played an integral role in the promotion of the ICO and the sale of the EOS Securities.  Blumer had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

265.    Defendant Larimer controlled block.one through his position as the Chief Technology Officer of the Company.  Further, Larimer was the chief architect and engineer of the EOSIO software that underlie the EOS Blockchain, as well as the governance structure of the EOS Blockchain.  Larimer also played an integral role in the promotion of the ICO and the sale of the EOS Securities.  Larimer had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

266.    Defendant Pierce controlled block.one through his position as the Chief Strategy Officer of the Company.  Pierce played an integral role in the promotion of the ICO and the sale of the EOS Securities.  Pierce had direct and supervisory involvement in the day-to-day

operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

267.    Defendant Grigg controlled block.one through his early involvement in block.one's development.   Among other things, Grigg was the chief author and disseminator of various publications that purported to describe the EOSIO software and the EOS Blockchain. Grigg had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

268.    The Individual Defendants culpably participated in the violations of Sections 5, 12(a)(1) and 12(a)(2) of the Securities Act.

269.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to the Plaintiff and the Class for rescission and damages suffered.

## XIII.    EXCHANGE ACT COUNTS AND DEFENDANTS

### A.    Count Four: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Asserted Against All Defendants

270.    Plaintiff repeats and realleges every allegation contained above as if fully alleged in this Count.

271.    The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1). Defendant block.one, by engaging in the conduct described above, promoted, offered, or sold EOS securities.

272.    Count Four is brought on behalf of all Class members who purchased the EOS Securities during the period of June 26, 2017 to June 4, 2019.

273.     Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5(b) promulgated thereunder (17 C.F.R. §240.10b-5(b)) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

274.     Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase EOS Securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

275.     During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew or recklessly disregarded were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

276.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for EOS Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of EOS Securities as specified herein.

278.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EOS Securities' value and performance and continued substantial growth, which included the making of, or participation in the making of, materially false and misleading statements, including statements that omitted to state material facts necessary in order to make the statements made about block.one's business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of EOS Securities.

279.    As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's true condition and growth prospects, thereby artificially inflating the price of its common stock. As demonstrated by Defendants' omissions and misstatements concerning the Company's business strategy, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps

necessary to discover whether those statements were materially false or misleading, or suffered from actionable material omissions.

280.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of EOS Securities was artificially inflated. In ignorance of the fact that price of EOS Securities was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements made and approved by these Defendants, or upon the integrity of the market in which its common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class acquired EOS Securities at artificially high prices and were damaged thereby.

281.    By reason of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

282.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of EOS Securities.

**B.    Count Five: Violation of Section 20(a) of the Exchange Act Asserted Against the Individual Defendants**

283.    Plaintiff repeats and realleges every allegation contained above as if fully alleged in this Count.

284.    The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

285.    This Count is asserted against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. §78t.

286.     Count Five is brought on behalf of all Class members who purchased the EOS Securities during the period of June 26, 2017 to June 4, 2019.

287.     The Individual Defendants acted as controlling persons of block.one and the EOS Securities within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of block.one's operations and/or intimate knowledge of the false statements disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of block.one and the issuance of the EOS Securities, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. These Defendants were provided with or had unlimited access to copies of block.one's reports, press releases, and other public statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of those statements.

288.     Defendant Blumer controlled block.one through his position as the Chief Executive Officer of the Company.  Further, Blumer was integral in the development of the design and conception of the EOSIO software that underlie the EOS Blockchain, as well as the governance structure of the EOS Blockchain.  Blumer also played an integral role in the promotion of the ICO and the sale of the EOS Securities.  Blumer had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

289.     Defendant Larimer controlled block.one through his position as the Chief Technology Officer of the Company.  Further, Larimer was the chief architect and engineer of

the EOSIO software that underlie the EOS Blockchain, as well as the governance structure of the EOS Blockchain.  Larimer also played an integral role in the promotion of the ICO and the sale of the EOS Securities.  Larimer had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

290.    Defendant Pierce controlled block.one through his position as the Chief Strategy Officer of the Company.  Pierce played an integral role in the promotion of the ICO and the sale of the EOS Securities.  Pierce had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

291.    Defendant Grigg controlled block.one through his early involvement in block.one's formation and development.  Among other things, Grigg was the chief author and disseminator of various publications that purported to describe the EOSIO software and the EOS Blockchain. Grigg had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, had the power to control or influence the particular conduct and statements made that give rise to the securities violations as alleged herein.

292.    The Individual Defendants culpably participated in the violation of Section 10(b) of the Exchange Act.

293.    As set forth above, the Individual Defendants violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

294.    As a direct and proximate result of the foregoing wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of EOS Securities.

XIV.    **PRAYER FOR RELIEF**

**WHEREFORE**, on behalf of themselves and the Class, Plaintiff prays:

1.      That the Court maintain this action as a Class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Counsel of the Class, and direct that notice of this action be given to Class members;

2.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

4.      Awarding rescission or a rescissory measure of damages; and

5.      Awarding such equitable and/or injunctive or other relief as the case may require or as this Court may deem just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby respectfully demands a jury trial as provided by Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: September 18, 2020
      New York, New York

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

*/s/ Daniel L. Berger*
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: jeisenhofer@gelaw.com
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com

*Lead Counsel for the Class and for Lead
Plaintiff Crypto Assets Opportunity Fund*

**BLUHM LEGAL CLINIC OF THE
NORTHWESTERN PRITZKER SCHOOL
OF LAW, COMPLEX CIVIL LITIGATION
AND INVESTOR PROTECTION CENTER**

J. Samuel Tenenbaum
375 East Chicago Ave.
Chicago, IL 60611
Tel: (312) 503-4808
Email: s-tenenbaum@law.northwestern.edu

*Counsel for Lead Plaintiff Crypto Asset
Opportunity Fund*

**IEVGENIIA VATRENKO, ESQ.**

Ievgeniia P. Vatrenko
2 Northside Piers
Brooklyn, NY 11249
Tel: (718) 451-6384
jenny@vatrenkoesq.com

*Counsel for Lead Plaintiff Crypto Asset
Opportunity Fund*