UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHASE WILLIAMS and WILLIAM ZHANG, individually and on behalf of all others similarly situated, <br><br>                 Plaintiffs, <br><br>      v. <br><br> BLOCK.ONE, BRENDAN BLUMER, and DANIEL LARIMER, <br><br>                 Defendants. | Civ. No. 1:20-cv-02809-LAK <br><br> <u>CLASS ACTION</u> |
| CRYPTO ASSETS OPPORTUNITY FUND LLC and JOHNNY HONG, Individually and on Behalf of All Others Similarly Situated, <br><br>                 Plaintiffs, <br><br>      v. <br><br> BLOCK.ONE, BRENDAN BLUMER, DANIEL LARIMER, IAN GRIGG, and BROCK PIERCE, <br><br>                 Defendants. | Civ. No. 1:20-cv-03829-LAK <br><br> <u>CLASS ACTION</u> |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**<u>THE AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

P<small>AGE</small>

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 4

    A.    BLOCKCHAIN TECHNOLOGY, CRYPTOCURRENCY, AND SMART CONTRACTS ................................................................................................. 4

    B.    BLOCK.ONE AND ITS PLAN TO DEVELOP THE EOSIO SOFTWARE ........ 5

    C.    BLOCK.ONE'S TOKEN SALE AND TOKEN PURCHASE AGREEMENT ..... 7

    D.    THE EOSIO OPEN SOURCE SOFTWARE RELEASE AND LAUNCH OF THE FIRST EOSIO-BASED BLOCKCHAIN .................................................... 10

    E.    THE TECHNICAL PERFORMANCE AND OPERATIONAL GOVERNANCE OF THE EOS BLOCKCHAIN ................................................. 11

    F.    BLOCK.ONE'S COMMITMENT TO BACK ENTREPRENEURS TO CREATE INNOVATION IN THE EOSIO ECOSYSTEM ................................. 14

    G.    THE SECONDARY MARKET FOR CRYPTOCURRENCIES ......................... 15

    H.    CRYPTO ASSETS OPPORTUNITY FUND AND THIS LITIGATION .......... 16

ARGUMENT ......................................................................................................................... 19

    I.    CAOF HAS FAILED TO ALLEGE A DOMESTIC TRANSACTION SUBJECT TO THE U.S. SECURITIES LAWS ................................................. 19

    II.    CAOF'S SECURITIES ACT CLAIMS SHOULD BE DISMISSED ................. 21

        A.    CAOF Lacks Standing to Bring Section 12 Claims for Its Secondary Market Purchases ..................................................................................... 21

            1.    CAOF's Securities Act Claims Fail Because CAOF Cannot Allege that Any Defendant Is a Statutory Seller ........................... 22

            2.    CAOF's Section 12(a)(2) Claim Fails for the Additional Reason that Secondary Purchasers Lack Standing ...................... 23

        B.    CAOF's Claim Under Section 12(a)(1) Is Time-Barred ......................... 24

|  | 1. | Claims Under Section 12(a)(1) Are Governed by a One-Year Limitations Period and Are Not Subject to a Discovery Rule ...... 24 |

|  | 2. | Even If There Were a Legal Basis to Toll the Relevant Statute of Limitations, CAOF Has Failed to Plead Facts to Support Tolling Here ................................................................................. 25 |

| C. | CAOF Has Failed to State a Claim Under Section 12(a)(2) ..................... 28 |

III. | CAOF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED .................. 29 |

| A. | CAOF Fails to Plead Any Actionable Misstatement or Omission ........... 30 |

|  | 1. | Defendants' Alleged Plans for EOSIO Software ........................... 31 |

|  | 2. | Defendants' Alleged Representations About the Governance of the EOS Blockchain .................................................. 36 |

|  | 3. | Defendants' Alleged Plans to Support the EOSIO Blockchain Ecosystem ................................................................... 37 |

| B. | CAOF Fails to Allege Facts Giving Rise to a Strong Inference of Scienter ......................................................................... 39 |

| C. | CAOF Fails to Tie Any Alleged Misstatement to Any Loss, and Has Not Sufficiently Pled Loss Causation ......................................... 42 |

IV. | CAOF'S CONTROL PERSON LIABILITY CLAIMS SHOULD BE DISMISSED ......................................................................... 45 |

CONCLUSION ........................................................................... 45

# TABLE OF AUTHORITIES

P<span></span>AGES

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ............................................................................. 19, 20, 21

*Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineracao S.A.*,
    2019 WL 2514056 (S.D.N.Y. June 18, 2019) ............................................................ 19

*Barton v. Peterson*,
    733 F. Supp. 1482 (N.D. Ga. 1990) ........................................................................ 26

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011) ........................................................... 35, 41, 42

*Braka v. Multibanco Comermex, S.A.*,
    589 F. Supp. 802 (S.D.N.Y. 1984) .......................................................................... 25

*Bratusov v. ComScore, Inc.*,
    2020 WL 3447989 (S.D.N.Y. June 24, 2020) ........................................................... 44

*Capri v. Murphy*,
    856 F.2d 473 (2d Cir. 1988) ................................................................................... 22

*Cartica Mgm't, LLC v. Corpbanca, S.A.*,
    50 F. Supp. 3d 477 (S.D.N.Y. 2014) ....................................................................... 21

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
    543 F. App'x. 72 (2d Cir. 2013) ............................................................................. 45

*City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ..................................................................... 28

*City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ................................................................................... 20

*DeLeonardis v. Berg*,
    1998 WL 760338 (E.D.N.Y. Sept. 15, 1998) ........................................................... 25

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003) ................................................................................... 24

*Dura Pharms., Inc., v. Broudo*,
    544 U.S. 336, 125 S. Ct. 1627 (2005) ..................................................................... 29

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................. 30, 34, 39

*Ellison v. Am. Image Motor Co., Inc.*,
    36 F. Supp. 2d 628 (S.D.N.Y. 1999) ................................................................. 45

*Ellul v. Congregation of Christian Bros.*,
    774 F.3d 791 (2d Cir. 2014) ................................................................. 26, 27, 28

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ................................................................. 45

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
    783 F.3d 395 (2d Cir. 2015) ................................................................. 43

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) ................................................................. 30

*Ghartey v. St. John's Queens Hosp.*,
    869 F.2d 160 (2d Cir. 1989) ................................................................. 24

*Gustafson v. Alloyd Co.*,
    513 U.S. 561, 115 S. Ct. 1061 (1995) ................................................................. 23

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) ................................................................. 28

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018) ................................................................. 41

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008) ................................................................. 41

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................. 22, 29

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................. 40

*In re Cosi, Inc. Sec. Litig.*,
    379 F. Supp. 2d 580 (S.D.N.Y. 2005) ................................................................. 24

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F. 3d 56 (2d Cir. 1998) ................................................................. 28

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) ................................................................. 28

*In re Omnicom Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................ 45

*In re OPUS 360 Corp. Sec. Litig.*,
  2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) .......................................... 22

*In re Rexplore, Inc. Sec. Litig.*,
  671 F. Supp. 679 (N.D. Cal. 1987) ........................................................ 26

*In re Sanofi-Aventis Sec. Litig.*,
  293 F.R.D. 449 (S.D.N.Y. 2013) .......................................................... 21

*In re Smart Techs., Inc. S'holder Litig.*,
  295 F.R.D. 50 (S.D.N.Y. 2013) ............................................................ 24

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ........................................ 30

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ................................................................. 39

*Katz v. Amos Treat & Co.*,
  411 F.2d 1046 (2d Cir. 1969) .......................................................... 26, 27

*Komanoff v. Mabon, Nugent & Co.*,
  884 F. Supp. 848 (S.D.N.Y. 1995) ........................................................ 24

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ............................................................ 43, 45

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ................................................................. 18

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................... 42

*Lopez v. CTPartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016) ...................................................... 35

*Marbury Mgmt., Inc. v. Kohn*,
  470 F. Supp. 509 (S.D.N.Y. 1979) ........................................................ 35

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247, 130 S. Ct. 2869 (2010) .................................................... 19

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018) .................................................... 43

*Nolfi v. Ohio Kentucky Oil Corp.*,
    675 F.3d 538 (6th Cir. 2012) ......................................................................... 26

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................... 31, 40

*Or. Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ........................................................................ 43

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) ......................................................................... 20

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015) ........................................................... 39

*Pinter v. Dahl*,
    486 U.S. 622, 108 S. Ct. 2063 (1988).................................................... 22, 23

*Pollack v. Laidlaw Holdings, Inc.*,
    1995 WL 261518 (S.D.N.Y. May 3, 1995) .................................................. 27

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ....................................................... 29, 30, 31, 32

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ..................................................................... 39, 40

*San Leandro Emerg. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ..................................................................... 31, 37

*Schwartz v. Novo Industri, A/S*,
    658 F. Supp. 795 (S.D.N.Y. 1987) ............................................................... 35

*SEC v. Revelation Capital Mgmt., Ltd.*,
    246 F. Supp. 3d 947 (S.D.N.Y. 2017) ......................................................... 19

*Shain v. Duff & Phelps Credit Rating Co.*,
    915 F. Supp. 575 (S.D.N.Y. 1996) ............................................................... 23

*Shemian v. Research In Motion Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ............................................. 41

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) ........................................................................... 30

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001)............................................. 23

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ................................................................. 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499 (2007) .................................................. 30

*Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*,
    2010 WL 6864006 (S.D.N.Y. Dec. 14, 2010) ....................................... 25

*Tung v. Bristol-Myers Squibb Co.*,
    412 F. Supp. 3d 453 (S.D.N.Y. 2019) ............................................ 41, 42

*United States v. Mandell*,
    752 F.3d 544 (2d Cir. 2014) ................................................................. 20

## Rules

15 U.S.C. § 77k .......................................................................................... 24

15 U.S.C. § 77l ...................................................................................... 22, 23

15 U.S.C. § 77m ......................................................................................... 25

15 U.S.C. § 78u .......................................................................................... 42

## PRELIMINARY STATEMENT

This is a putative securities class action brought by a plaintiff claiming to have purchased digital tokens that plaintiff now contends are securities. The amended complaint (the "Complaint") fails to state a claim for multiple reasons. It should be dismissed in its entirety.

In 2017, defendant Block.one[1] announced that it was developing a blockchain software protocol called EOSIO,[2] which was intended to improve on technologies underlying existing blockchains such as Bitcoin and Ethereum. The EOSIO software was designed to be—and ultimately was—open sourced and customizable for use by anyone launching a public or private blockchain based on this software. Defendants made clear that they would have no control over whether, or how, others might use the software to establish EOSIO blockchains. Defendants explained that they would not be responsible for the governance of any eventual EOSIO blockchains, which would instead be the responsibility of each blockchain's token holders and their elected delegates. Over the course of just under one year starting in June 2017, Block.one sold "ERC-20" digital tokens that operated on the Ethereum blockchain. When the first public EOSIO blockchain was launched by third parties after the end of the token sale, native EOS tokens, with different characteristics from those sold by Block.one, were created on this blockchain.

In this action, Plaintiff Crypto Assets Opportunity Fund LLC ("CAOF") asserts five claims, three under the Securities Act of 1933 and two under the Securities Exchange Act of 1934. CAOF alleges that both the ERC-20 tokens and native EOS tokens are securities and that

---

[1] Block.one previously was known as "block.one."

[2] The EOSIO software previously was known as the "EOS.IO" software. Additionally, the term "EOS" in certain documentation referenced in the Complaint refers to the EOSIO software.

the ERC-20 token sale constituted an unregistered offering.  Although CAOF's contention that the tokens are securities is wrong, defendants do not rely on that ground in seeking dismissal. That is because a host of other defects permeate the Complaint.

*First*, as a threshold matter, all five claims must be dismissed because CAOF has failed to allege that any of its token purchases occurred in the United States.  (*See* Point I, *infra*.)  CAOF does not allege that it purchased anything from defendants, and instead acknowledges that all of its purchases occurred on secondary markets.  Further, although CAOF alleges that *some* cryptocurrency exchanges are located in the United States, it is conspicuously silent about the geographical location of any of *its* alleged purchases.  That silence is fatal to its claims.  CAOF has failed to rebut the presumption against extraterritorial application of the federal securities laws under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869 (2010).

*Second*, even if the U.S. securities laws applied, CAOF's Securities Act claims should still be dismissed for several independent reasons.  (*See* Point II, *infra*.)  Because CAOF does not allege that it purchased anything from, or had any direct contact with, Block.one or any other defendant, CAOF has failed to plead that any defendant is a statutory seller.  CAOF therefore lacks standing to pursue any of its claims under Section 12 of the Securities Act.  Moreover, even if CAOF could establish standing, its claims still would fail.  Its unregistered offering claims under Section 12(a)(1) are untimely on their face.  The token sale that CAOF contends constituted the offering took place between June 2017 and June 2018, but neither CAOF nor any other plaintiff filed suit until April 2020, long after the expiration of the one-year statute of limitations.  CAOF's misleading prospectus claims under Section 12(a)(2) likewise fail.  CAOF does not allege that any particular document or communication constituted a prospectus; indeed, the essence of CAOF's first claim is that there was no registration or prospectus.  Regardless,

CAOF has not identified any false or misleading statements by defendants.

*Third*, the Court should also dismiss CAOF's Exchange Act claims for several independent reasons. (*See* Point III, *infra*.) The Complaint fails to plead any misstatement or omission, much less with the particularity required by the Private Securities Litigation Reform Act ("PSLRA"). Defendants' alleged statements reflect forward-looking opinions about attributes that they hoped that the software, and the blockchains using the software, would someday have. Even if CAOF had alleged plausibly that the software did not perform as predicted (and CAOF has not remotely done so), that would never support a securities fraud claim. CAOF cannot state such a claim for securities fraud simply because Block.one allegedly released software with bugs, or because CAOF does not like the governance rules adopted by others (and not defendants).

The Exchange Act claims should also be dismissed because the Complaint lacks particularized allegations supporting any inference of scienter, let alone a strong inference. The Complaint posits that scienter exists because defendants all had a motive to maximize revenue via a token sale that is described further below. As a matter of law, however, a general desire to receive revenue cannot suffice to meet a plaintiff's high pleading burden. Nor does the Complaint succeed at pleading loss causation, an essential element of a securities fraud claim. There is simply no nexus between the allegedly misleading statements and the supposed corrective disclosures or alleged price drops in the value of the tokens.

*Finally*, because there are no underlying primary violations of securities laws, CAOF's two claims for control person liability must also be dismissed. (*See* Point IV, *infra*.)

The Complaint's flaws are fatal and irremediable. Defendants, therefore, respectfully request that the Court dismiss the Complaint with prejudice.

## FACTUAL BACKGROUND[3]

### A.   BLOCKCHAIN TECHNOLOGY, CRYPTOCURRENCY, AND SMART CONTRACTS

A blockchain is an electronic distributed ledger—or list of entries—that is used to record transactions across many electronic devices.  (*See, e.g.*, Compl. ¶¶ 3, 41-42.)  In contrast to platforms controlled by a single authority (such as a government or a company), the information on a blockchain exists in a shared and continually reconciled database.  (*See id.* ¶¶ 3-4, 41.)  A public blockchain database is not stored in any single location; rather, it is "distributed" or "decentralized" because it is hosted and maintained by different persons operating their own electronic devices on a network.  (*Id.* ¶ 41.)

To ensure that transactions are accurately and securely recorded on the ledger, blockchains use cryptography, managed by a peer-to-peer network based on the technical rules (*i.e.*, the protocol) that are adopted for each particular blockchain.  (*See id.* ¶¶ 5, 41-42.)  For instance, on the Bitcoin network, "users who validate transactions" recorded in the individual blocks of the blockchain are referred to as "miners" and are "rewarded with newly minted bitcoin."  (*Id.* ¶ 42.)

Digital tokens refer to assets or access rights, which are created, stored, and managed on a particular blockchain network.  Different digital tokens can have a number of different attributes, and they can play an important role in enabling blockchain networks to function.  Digital tokens may be used to facilitate transactions on a blockchain or have some other utility

---

[3] The Factual Background is drawn from the Complaint, documents incorporated by reference, and matters of which judicial notice may be taken.  Documents incorporated into the Complaint are attached as exhibits to the Declaration of Edmund Polubinski III, dated November 2, 2020, and referred to by exhibit numbers ("Ex. __").  By referencing the Complaint in this brief, defendants do not accept or admit any of its allegations.

on a blockchain.  Some digital tokens can also be a currency used to incentivize and compensate the network participants whose contributions are necessary to process and record transactions on the network; they may also be used by network participants as a medium of exchange.  (*See id*. ¶ 40.)  An example of a digital token is Bitcoin, which exists on the Bitcoin blockchain.  (*Id*. ¶ 42.)

Another blockchain is Ethereum.  (*Id.* ¶ 44.)  Unlike the Bitcoin blockchain, the Ethereum blockchain allows for the creation of "smart contracts," which are programs that facilitate, verify, and enforce the negotiation or performance of self-executing binary contracts.  (*Id.*)  There are a number of different tokens on the Ethereum blockchain, including the native Ether token and other tokens developed by third parties based on the ERC-20 application standard proposed by Ethereum's creator.  (*Id.* ¶¶ 44-47.)  ERC-20 tokens are smart-contract tokens that "operate on the Ethereum blockchain" and enable the building of new applications and new blockchains.  (*Id*. ¶¶ 47, 73.)

**B.      BLOCK.ONE AND ITS PLAN TO DEVELOP THE EOSIO SOFTWARE**

Block.one is a company incorporated under the laws of the Cayman Islands.  (*Id.* ¶¶ 3, 28.)  It developed an open source blockchain software protocol called the EOSIO software, which aimed to be a "high-performance" platform that would improve on the technologies underlying existing blockchains such as Bitcoin and Ethereum.  (*Id.* ¶¶ 3, 123-24.)

On June 5, 2017, Block.one released a technical White Paper (the "White Paper") that set forth high-level goals for the development of the EOSIO software.  (*Id.* ¶ 52.)  In it, Block.one described the technical attributes of the proposed software and theorized that the software could be used to improve on the attributes of existing blockchains.  The abstract posited that the EOSIO software would be "designed to enable vertical and horizontal scaling of decentralized applications."  (White Paper, Ex. 1, p. 1; Compl. ¶¶ 7, 52.)  The "resulting technology" would allow fast and low-cost transactions as compared to existing blockchains and "allow[] for quick

and easy deployment of decentralized applications." (Compl. ¶ 150.)  "Decentralized

applications" or "Dapps" are computer applications that run on a blockchain. (*Id*. ¶ 125 n.2.)

In contrast to the use of miners on the Bitcoin and Ethereum networks (which allegedly

"were dominated by fewer than ten large mining entities"), Block.one proposed a "continuous

approval voting system" to elect "block producers." (*Id*. ¶¶ 123-24.)  The White Paper suggested

that power on EOSIO blockchains would "originate[] with the token holders" who could elect,

and "delegate [their] power to[,] the block producers." (*Id.* ¶¶ 66, 123.)  As with miners, block

producers would verify transactions and, in so doing, "generate" the individual blocks. (*Id.* ¶¶ 8,

123-27.)  The White Paper explained that block producers also would be "given limited and

checked authority to," *inter alia*, "freeze accounts." (White Paper, Ex. 1, p. 11; Compl. ¶ 66.)

Under the continuous approval voting system, token holders would elect 21 block

producers at a time, each of whom would be responsible for generating one block on the

blockchain. (White Paper, Ex. 1, p. 4; Compl. ¶¶ 123, 126.)  "[T]here would be frequent

elections to select the block producers," ensuring that the top 21 block producers could be

changed at any time. (Compl. ¶ 124.)  The Complaint contends that "the 21 block producers"—

who are drawn from a much larger pool of block producers that are vying to be elected—

"provided the critical decentralization feature" of EOSIO blockchains. (*Id*. ¶¶ 123, 125, 157.)[4]

Notably, the White Paper made clear that a token holder's "[v]oting power" depended on

"the amount of tokens held; thus the larger token-holders [would] have more sway in electing

block producers." (White Paper, Ex. 1, p. 10; Compl. ¶ 124.)  The White Paper explained that

---

[4] As discussed further *infra*, the Complaint alleges that Block.one made supposed misstatements
about how "decentralized" future blockchains built using the EOSIO software might someday
be, but the Complaint never actually seeks to define the term "decentralization," nor does it
allege that the term has—or had at the time—a single uniform meaning. (Compl. ¶¶ 151-52.)

election outcomes would not be preordained; rather, they would depend on the ability of proposed block producers to attract votes: "[a]nyone may choose to participate in block production and will be given an opportunity to produce blocks, provided they can persuade token holders to vote for them." (March 16, 2018 White Paper, Ex. 2, p. 5.)

Rather than mandate dispute resolution procedures in the software, the White Paper proposed that each EOSIO blockchain could form its own constitution by vote of its token-holders. It explained that the open source "EOS.IO software enables blockchains to establish a peer-to-peer terms of service agreement or a binding contract among those users who sign it, referred to as a 'constitution.'" (White Paper, Ex. 1, p. 12.) "The content of this constitution defines obligations among the users which cannot be entirely enforced by code and facilitates dispute resolution by establishing jurisdiction and choice of law along with other mutually accepted rules." (*Id.*)

In this way, *token holders* would determine their own governance principles. For example, the Complaint cites a July 5, 2017 paper called "EOS: An Introduction," in which defendant Ian Grigg explained that token holders on an EOSIO blockchain could vote to adopt a constitution that empowers arbitrators to resolve disputes. (Compl. ¶ 153; *see also* EOS: An Introduction, Ex. 3, p. 7.) Mr. Grigg posited that, though block producers may be empowered to "choose blocks," arbitrators could serve as a "counterbalance" to block producers and "deliver legally binding rulings to resolve disputes." (EOS: An Introduction, Ex. 3, p. 7.)

## C.    BLOCK.ONE'S TOKEN SALE AND TOKEN PURCHASE AGREEMENT

On June 22, 2017, Block.one announced that it would conduct a sale of ERC-20 tokens over a period of just under one year (the "Token Sale"). (Compl. ¶¶ 53, 57.) A key feature of ERC-20 tokens is that they did not operate on their own blockchain; "instead, they operate on the

Ethereum blockchain." (*Id*. ¶¶ 47, 73.)  To acquire ERC-20 tokens from Block.one in the Token

Sale, purchasers were required to pay with Ether.  (*See id.* ¶ 78.)  Secondary market purchases

were governed by the rules on those secondary markets.  (*Id.* ¶ 79.)

    The Token Sale, which the Complaint refers to as an "initial coin offering" or "ICO,"

took place over nearly a year from June 26, 2017 through June 1, 2018.  (*Id*. ¶¶ 57, 78.)  In the

Token Sale, Block.one sold tokens "to the general public" pursuant to a "Token Purchase

Agreement" (the "TPA"),[5] which governed the terms and conditions of the Token Sale.  (*Id.* ¶

57.)  The TPA explained that Block.one is "developing the EOS.IO software . . . as further

described" in the White Paper, and that "at the end of its development stage, block.one will be

releasing the EOS.IO Software it has developed under an open source software license."  (TPA,

Ex. 4, p. 1.)  It disclosed that Block.one *would not* "configure and/or launch any public

blockchain," that third parties may use the publicly released open source EOSIO software to

launch one or more EOSIO blockchains, that those third parties "may delete, modify or

supplement the EOS.IO Software prior to, during or after" any launch, and that Block.one would

have *no control* "over when, how or whether the EOS.IO Software is adopted or implemented, or

how, when or whether" a blockchain adopting the EOSIO software "is launched."  (*Id*.)  The

TPA disclosed that the Token Sale involved new, rapidly changing technologies, and that any

eventual launch of an EOSIO blockchain might look different from the anticipated design.  (*Id*. §

7.14; *see also id.* § 1.3 (stating that the White Paper "may be amended from time to time").)[6]

_____

[5] There were two different versions of the TPA, dated June 22, 2017 and September 4, 2017.
Citations to the TPA in this brief are to the June 2017 version unless otherwise noted.

[6] An amended version of the White Paper was published on March 16, 2018.  (March 16, 2018
White Paper, Ex. 2.)

The TPA barred U.S. purchasers from participating in the Token Sale.  Purchasers had to confirm that they understood that persons in the United States were not allowed to purchase tokens, and purchasers were required to represent that they were not a "U.S. Person."[7]  (*Id.* §§ 2.2 ("No U.S. Buyers"), 5.1 ("Not a US Person").)  The TPA also made clear that the Token Sale was not registered with governmental authorities.  It said that the ERC-20 tokens "themselves are not securities," that there was no prospectus or offering document, and that the purchase of the ERC-20 tokens "does not provide Buyer with any ownership or other interest in [the] Company." (*Id.* §§ 2.5, 3.1; *see also* FAQ, Ex. 6, § 17 (explaining that "block.one does not believe" that the Token Sale or the ERC-20 tokens "themselves are securities, commodities, swaps on either securities or commodities, or similar financial instruments").)

Additionally, the TPA disclosed that the "regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear or unsettled in many jurisdictions."  (TPA, Ex. 4, § 7.19 ("Uncertain Regulatory Framework").)  It also disclosed that it is "difficult to predict" how government regulation could affect the blockchain market, and warned about the potential negative implications of a determination that the ERC-20 tokens were "regulated financial instruments that require registration."  (*Id.*; *see also* FAQ, Ex. 6, § 22 (ERC-20 tokens being sold "on an 'as is' and 'as available' basis without representations, warranties, promises or guarantees whatsoever of any kind made by block.one").)  Indeed, as the Complaint acknowledges, U.S. law was (and still is) unsettled as to when digital tokens are considered

---

[7] The September 2017 version of the TPA barred Chinese purchasers as well.  (September 4, 2017 TPA, Ex. 5, § 2.2 ("No U.S. or Chinese Buyers"), § 5.1 ("Not a U.S. Person or Chinese Person").)

securities under federal law.  (Compl. ¶ 120 (alleging that "[t]he 'security versus utility token' topic was hotly debated among participants in the cryptocurrency markets").).)[8]

As a result of the Token Sale, Block.one received about 7.12 million Ether, valued at approximately $4.1 billion.  (*Id.* ¶ 78.)  The proceeds from the sale of ERC-20 tokens were "considered 'revenue' to block.one."  (*Id.* ¶ 211.)  As the TPA disclosed, proceeds collected from the Token Sale could be used by Block.one in its "sole discretion."  (TPA, Ex. 4, § 1.4(b); *see also* FAQ, Ex. 6, § 23 (explaining that "[p]roceeds from the [Token Sale] will be the revenue of block.one").)

## D.   THE EOSIO OPEN SOURCE SOFTWARE RELEASE AND LAUNCH OF THE FIRST EOSIO-BASED BLOCKCHAIN

In early June 2018, at the end of the Token Sale, Block.one released the EOSIO software as planned.  (Compl. ¶¶ 14, 199.)  Although the open sourced EOSIO software has been used to launch multiple blockchains, the Complaint focuses only on the first EOSIO blockchain launched by the first block producers following a vote of token holders based on the open source code.  (*See id.* ¶ 14.)  The Complaint refers to this first EOS blockchain as the "EOS Blockchain."

Without pleading any facts, the Complaint asserts in conclusory fashion that Block.one itself then "converted" or "replaced" the ERC-20 tokens sold during the Token Sale with another

---

[8] Against this backdrop—*i.e.*, the express prohibition on U.S. purchasers, the express references to *the absence of* offering documents, and the express references to regulatory uncertainty about the treatment of tokens—there is no basis for the Complaint's implication that defendants ever offered any assurances about the regulatory classification of the ERC-20 tokens.  (TPA, Ex. 4, p. 1, §§ 2.2, 2.5, 7.19.)

putative security: "native EOS tokens" on the EOS Blockchain.  (*Id.* ¶¶ 75, 85.)[9]  As the TPA and FAQ make clear, however, the ERC-20 tokens sold by Block.one continued to exist on the Ethereum blockchain and became "fixed (non-transferable) on the Ethereum blockchain" at the end of the Token Sale and were never "converted" into anything; moreover, ERC-20 tokens did not themselves automatically "entitle holders to participate on" any subsequent EOSIO blockchains launched by third parties.  (*See* FAQ, Ex. 6, § 19; *see also* TPA, Ex. 4, §§ 2.6, 7.1, 7.2, 7.9, 7.15, 7.16.)  In connection with the launch of the new blockchain, holders of EOS tokens on the EOS Blockchain approved a constitution to govern it.  (*See* Compl. ¶ 66; *see also* White Paper, Ex. 1, p. 12.)

**E.**     **THE TECHNICAL PERFORMANCE AND OPERATIONAL GOVERNANCE OF THE EOS BLOCKCHAIN**

The EOS Blockchain launched in June 2018.  The Complaint alleges in a wholly conclusory manner that this blockchain "was not superior to those already existing" and that it "did not deliver enhanced decentralization," which the Complaint alleges "was revealed slowly through a series of partial corrective disclosures occurring over a year, from June 2018 through June 2019."  (Compl. ¶ 173.)  As noted above, the Complaint does not define what it means by "decentralization" and does not identify any definitional statement allegedly made by defendants.  (*See id*. ¶ 6 (alleging that "decentralization occurs in degrees").)  Nor does the Complaint offer any explanation or support for its assertion that the EOS Blockchain was "not superior to those

---

[9] The Complaint uses the term "EOS Securities" to describe the tokens at issue in this case.  (*See, e.g.*, Compl. ¶ 1.)  It thus uses one term to encompass two *different* tokens that operate on different blockchains with different features: (1) the ERC-20 tokens that Block.one sold in the Token Sale, which operated on the Ethereum blockchain (*id.* ¶¶ 47, 73); and (2) native EOS tokens created after the conclusion of the Token Sale when the EOS Blockchain launched, and which operate on the EOS Blockchain.  (*Id.* ¶¶ 75, 85.)

already existing." (*Id.* ¶ 173.)

The Complaint does not allege that Block.one misrepresented its plans to design the EOSIO software in accordance with the goals or specifications set forth in the White Paper or elsewhere. Instead, it alleges that, shortly before and immediately after the launch of the EOS Blockchain, various problems on the blockchain reportedly "began to surface[.]" (*Id.* ¶ 128.) Specifically, hackers "sent phishing emails to investors" (*id.*), a "Chinese internet security firm . . . identified a number of vulnerabilities in the EOS network" (*id.*), software developers reportedly disagreed with one another on unspecified issues ranging from "philosophical questions to technical arcana" (*id.* ¶ 129), and "users discovered a bug [in the software] that caused [unspecified] major glitches." (*Id.* ¶ 14; *see also id.* ¶ 151.) The Complaint does not explain how any of these supposed "problems" were either unusual for a software launch or relevant to CAOF's fraud claims. Indeed, the White Paper expressly warned that "[a]ll non-trivial software is subject to bugs, even with the most rigorous of formal verification. The platform must be robust enough to fix bugs when they inevitably occur." (White Paper, Ex. 1, p. 3.) Nor does the Complaint allege that any of these supposed bugs or glitches impacted the performance of the EOSIO software in any lasting or material way.

With respect to governance, the Complaint alleges that arbitrators who had been appointed to resolve disputes on the EOS Blockchain undermined its "independence" and claims to "decentralized authority." (Compl. ¶ 131.) Specifically, it alleges that shortly after the launch, "arbitrators directed EOS block producers not to process transactions from 27 different addresses" due to suspected "fraudulent activity," and another arbitrator "issued an order reversing certain EOS transactions to restore control over a hacked account to its original owner." (*Id.* ¶¶ 131-32, 177, 181.) Some "observers" reportedly "viewed" these kinds of

activities by arbitrators as "akin to government interference" and as "demonstrating that EOS is not, in fact, a decentralized network." (*Id*. ¶ 177.)  Additionally, the Complaint alleges that if a previously approved transaction could be reversed by an arbitrator, then the claim in the White Paper that the data contained in a block is "declared immutable" once approved by a quorum of block producers must be false. (*Id*. ¶ 154.)[10]  But the Complaint does not allege that defendants ever represented that the EOSIO software would be designed to disallow arbitrators from resolving disputes or directing that allegedly fraudulent accounts on an EOSIO blockchain be frozen.  To the contrary, the White Paper acknowledged both that token holders on an EOSIO blockchain could choose to adopt a dispute resolution procedure (whether through arbitrators or otherwise) in a constitution (White Paper, Ex. 1, p. 12), and that block producers would have "authority to freeze accounts" (*id.*, p. 11).  And the TPA explained that "third parties launching the EOS Platform may delete, modify or supplement the EOS.IO Software[.]"  (TPA, Ex. 4, p. 1.)

The Complaint also alleges that "certain individuals who held larger amounts of" tokens began to "purchase the votes" of other token holders "so that they could be elected as block producers," which allegedly corrupted the block producer voting process and "concentrated" power "in the hands of a few."  (Compl. ¶¶ 133, 138-40.)  When "rumors . . . began to surface that some token holders were selling their votes," defendant Brendan Blumer allegedly issued a statement on October 1, 2018, in which he expressed the view that "[w]e believe it is important to ensure a free and democratic election process within EOS and ***may, as we deem appropriate***,

---

[10] In actuality, there is a difference between the immutability of data stored in a single block of a blockchain and the ability to freeze an account or code a new block that seeks to return the contracting parties to their original positions.

vote with other holders to reinforce the integrity of this process." (*Id.* ¶ 135 (emphasis added); *see also* ¶ 169.)  The Complaint does not and cannot allege that defendants were responsible for, or had any means to prevent or influence, any alleged concentration of power.  In fact, though the Complaint criticizes the EOS Blockchain as insufficiently "decentralized," it simultaneously faults Block.one for not exercising its (minority) power[11] to somehow pick and choose block producers.  (*Id.* ¶¶ 159, 170.)  The Complaint does not allege that Block.one purchased votes, acted as a block producer, conspired with others to elect certain block producers, or controlled any token holders who allegedly purchased or sold their votes.

## F.    BLOCK.ONE'S COMMITMENT TO BACK ENTREPRENEURS TO CREATE INNOVATION IN THE EOSIO ECOSYSTEM

In January 2018, Block.one "announced plans to invest *a portion* of its ICO proceeds to 'offer[] developers and entrepreneurs the funding they need to create community driven businesses leveraging EOSIO software.'" (*Id.* ¶ 103 (emphasis added).)  Mr. Blumer explained that "Block.one is making a formal commitment to deploy over $1 billion through leading global venture capital firms to deploy capital back to entrepreneurs to create innovation in the EOS ecosystem." (*Id.* ¶ 155.)

Consistent with this commitment, Block.one used Token Sale proceeds "to fund projects that would increase the adoption of the EOSIO-based blockchains." (*Id.* ¶ 93.)  Indeed, CAOF contends that, by June 1, 2018, just five months after its announcement, Block.one had partnered with multiple organizations to commit a "minimum of $675 million" to support "the growth and development of the EOSIO blockchain ecosystem." (*Id.* ¶¶ 145-46.)  The Complaint also admits

---

[11] Block.one has always had a minority stake.  Its initial 10% stake has been decreasing since launch as new tokens are generated.

that Block.one invested technical and financial resources into the development of a new social

media application called "Voice," which would run on an EOSIO blockchain.  (*Id*. ¶¶ 20, 142,

185-87, 191, 194-97.)  "Block.one allegedly invested over $100 million of ICO proceeds and $50

million of intellectual property into Voice."  (*Id*. ¶ 186.)  Though the Complaint alleges that

"[i]nvestors questioned the value of Voice and asked why the Company was launching a social-

media product when that market already had dominant competitors" (*id*. ¶ 187), it does not and

cannot claim that such an investment is inconsistent with previously stated desires to support the

development of the EOSIO blockchain ecosystem.  Indeed, the Complaint alleges that in July

2017, Mr. Grigg affirmatively identified "social media" among the potential "[p]opular use

cases" for which "EOSIO was pitched by block.one."  (*Id*. ¶ 54.)

The Complaint also alleges that defendants "funneled" revenue from the Token Sale into

Hong Kong-based investment vehicles, but fails to specify what those vehicles are, or how that

fact might bear on its claims.  (*Id*. ¶¶ 144, 156.)  The Complaint acknowledges that Block.one

has offices and operations in Hong Kong.  (*See id*. ¶¶ 28, 214.)  The Complaint pleads no facts

suggesting that the investments were improper.  (*See id*. ¶ 144.)  Moreover, the fact that a private

company is supposedly "tight-lipped"[12] about its finances—or that it invests in "other

cryptocurrencies and more traditional investments" as part of a treasury management and

diversification strategy—is neither fraudulent nor surprising.  (*Id.* ¶¶ 24, 144, 147-48.)

## G.    THE SECONDARY MARKET FOR CRYPTOCURRENCIES

The Complaint alleges that "EOS Securities"—*i.e.*, both the ERC-20 tokens sold in the

---

[12] The Complaint alleges that Block.one failed to publicly release a report by a third-party
auditor after it represented that it planned to conduct an audit.  (Compl. ¶¶ 60, 160-61, 213.)
There are no factual allegations to support an inference that those representations were false
when made.

Token Sale, and EOS tokens that traded after the launch of the EOS Blockchain—were "tradeable on online cryptocurrency exchanges," which "provide a convenient and accessible marketplace for buyers and sellers to meet and transact, similar to traditional exchanges." (*Id.* ¶¶ 10, 43, 83.) It implicitly acknowledges that many of these cryptocurrency exchanges are based in foreign countries. (*See id.* ¶¶ 10, 76, 79, 84, 99 (identifying only three exchanges—Coinbase, Kraken and Poloniex—that allegedly are based in the United States).)

The Complaint alleges that Block.one "contacted several online cryptocurrency exchanges . . . to facilitate trading of EOS securities on those platforms[.]" (*Id.* ¶¶ 79, 99.) It does not provide any factual details to support this allegation. Nor does it allege that Block.one or any of the individual defendants directly sold or actively solicited the purchases of tokens on cryptocurrency exchanges, or that CAOF purchased tokens on one of the exchanges that Block.one allegedly contacted.

## H.   CRYPTO ASSETS OPPORTUNITY FUND AND THIS LITIGATION

The original complaint in this action was filed by Chase Williams and William Zhang on April 3, 2020, together with ten other nearly identical actions—all filed on the same day in this District against other blockchain companies or cryptocurrency exchanges, and all filed by the same counsel.[13] It asserted only claims for offering or selling unregistered securities, including under Section 12(a)(1) of the Securities Act. (*See* Dkt. No. 1 ("Williams Complaint").)

Approximately six weeks later—several weeks before the statutory deadline for lead

---

[13] *See Holsworth v. Bprotocol Foundation*, Case No. 20-cv-2810; *Zhang v. Civic Techs., Inc.*, Case No. 20-cv-2811; *Clifford v. Kaydex Pte. Ltd.*, Case No. 20-cv-2812; *Clifford v. Status Research and Dev. GmbH*, Case No. 20-cv-2815; *Clifford v. TRON Found.*, Case No. 20-cv-2804; *Williams v. Quantstamp, Inc.*, Case No. 20-cv-2813; *In re Bibox Grp. Holding Ltd. Sec. Litig.*, Case No. 20-cv-2807; *Lee v. Binance*, Case No. 20-cv-2803; *Willams v. HDR Global Trading Ltd.*, Case No. 20-cv-2805; *Williams v. Kucoin*, Case No. 20-cv-2806.

plaintiff motions—CAOF filed its first complaint.  (*See Crypto Assets Opportunity Fund, LLC v. Block.one*, Case No. 1:20-cv-03829, Dkt. 1 ("Original CAOF Compl.").)  CAOF brought registration claims under Section 12(a)(1), just as in the Williams Complaint.  (*Compare id.* ¶¶ 140-49 *with* Williams Complaint ¶¶ 113-19.)  In addition, CAOF added new allegations, seeking to recover under Section 12(a)(2) and Section 10(b) of the Exchange Act for alleged misstatements or omissions that were not referenced in the original Williams Complaint. (Original CAOF Compl. ¶¶ 1, 135.)  On August 4, 2020, the Court granted the motion to consolidate the two cases and appointed CAOF as lead plaintiff.  (Dkt. No. 57.)

The operative Complaint provides virtually no information about CAOF or its purchases. However, it is clear from its allegations that CAOF purchased its tokens "on the secondary market."  (Compl. ¶ 27.)  Although CAOF identifies three secondary exchanges that it alleges are based in the United States, it does not claim that *its* secondary market transactions occurred on any of those exchanges.  In fact, CAOF offers *no* allegations of any kind about the circumstances or location of its purchases.[14]

CAOF asserts five counts.  Count One alleges that Block.one violated Section 12(a)(1) of the Securities Act on the ground that the ERC-20 Token Sale constituted an unregistered offering of securities.[15]  (*Id*. ¶¶ 234-43.)  Count Two asserts a claim against all defendants under Section

---

[14] In its motion to be appointed lead plaintiff, CAOF represented that it "specializes in investing in cryptocurrencies," and that "those responsible for its investment decisions have significant experience with and knowledge of various aspects of cryptocurrency investing."  (Dkt. 27 at 7.) In its PSLRA certification, CAOF lists 306 transactions that allegedly took place between April 11, 2018 and March 13, 2020.  (Dkt. 23-3.)

[15] The Complaint improperly cites to an SEC Order Instituting Proceedings ("OIP") dated September 30, 2019, which memorialized a consent decree between the SEC and Block.one related to the Token Sale.  (*See* Compl. ¶ 25.)  The OIP only concerned the non-registration of

12(a)(2) of the Securities Act for allegedly soliciting the purchase of securities in the Token Sale by means of a misleading prospectus.  (*Id.* ¶¶ 244-58.)  For this claim, CAOF relies on allegations of supposed fraud from the rest of the Complaint.  (*Id.* ¶¶ 244, 252, 255.)

Count Four asserts a securities fraud claim against all defendants pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.  These allegations fall into three categories: (1) allegations that defendants exaggerated the company's "ability to generate software that would truly create" a more decentralized blockchain (*e.g.*, *id.* ¶ 149); (2) allegations that defendants misrepresented their efforts to improve EOS Blockchain governance (*id.* ¶¶ 170, 172); and (3) allegations that defendants overstated their plans to support the EOSIO blockchain ecosystem. (*E.g.*, *id.* ¶¶ 156, 162, 165.)

Counts Three and Five consist of control person claims under the Securities Act (*id.* ¶¶ 259-69) and the Exchange Act (*id.* ¶¶ 283-94) against the four individual defendants: Mr. Blumer, Mr. Larimer, Mr. Pierce, and Mr. Grigg.  (*Id.* ¶¶ 30-33.)

Of the individual defendants, only Mr. Larimer and Mr. Pierce have been served.  The Complaint alleges in conclusory fashion that both "controlled Block.one" through their respective positions.  (*Id.* ¶¶ 30, 31, 33, 265-66.)  It characterizes Mr. Larimer as the "lead architect behind the EOSIO software" and "the author of the White Paper."  (*Id.* ¶ 31.)  The Complaint alleges that Mr. Pierce co-founded Block.one and served as its Chief Strategy Officer

---

the ERC-20 tokens sold in the Token Sale, not the EOS native tokens on the EOS Blockchain. (OIP, Ex. 7, ¶¶ 19-20.)  Nor did it involve any claim or finding of fraud against Block.one.  In any event, because the OIP was on a "neither admit, nor deny" basis, it cannot be used as evidence against Block.one here.  *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("This is a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues.  Consequently, it cannot be used as evidence in a subsequent litigation between that corporation and another party.").

until March 2018.  (*Id.* ¶ 33.)

## ARGUMENT

I.  **CAOF HAS FAILED TO ALLEGE A DOMESTIC TRANSACTION SUBJECT TO THE U.S. SECURITIES LAWS**

All of CAOF's claims should be dismissed because it has failed to plead facts indicating that its secondary market purchases took place domestically.  CAOF claims that it purchased alleged securities of the Cayman Islands-registered Block.one, and the Complaint does not allege that it did so on domestic exchanges or in any other type of domestic transaction.  CAOF has thus failed to meet its burden of rebutting the presumption against extraterritorial application of the federal securities law.[16]  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265, 268-69, 130 S. Ct. 2869, 2883, 2885 (2010).

CAOF bears the burden of alleging conduct that rebuts the presumption against extraterritoriality.  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69-70 (2d Cir. 2012) (a plaintiff must "sufficiently allege that purchase or sales took place in the United States"); *Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineracao S.A.*, 2019 WL 2514056, at *4 (S.D.N.Y. June 18, 2019).  Because the transactions are not alleged to have been in "securities listed on domestic exchanges," CAOF must allege that the purchase and sale were "domestic."  *SEC v. Revelation Capital Mgmt., Ltd.*, 246 F. Supp. 3d 947, 952 (S.D.N.Y. 2017) (quoting *Morrison*, 561 U.S. at 267, 130 S. Ct. at 2884).  The failure to allege a domestic nexus with respect to any transaction is fatal.  *See Parkcentral Global Hub Ltd. v. Porsche Auto.*

---

[16] Even if U.S. securities laws did apply, the Token Sale was not an offering of securities, and neither the ERC-20 tokens nor the native EOS tokens were securities.  There is, however, no need for the Court to address these issues at this stage because CAOF's claims fail for multiple other reasons, as set forth in this brief.

*Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014).

A "domestic" purchase and sale is one in which "irrevocable liability" is incurred in the United States. *United States v. Mandell*, 752 F.3d 544, 548 (2d Cir. 2014). To incur irrevocable liability, CAOF was required to plead that it took or paid for a security within the United States. *See Parkcentral*, 763 F.3d at 212. To do so, a plaintiff must allege facts concerning "the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 70. The location of the parties is irrelevant: "citizenship or residency does not affect where a transaction occurs." *Id.* at 69; *City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

CAOF never alleges *where* its transactions took place. Even though CAOF identifies three cryptocurrency exchanges allegedly based in the United States, it does not allege that it purchased "EOS Securities" on any of those exchanges. (Compl. ¶ 79.) The Complaint contains no information whatsoever about the exchanges on which CAOF placed its orders, the confirmations that CAOF received from those exchanges, or the details of CAOF's orders. The *only* allegations that might relate to the location of CAOF's transactions are that CAOF purportedly bought "EOS Securities" on a "secondary market." (*Id.* ¶¶ 10, 27, 76, 79, 99.)[17] But

---

[17] Apparently in an effort to suggest that its secondary market purchases had a domestic nexus, CAOF refers to the location of "nodes running on the Ethereum Blockchain . . . [a]s of September 14, 2020." (Compl. ¶ 74.) This allegation is meaningless for multiple reasons. First, even if node location *were* relevant—and it is not—the relevant inquiry would be where such nodes were located *when CAOF made its purchases*, not at some arbitrary later date. Second, as the Complaint makes clear, EOS native tokens (the second putative security at issue) do not exist on the Ethereum blockchain; they exist on the EOS Blockchain. So at most, this allegation could bear on the purchase of ERC-20 tokens sold during the Token Sale, which concluded more than two years before September 2020. Third, CAOF does not plead that it purchased ERC-20 tokens directly from another token holder on the Ethereum blockchain, suggesting instead that it purchased them on an exchange, in which case the relevant question is the location of the exchange(s), not the location of Ethereum nodes.

an unidentified secondary market on which a putative security was transacted does not suffice to establish the existence of a domestic transaction.  Likewise, CAOF asserts that some of defendants' purported misstatements were made in the United States, but those allegations are silent as to the salient question: the locations of the *transactions*.  (*See id.* ¶¶ 63, 65, 150.)

Courts routinely dismiss complaints that allege *significantly* more than CAOF did to link the transactions at issue with the United States.  *See, e.g.*, *Absolute Activist*, 677 F.3d at 70 (finding insufficient the "sole allegation that affirmatively states that the transactions took place in the United States" because it was conclusory); *Cartica Mgm't, LLC v. Corpbanca, S.A.*, 50 F. Supp. 3d 477, 492 (S.D.N.Y. 2014) (dismissing complaint because plaintiff "did not allege that it purchased or sold shares in a transaction based in the United States *in connection with the alleged misrepresentations or omissions*" (emphasis added)); *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 458 (S.D.N.Y. 2013) (dismissing because the pleadings indicated that the obligations between buyer and seller were formed extraterritorially).  The Court should do the same here.

## II.    CAOF'S SECURITIES ACT CLAIMS SHOULD BE DISMISSED

The Court should dismiss CAOF's Securities Act claims.  CAOF lacks standing to pursue claims under either Section 12(a)(1) or 12(a)(2), and even if it did have standing, both claims would still fail.  CAOF's Section 12(a)(1) claim is time-barred on its face, and CAOF has failed to state a claim under Section 12(a)(2).

### A.    CAOF Lacks Standing to Bring Section 12 Claims for Its Secondary Market Purchases

CAOF brings claims under Section 12, alleging both that the Token Sale was an unregistered securities offering and that it occurred by means of a misleading prospectus. Critically, however, CAOF does not allege that it made any purchases in the Token Sale.  CAOF thus lacks standing to pursue any of its claims under the Securities Act.

1.  **CAOF's Securities Act Claims Fail Because CAOF Cannot Allege that Any Defendant Is a Statutory Seller**

Section 12(a) provides that persons who "*offer[] or sell[] a security . . . shall be liable . . . to the person purchasing such security from him . . . .*" 15 U.S.C. § 77l(a) (emphases added). CAOF does not, however, allege that any defendant actually sold or solicited any of its purchases. CAOF therefore lacks standing to assert claims under either Sections 12(a)(1) or (a)(2). *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 744 (S.D.N.Y. 2015).

In *Pinter v. Dahl*, the Supreme Court adopted a narrow two-pronged legal test for what class of defendants can face liability as a "statutory seller" under Section 12.[18] 486 U.S. 622, 108 S. Ct. 2063 (1988). The Court held that liability is limited to a defendant (1) who "passed title, or other interest in the security, to the buyer for value" or (2) "who successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 642, 647, 108 S. Ct. at 2076, 2078; *accord In re OPUS 360 Corp. Sec. Litig.*, 2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002).

CAOF cannot satisfy either prong of the *Pinter* test. As to the first, CAOF admits that it purchased tokens on the secondary market. As *Pinter* explains, Section 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." 486 U.S. at 644 n.21, 108 S. Ct. at 2077 n.21. For this reason, it is neither relevant nor sufficient for CAOF to allege that its purchases are "traceable to" the Token Sale. (*See* Compl. ¶¶ 1, 235, 246.)

---

[18] Though the Supreme Court "did not 'take a position on' the scope of a 'seller' for purposes of section 12[(a)](2)," the Second Circuit has held that the two-pronged test articulated in *Pinter* applies to claims brought under both Sections 12(a)(1) and 12(a)(2). *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (quoting *Pinter*, 486 U.S. at 642 n.20, 108 S. Ct. at 2076 n.20).

Nor can CAOF satisfy the second prong.  Courts in this Circuit "consistently have held that persons are not liable under § 12 for solicitation unless they directly or personally solicit the buyer."  *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 581 (S.D.N.Y. 1996).  Also, a plaintiff must allege that the defendant's acts of solicitation were motivated at least in part by financial gain, *id*. at 583, and that the plaintiff "purchased the securities *as a result of* [the defendant's] solicitation," *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (emphasis added).  Section 12(a) focuses "on the defendant's *relationship* with the plaintiff-purchaser," *Pinter*, 486 U.S. at 651, 108 S. Ct. at 2080 (emphasis added), and "contemplates a buyer-seller relationship not unlike traditional contractual privity," *id.* at 642, 108 S. Ct. at 2076.

The Complaint is devoid of any of the necessary allegations to support a solicitation claim.  CAOF does not allege that defendants communicated orally or in writing with it, or otherwise solicited its secondary market purchases.  Nor does it allege that it purchased tokens on the secondary market *as a result* of any acts of solicitation by defendants.  Nor are there any allegations that defendants earned a commission or a similar "financial gain" from CAOF's alleged secondary market purchases.  CAOF's Section 12(a) claims thus fail.

### 2.    CAOF's Section 12(a)(2) Claim Fails for the Additional Reason that Secondary Purchasers Lack Standing

CAOF independently lacks standing to pursue a claim under Section 12(a)(2) because it cannot allege that it acquired any security "by means of a prospectus," 15 U.S.C. § 77l(a)(2), since it concededly made all of its alleged purchases on secondary markets.  (Compl. ¶ 27.)

In *Gustafson v. Alloyd Co.*, the Supreme Court held that Section 12(a)(2) does not apply to secondary market sales of securities.  513 U.S. 561, 583-84, 115 S. Ct. 1061, 1073-74 (1995).  Since *Gustafson*, it has been "well-settled that a plaintiff may maintain a section 12(a)(2) claim

only where the plaintiff purchased securities directly in the initial public offering; so-called 'aftermarket' or 'secondary market' purchasers do not have standing to maintain a section 12(a)(2) claim." *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 57 (S.D.N.Y. 2013); *accord Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 857 (S.D.N.Y. 1995).

CAOF cannot plead around its admission that it purchased on the secondary market by alleging that it "acquired EOS Securities" "pursuant" or "traceable" to the Token Sale.  (*See* Compl. ¶¶ 246, 257.)[19]  Traceability is irrelevant to claims under Section 12(a)(2).  *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003) (comparing 15 U.S.C. § 77k[20] with 15 U.S.C. § 77l); *see also In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (rejecting plaintiffs' argument that "the allegation that they bought their shares 'pursuant to or traceable to' the Prospectus is sufficient to state a claim under § 12(a)(2)").

**B.    CAOF's Claim Under Section 12(a)(1) Is Time-Barred**

Even if CAOF had standing to pursue its claim under Section 12(a)(1), that claim should still be dismissed because "the dates in [the] complaint show that [the] action is barred by a statute of limitations."  *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989).

**1.    Claims Under Section 12(a)(1) Are Governed by a One-Year Limitations Period and Are Not Subject to a Discovery Rule**

Section 13 of the Securities Act supplies the relevant statute of limitations for claims under Section 12.  It provides: "No action shall be maintained . . . to enforce a liability created

---

[19] As explained above, the only tokens sold in the Token Sale were ERC-20 tokens, not EOS tokens.

[20] CAOF incorrectly cites to 15 U.S.C. § 77k—Section 11 of the Securities Act—as the legal authority for its misleading prospectus claim.  (*See* Compl. ¶ 245.)  But that provision governs only civil liability for false statements in a registration statement, not a prospectus.  Because there was no registration statement here, Section 11 is inapplicable.

under [Section 12(a)(1)], unless brought within one year after the violation upon which it is based." 15 U.S.C. § 77m.

The limitations period in Section 13 for claims under Section 12(a)(1) is absolute, keyed only off the date of "the violation upon which it is based." *Id.* Unlike the corresponding statute of limitations for claims under Section 12(a)(2)—which is in the same statutory section—the limitations period is *not* keyed off a plaintiff's "discovery" of any violation or when "such discovery should have been made by the exercise of reasonable diligence." *Id.* Rather, the limitations period begins to accrue, "regardless [of] whether Plaintiff knew or reasonably could have known of the injury at that time." *Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*, 2010 WL 6864006, at *2 (S.D.N.Y. Dec. 14, 2010); *see also DeLeonardis v. Berg*, 1998 WL 760338, at *3 (E.D.N.Y. Sept. 15, 1998), *aff'd*, 199 F.3d 1321 (2d Cir. 1999) ("The one-year period is not an inquiry notice provision" and "runs from the date of the sale").

The Complaint admits, as it must, that the Token Sale took place "between June 26, 2017 and June 1, 2018." (Compl. ¶¶ 57, 78.) That was well over one year before the original complaint was filed on April 3, 2020. Thus, it is clear that this claim is untimely. *See, e.g.*, *Teva Pharm. Indus.*, 2010 WL 6864006, at *2-3; *Braka v. Multibanco Comermex, S.A.*, 589 F. Supp. 802, 805 (S.D.N.Y. 1984).

## 2. Even If There Were a Legal Basis to Toll the Relevant Statute of Limitations, CAOF Has Failed to Plead Facts to Support Tolling Here

As explained above, Section 13 does not contemplate any discovery rule for Section 12(a)(1) claims. Thus, most courts outside this Circuit have held that a plaintiff can *never* rely on common law doctrines such as equitable tolling or fraudulent concealment to plead around the one-year limitations period for Section 12(a)(1). These courts reason that "the fact that [Section 13] plainly fails to include a discovery rule for § 12(a)(1)—when juxtaposed with a provision

within the same sentence specifically allowing it for § 12(a)(2)—shows that Congress intended to negate equitable tolling in this context." *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 553 (6th Cir. 2012) (collecting cases); *Barton v. Peterson*, 733 F. Supp. 1482, 1490 (N.D. Ga. 1990) ("The better reasoned authority holds that equitable tolling and fraudulent concealment are not available to toll the one-year statute of limitation for registration claims.").  As one court explained, "since the registration, or lack thereof, of securities is a public record and easily discovered, it is inappropriate to apply the equitable tolling doctrine to a claim brought for failure to register securities." *In re Rexplore, Inc. Sec. Litig.*, 671 F. Supp. 679, 687 (N.D. Cal. 1987).

Though the Second Circuit has permitted equitable tolling for Section 12(a)(1) claims, it has done so only in the narrowest of circumstances, none of which apply.  *See, e.g., Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir. 1969).  To equitably toll the statute of limitations due to fraudulent concealment, a plaintiff must establish that (1) the defendant wrongfully concealed material facts relating to the defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled. *See Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014).  CAOF has failed to plead any of those elements.

***First***, CAOF has not alleged that defendants "wrongfully concealed material *facts* relating to [their] wrongdoing." *See id*. (emphasis added).  The only information allegedly concealed is a legal *conclusion*, not a fact, about whether tokens should be deemed securities as a legal matter.  (*See* Compl. ¶¶ 116-21.)  A legal conclusion is not a *fact* that could be *concealed by defendants* in a way that would permit a finding of fraudulent concealment.  The Complaint's allegations thus stand in stark contrast to the facts in *Katz*, where the defendant fraudulently told

the plaintiff that a registration statement was at the SEC and "would come out momentarily"—a false statement of facts uniquely in the defendant's possession, not a legal conclusion based on public facts.  411 F.2d at 1055; *Pollack v. Laidlaw Holdings, Inc.*, 1995 WL 261518, at *16 (S.D.N.Y. May 3, 1995) ("For equitable tolling to apply [under *Katz*], the plaintiffs must allege some conduct that would have caused the plaintiffs to believe that the Notes were in fact registered when they were not.").  None of those facts are present here; in fact, the TPA makes plain that Block.one would not register the Token Sale as an offering.  (*See* Compl. ¶¶ 117-18.)

     ***Second***, the Complaint has not alleged that "the concealment prevented [CAOF's] discovery of the nature of the claim within the limitations period."  *See Ellul*, 774 F.3d at 801. Though the Complaint asserts that a "reasonable investor" would have been misled by defendants, the Complaint is silent as to CAOF's knowledge and whether it heard or relied on statements by defendants that prevented it from filing suit on a timely basis.  Nor could CAOF ever so allege.  The TPA and related documents themselves contained warnings about uncertainty relating to the regulatory treatment of the Token Sale and of ERC-20 tokens.  (TPA, Ex. 4, § 7.19; *see also* FAQ, Ex. 6, § 22.)  As set forth in the concurrently filed Request for Judicial Notice, there were also multiple, widely publicized "storm warnings" dating back to the SEC's publication of its DAO Report on July 25, 2017[21] that should have placed a reasonable person on inquiry notice that digital tokens might be legally treated as securities.  Since the DAO Report, there have been dozens of regulatory actions, lawsuits, congressional testimony, and

---

[21] *See* Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207 (July 25, 2017), *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.

statements by SEC officials that would have made any reasonable person aware that digital tokens might constitute securities.  (RJN, Exs. 8-22.)[22]  CAOF cannot feign ignorance of these obvious storm warnings.

 *Third*, the Complaint has not alleged that CAOF "exercised due diligence in pursuing the discovery of the claim during the period CAOF seeks to have tolled."  *See Ellul*, 774 F.3d at 801. Though CAOF previously represented to this Court that it "specializes in investing in cryptocurrencies" and has "significant experience with and knowledge of various aspects of cryptocurrency investing" (Dkt. 27 at 7), it has not pled any facts showing that it ever acted diligently in pursuing its rights.  In the absence of such particularized allegations, courts routinely reject fraudulent concealment claims.  *See, e.g.*, *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 521-22 (S.D.N.Y. 2009).

 **C.** **CAOF Has Failed to State a Claim Under Section 12(a)(2)**

 Even if CAOF had standing, the Complaint would still fail to state a claim under Section 12(a)(2).  Section 12(a)(2) requires a plaintiff to allege that a sale was effected "by means of a prospectus or oral communication" and that such a prospectus contained an untrue or misleading statement.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  Because this claim sounds in fraud, it must be pled with particularity.  *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 401 (S.D.N.Y. 2020) (heightened standard under Rule 9(b) applies to Securities Act claims "premised on allegations of fraud").  While CAOF makes the boilerplate assertion that its claim under Section

---

[22] Defendants submit these documents merely to establish that CAOF was on inquiry notice of its registration claim more than a year before this suit was filed.

12(a)(2) sounds in negligence (Compl. ¶¶ 253-54), it incorporates each allegation of its fraud-based Exchange Act claims.  (*Id.* ¶¶ 244, 252, 255.)  Thus, the heightened pleading standard applies.  *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *BioScrip*, 95 F. Supp. 3d at 742.  The Complaint fails to meet that standard.

As a threshold matter, CAOF does not even identify a specific alleged prospectus.  Nor could it, given that the TPA expressly disclosed that there was no prospectus or offering document associated with the Token Sale.  (TPA, Ex. 4 § 2.5; *see also* Compl. ¶ 9.)  Instead, it asserts in a generalized manner that countless written or oral communications—including "statements made in the White Paper, and at all associated conferences, YouTube videos, press releases, interviews, and other statements made for the purpose of offering and/or selling the EOS Securities—fall within the broad definition of 'prospectus.'"  (*See* Compl. ¶ 255.)  This allegation is hopelessly overbroad and provides no meaningful notice as to what particular communications allegedly constitute a prospectus.  *See Rombach*, 355 F.3d at 171.

In any event, CAOF has not pled the existence of any misstatement, much less pled particularized facts demonstrating fraud.  (*See* Section III.A *infra*.)  Thus, CAOF has failed to plead an actionable claim under Section 12(a)(2).

## III.   CAOF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

The Court should dismiss the Exchange Act claims because CAOF has failed to meet its heightened pleading burden under Federal Rules of Civil Procedure 9(b) and 12 and the PSLRA.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation (or omission); (2) scienter . . . ; (3) a connection with the purchase or sale of a security; (4) reliance, . . . also known as 'transaction causation'; (5) economic loss; and (6) 'loss causation.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 1631 (2005) (citations omitted).  Because these claims sound in fraud, Rule 9(b)'s heightened

pleading standard applies. *Rombach*, 355 F.3d at 171; *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). Thus, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (internal quotation marks omitted). In addition, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (quoting 15 U.S.C. § 78u-4(b)).

The PSLRA also imposes a heightened burden in pleading scienter. It requires a complaint to plead specific facts that give rise to a "strong inference" of the intent to deceive. *Id.* A strong inference means that "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S. Ct. 2499, 2510 (2007). A plaintiff must allege detailed "facts to show either (1) that [d]efendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Generalized allegations are insufficient: a complaint must "state with particularity facts giving rise to a strong inference that each defendant acted with scienter." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *9 (S.D.N.Y. Sept. 28, 2012) (citation omitted) (internal quotation marks omitted).

As explained below, the Complaint fails to meet its pleading burden in multiple independent ways.

### A.     CAOF Fails to Plead Any Actionable Misstatement or Omission

Under the PSLRA, CAOF must identify each misleading statement and "state with particularity the specific facts in support of [its] belief that [defendants'] statements were *false*

*when made*." *Rombach*, 355 F.3d at 172 (emphasis added).  It has failed to do so.

Unlike in many securities cases, CAOF does not allege that Block.one misrepresented its financial performance.  Indeed, CAOF does not allege that Block.one misstated *any* historical or contemporaneous fact, instead seeking to recover on the basis of defendants' generalized statements about their expectations, plans, and efforts.  CAOF alleges that defendants (1) *exaggerated* the company's "*ability* to generate software that would truly create" a more decentralized blockchain (Compl. ¶ 149) (emphasis added); (2) overpromised on their *efforts* to improve governance on the EOS Blockchain (*id.* ¶¶ 170, 172); and (3) overstated their *plans* to support the EOSIO blockchain ecosystem (*id.* ¶¶ 156, 162, 164-65).  None of the statements at issue was false or misleading when made.  Even if CAOF could allege falsity, at most the statements would reflect non-actionable optimism and puffery.  *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000); *San Leandro Emerg. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (company's statements about its marketing plan "were not promises to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan"); *Rombach*, 355 F.3d at 174 (general expressions of puffery and corporate optimism not actionable).  This is particularly so given the TPA's disclosures explaining that Block.one would not, and could not, control the ultimate form that any EOSIO blockchain might take.  (TPA, Ex. 4, p. 1; § 7.14.)

## 1. Defendants' Alleged Plans for EOSIO Software

Citing the White Paper and a few other statements made during the Token Sale in which defendants used the word "decentralized," CAOF claims that defendants made "false statements regarding [their] ability to generate a decentralized blockchain that would be superior to other available blockchains."  (Compl. ¶¶ 11, 150.)  CAOF does not, however, identify any actual statements made by Block.one—whether about anticipated "decentralization" or its technical

abilities or resources—that were false or misleading.  Nor does CAOF assert that Block.one's eventual design plans for the EOSIO software (such as the use of delegated proof of stake) were at all inconsistent with the technical specifications in the White Paper.  None of the statements identified in the Complaint is actionable.

*First*, CAOF's cursory allegations that it was false and misleading for defendants to characterize EOSIO software as a "fundamental advancement" (*see id.*) are legally insufficient to support a fraud claim.  CAOF alleges that this statement was false and misleading because the EOS Blockchain "nearly did not launch following a fraught call held on June 8, 2018, among software developers expressing concerns over bugs in the software."  (*Id.* ¶ 151.)  Even if true, the presence of "bugs in the software" at the time of launch is irrelevant to whether the EOSIO software was a fundamental advancement.  In any event, the term "fundamental advancement" is exactly the sort of generalized optimistic statement that constitutes non-actionable puffery. *Rombach*, 355 F.3d at 174.  And other allegedly false statements are obvious puffery.  (*See* Compl. ¶ 67 (quoting a statement by Mr. Pierce that "everything will be better, faster, and cheaper"); *id.* ¶ 70 (quoting a statement by Mr. Larimer that "[EOS] will be better than bitcoin and all the rest").  Notably, the Complaint does not identify any *technical* statements about the design plans for the EOSIO software that were allegedly false.  For instance, CAOF does not dispute that the EOSIO software uses delegated proof of stake; nor does CAOF dispute any other technical claim in the White Paper.[23]

*Second*, CAOF alleges that defendants did not disclose that the "voting framework of the

---

[23] The alleged bugs of which CAOF complains relate to the launch of the EOS Blockchain. CAOF does not allege that the ERC-20 tokens sold during the Token Sale and which operated on the Ethereum blockchain failed to operate in accordance with the Token Sale disclosures.

EOS Blockchain made it susceptible to placing power in large token-holders." (*Id.* ¶¶ 151, 159.) But, as the Complaint acknowledges, defendants made clear that "[v]oting power" on an EOSIO blockchain would be "directly proportional to the amount of tokens held; thus the larger token-holders have more sway in electing block producers." (*Id.* ¶ 124.)

**Third**, CAOF complains that some block producers on the EOS Blockchain allegedly corrupted the election process by purchasing votes. (*Id.* ¶¶ 18, 166, 168.) There are no allegations, however, that defendants ever represented that they could *prevent* third parties from participating in voting pools. The White Paper merely states that "anyone . . . will be given an opportunity to produce blocks, provided they can *persuade* token holders to vote for them." (March 16, 2018 White Paper, Ex. 2, p. 5 (emphasis added).) The Complaint nowhere explains how putative investors could ever have misunderstood the amply disclosed process—*i.e.*, that voting would be based on the size of token holdings—to somehow limit the criteria that voters could use to select block producers. (*Compare* Compl. ¶ 167 (statement that token holders will elect block producers based on their own vision), *with id.* ¶ 168 (claiming that the statement was fraudulent because of "a high concentration of block producers within a few entities").)

**Fourth**, the allegation that "Defendants failed to disclose that the EOS Blockchain governance system consisted of a revolving door of 'block producers' and could be overridden by a single 'arbitrator,' who had the power to reverse transactions and freeze accounts" (*id.* ¶ 151) is undermined by admissions in the Complaint and documents it references. The Complaint acknowledges that the White Paper disclosed that "there would be ***frequent*** elections to select the block producers"—which would ensure that the top 21 block producers could be changed at any time. (*Id.* ¶ 124; *see also* White Paper, Ex. 1, p. 4.) Additionally, the Complaint cites a July 5, 2017 paper called "EOS: An Introduction," in which Mr. Grigg explained ***that token holders***

***may choose to adopt a constitution that empowered arbitrators*** to serve as a "counterbalance" to block producers and to resolve disputes.  (Compl. ¶ 153; *see also* EOS: An Introduction, Ex. 3, p. 7.)  The Complaint nowhere explains how defendants were supposed to know, in June and July 2017, what dispute resolution procedures would be adopted by token holders to govern an EOSIO blockchain that had not yet been launched and they would not control.  (Compl. ¶¶ 131-32, 151.)

*Fifth*, the fact that an arbitrator allegedly "had the power to reverse transactions and freeze accounts" does not establish that defendants falsely represented that the data digitally recorded in an individual block of a future EOSIO blockchain would be "immutable."  (*Id.* ¶ 154.)  The Complaint does not—and cannot—allege that arbitrators had the power to erase an individual block after it was approved by a quorum of block producers.  Moreover, the White Paper itself described a system in which there could be the option to freeze accounts.  (*Id.* ¶ 66; White Paper, Ex. 1, p. 14.)

*Sixth*, any statements about what defendants hoped EOSIO blockchains could look like would—at most—have reflected non-actionable expressions of optimism about potential future events.  *See ECA*, 553 F.3d at 205-06.  For example, CAOF alleges that on June 22, 2017, Block.one issued a press release stating that "EOS is being designed to support applications that have the same look and feel of their centralized counterparts."  (Compl. ¶ 152; *see also* ¶ 157 (claiming in a YouTube video that "[c]entralization is something that EOS.IO is designed to solve"); ¶ 158 ("EOSIO . . . is probably one of the most decentralized versions of this technology we have ever seen").)  CAOF does not dispute the substance or technical accuracy of defendants' statements, but asks the Court to conclude that defendants actually were saying that unlaunched EOSIO blockchains were already "decentralized."  (*See, e.g.*, *id.* ¶ 151.)  CAOF cannot recover,

however, for supposed misstatements that defendants never made.

*Seventh*, even if defendants had asserted in some generalized way that still-unlaunched future EOSIO blockchains would be decentralized, any such statement would be so vague as to be non-actionable. *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 27-28 (S.D.N.Y. 2016). The Complaint acknowledges that "decentralization occurs in degrees" and depends at least in part on the number of users for a particular blockchain—which cannot be determined until a blockchain is actually launched. (Compl. ¶¶ 5-6.)

CAOF highlights an opinion that Mr. Pierce expressed in 2019—after he ceased to be Block.one's Chief Strategy Officer, as conceded by CAOF (*id.* ¶ 33)—that the EOS "ecosystem is a little bit of a Chinese oligarchy *right now*." (*Id.* ¶ 188 (emphasis added).) It is unclear what CAOF believes this quotation supposedly shows. The fact that multiple block producers at some point came from the same country is irrelevant: the Complaint does not plead facts indicating that defendants promised that there always would be geographic block-producer diversification. Even if CAOF could show that the existence of a "Chinese oligarchy" was inconsistent with a White Paper representation—and CAOF has not—it is not enough to show that defendants failed to predict perfectly what type of block producers token holders would decide to elect more than a year later. "It is well established that securities laws do not impose a duty on corporate officials to be clairvoyant." *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 874 (S.D.N.Y. 2011); *Schwartz v. Novo Industri, A/S*, 658 F. Supp. 795, 798-99 (S.D.N.Y. 1987) ("[A] judgment subsequently found to have been overly optimistic" is not a basis for a fraud claim under Rule 10b-5); *Marbury Mgmt., Inc. v. Kohn*, 470 F. Supp. 509, 512-13 (S.D.N.Y. 1979) ("[T]he mere fact that the defendant's predictions did not materialize" does not "indicate that the statements were untrue at the time of issuance.").

###### 2.    Defendants' Alleged Representations About the Governance of the EOS Blockchain

CAOF cannot state a viable claim by arguing that, after the Token Sale ended and after the EOS Blockchain launched, defendants misrepresented their efforts to improve that blockchain's governance.  As an initial matter, the Complaint cannot have it both ways: it cannot criticize a blockchain project on the one hand, for being too much in the hands of the few, and on the other hand, for being insufficiently controlled by defendants.  But even setting aside that basic internal inconsistency in CAOF's theory, CAOF again fails to identify any actual misleading statement by any defendant.

CAOF alleges that on June 28, 2018, Block.one stated that it planned to "soon begin allocating votes to block producers that share the core values necessary to maximize the integrity and potential of the EOS public blockchain network," and that it would be guided by certain values in doing so.  (Compl. ¶ 169.)  CAOF alleges that this statement was false and misleading because Block.one subsequently failed "to cast a single vote" for block producers through September 19, 2019 and "did nothing to select block producers that" shared its core values.  (*Id.* ¶¶ 161, 170.)  But CAOF fails to plead any facts to demonstrate when or how Block.one should have allocated its votes based on its "core values"—much less that it knew any statement was false when it was made.

CAOF similarly alleges that on October 1, 2018, Mr. Blumer stated that "[w]e are aware of some unverified claims regarding irregular block producer voting, and the subsequent denials of those claims.  We ***believe it is important*** to ensure a free and democratic election process within EOS and may, as we deem appropriate, vote with other holders to reinforce the integrity of this process.  We continue working on our potential involvement ***with the goal*** of empowering the intent of the greater community through a transparent process that incorporates community

36

feedback." (*Id.* ¶ 171 (emphasis modified).)  CAOF contends that this statement was false because Mr. Pierce had expressed his opinion that "governance of the" EOS Blockchain "was concentrated" geographically in the "hands of a few." (*Id.* ¶ 172.)  But even accepting Mr. Pierce's statement, CAOF pleads no facts indicating that Mr. Blumer's statements were false, or that Block.one did not share the goals Mr. Blumer articulated.

Finally, CAOF also alleges that it was false or misleading for Block.one to announce in August 2017 that it was "finalizing an engagement with a third-party auditor to release a public audit designed to provide comfort that Block.one has not participated in the EOS token sale in anyway [sic], with any funds." (*Id.* ¶ 160 (emphasis deleted) (brackets in original).)  CAOF alleges that this was false or misleading because the audit report has not yet been made public. (*Id.* ¶ 161.)  But the fact that a report has not been made public does not contradict the claim in the statement—which was simply that Block.one was finalizing an engagement in August 2017. Nor does CAOF plead any facts indicating the existence of financial or accounting misconduct.

### 3. Defendants' Alleged Plans to Support the EOSIO Blockchain Ecosystem

CAOF also alleges that defendants overstated the support they planned someday to offer to the eventual EOSIO blockchain ecosystem.  These allegations also fail to identify an actionable misstatement or omission, and the Complaint in fact undercuts any claim of wrongdoing.  *See, e.g.*, *San Leandro*, 75 F.3d at 811.

*First*, the Complaint alleges that in January and May 2018, defendants expressed an intention to deploy $1 billion to venture capital firms to back projects to drive innovation in the EOSIO blockchain ecosystem.  (Compl. ¶¶ 155, 162.)  CAOF alleges in conclusory terms that this claim was false and misleading "because Block.one did not plan to give $1 billion dollars of capital to third parties." (*Id.* ¶ 156.)  But the allegations in the Complaint directly undermine this

assertion.  For example, the Complaint alleges that Block.one already has committed $675 million to support "the growth and development of the EOSIO blockchain ecosystem" (*id.* ¶¶ 145-46), and that Block.one invested $150 million in a single project: a new social media platform (Voice) that was expected to operate on an EOSIO blockchain.  (*Id.* ¶¶ 185-86.)  These allegations support the conclusion that Block.one not only *intended* to deploy capital, it actually has been doing so.  Particularly in light of the hundreds of millions of dollars that CAOF concedes Block.one has *already* committed to support the EOSIO blockchain ecosystem (and given that CAOF nowhere contends that Block.one does not intend to make future commitments), it is insufficient for CAOF simply to assert that "[d]efendants did little to support applications on EOSIO" and did not "make substantial investments in third-party development of applications."[24]  (*Id.* ¶ 165.)

> ***Second***, that Block.one has invested in "other cryptocurrencies and more traditional investments" as part of a treasury management and diversification strategy is neither fraudulent nor inconsistent with defendants' prior representations.  (*Id.* ¶¶ 24, 144, 147-48.)  Particularly given that the Token Sale resulted in revenue of $4 billion (*id.* ¶ 144) and Block.one has allegedly committed only $1 billion to EOSIO-related investments to date, it is wholly sensible—and not inconsistent with any statement in the Complaint—that Block.one would invest the remainder of the amounts received in the Token Sale in a broadly diversified way.  The Complaint does not allege that Block.one ever represented that it would only spend money on EOSIO-based projects.

---

[24] Paragraph 164 contains alleged statements by defendants about developers and entities expressing interest in "building applications" utilizing EOSIO.  The Complaint does not allege, in paragraph 164 or elsewhere, that developers and entities in fact did not express such interest.

**Third**, the Complaint pleads no facts indicating that defendants' statements of intention about *future* investments were false when made. Furthermore, courts recognize that a company's investment priorities—even if publicly disclosed—may change without rendering the initial commitment false *when made. See, e.g.*, *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 645-46 (S.D.N.Y. 2015).[25]

## B. CAOF Fails to Allege Facts Giving Rise to a Strong Inference of Scienter

Even if CAOF could allege an actionable misstatement or omission, it has failed to meet its heightened pleading burden on scienter.

To raise a strong inference of fraud through a motive to defraud, CAOF must show that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307-08). "[I]t is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 308).

Where, as here, a plaintiff cannot show motive, it may meet its burden by pleading strong circumstantial evidence of conscious misbehavior or recklessness. However, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted). Conscious misbehavior "encompasses deliberate illegal

---

[25] It is also a matter of common knowledge that investing in venture capital is not the same as buying stock on an exchange. Indeed, one can commit capital to a venture fund that is not "called" by the fund for a period of years. CAOF nowhere alleges how much capital Block.one has actually deployed, much less committed, to venture investments.

behavior, such as securities trading by insiders privy to undisclosed and material information, or

knowing sale of a company's stock at an unwarranted discount."  *Novak*, 216 F.3d at 308

(citations omitted).  Recklessness is "a state of mind *approximating actual intent*, and *not merely*

*a heightened form of negligence*."  *S. Cherry*, 573 F.3d at 109 (citation omitted).  To show

recklessness, CAOF must allege that defendants either knew facts or had access to information

contradicting their public statements, "failed to review or check information that [they] had a

duty to monitor, or ignored obvious signs of fraud."  *Novak*, 216 F.3d at 308.  "'[W]here

plaintiffs contend defendants had access to contrary facts, they must specifically identify the

reports or statements containing this information.'"  *Teamsters Local 445 Freight Div. Pension*

*Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (citation omitted).

The Complaint does not refer to any facts that would support the conclusion that any of

the defendants ever intended to mislead.[26]  Instead of particularized facts, CAOF largely offers

generalized, conclusory, and speculative conjectures that defendants acted with scienter.  CAOF

makes virtually no attempt to distinguish between any of the defendants.  (*E.g.*, Compl. ¶¶ 204-

05, 209-13, 215, 217, 219-20.)  And the allegations that identify defendants by name largely

identify their roles and attempt to presume scienter by virtue of their positions.  (*E.g.*, *id.* ¶ 207

(attempting to presume scienter because a given defendant "is ostensibly in control of the

Company's plans and strategy").)  "[A]ccusations founded on nothing more than a defendant's

_____

[26] CAOF's inclusion of confidential witnesses in the Complaint seems to have been an
afterthought, and they do not support a scienter allegation.  For example, the confidential
witnesses allegedly expressed the view that the social network Voice was a "pet project" or a
"hobbyhorse" that did not offer an improvement on existing social networks.  (Compl. ¶¶ 196,
202.)  But that is irrelevant even to falsity, much less to scienter.  *Cf. In re BISYS Sec. Litig.*, 397
F. Supp. 2d 430, 442-43 (S.D.N.Y. 2005) (finding sufficient evidence of scienter where a
confidential witness alleged that defendants fraudulently overstated income and receivables even
after the confidential witness had complained about the overstatement to company officers).

corporate position are entitled to no weight."  *Mechel OAO*, 811 F. Supp. 2d at 873.

CAOF also seeks to plead scienter by alleging that the sale of tokens was "revenue" to Block.one and that defendants had a motive to maximize revenue.  (Compl. ¶¶ 211, 215.)  But revenue maximization is a motive possessed by virtually all corporate insiders; it is insufficient to show scienter.  *See, e.g.*, *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008); *see also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764-65 (S.D.N.Y. 2018).  Likewise, CAOF's complaints about the manner in which Block.one later *used* the revenue it received in the Token Sale (Compl. ¶¶ 212-14) are irrelevant to whether defendants' earlier statements on wholly different topics were made with scienter.

The remainder of CAOF's allegations are attempts to bootstrap scienter allegations from their existing, and conclusory, allegations of falsity.  Under the PSLRA, however, proof of falsity and proof of scienter require distinct support.  *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 460 n.3 (S.D.N.Y. 2019).

CAOF alleges that defendants knew "that the Company would not actually commit itself to pursuing the goals it publicly held itself out to pursue."  (Compl. ¶ 220.)  And CAOF asserts that defendants "mask[ed] the truth underlying the capabilities of" EOSIO blockchains and their decentralization capabilities.  (*Id.* ¶ 205.)  CAOF does not even purport, however, "to provide support for the contention that defendants had access to *specific* contradictory information *at the time* the allegedly fraudulent statements were made."  *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *15 (S.D.N.Y. Mar. 29, 2013).  For instance, CAOF has not pled facts indicating that decision-makers knew that Block.one could not, or would not, adhere to any stated plan.  Likewise, CAOF asserts that certain individual defendants are "charged with knowledge of the truth underlying those statements" solely by virtue of having made the

statements.  (*E.g.*, Compl. ¶ 208.)  That is not the law.

Finally, CAOF attempts to establish scienter on the basis of a "core operations" inference.  (*Id.* ¶¶ 218-20.)  CAOF alleges without any basis that the EOSIO software and EOSIO blockchains were "ostensibly the sole core operation of block.one," and therefore defendants must have known "that the Company would not actually commit itself to pursuing the goals it publicly held itself out to pursue."  (*Id.* ¶¶ 218, 220.)  But this is insufficient as a matter of law to support a scienter allegation.  *See Tung*, 412 F. Supp. 3d at 460 n.3 (the core operations doctrine "standing alone" does not "support an inference of scienter" but only "bolsters the strength of the inference of scienter when plaintiff has already adequately alleged facts indicating that defendants might have known their statements were false" (citations omitted)); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 806 (S.D.N.Y. 2020).  While the Court may consider a defendant's knowledge of core operations "as part of its holistic assessment of the scienter allegations," such knowledge is not "independently sufficient to raise a strong inference of scienter."  *Mechel OAO*, 811 F. Supp. 2d at 872.

### C.    CAOF Fails to Tie Any Alleged Misstatement to Any Loss, and Has Not Sufficiently Pled Loss Causation

Even if CAOF could plead an actionable misstatement or omission—which it cannot, as explained above—its Exchange Act claims still fail because it has failed to adequately plead loss causation.  CAOF points to a number of isolated declines in the price of EOS native tokens and claims that those price drops caused it to suffer loss.  But CAOF fails to connect any of the alleged price drops with the alleged misstatements or omissions set forth in the Complaint.  This failure to plead causation is fatal to CAOF's Exchange Act claims.

A plaintiff must establish "that the act or omission of the defendant[s] . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  To survive

dismissal, therefore, CAOF must allege, *inter alia*, a "causal link between the alleged misconduct and the economic harm ultimately suffered" by CAOF. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quotation marks and citation omitted).[27] The Complaint seeks to plead that link—*i.e.*, that defendants' purported fraud caused losses to CAOF—by pointing to a series of alleged "corrective disclosures" during the class period, which CAOF alleges caused the price of EOS tokens to drop. (Compl. ¶¶ 173-92.) But the alleged "disclosures" CAOF identifies have no connection to any alleged misstatement.

Most of the alleged disclosures do not relate to any of the alleged misstatements, but instead to garden-variety software bugs, delays, or security vulnerabilities. The largest price drop alleged by CAOF relates to a putative bug that could potentially prevent users from making transactions (*id.* ¶¶ 174-76), which has nothing to do with any purported misstatement. "To plead loss causation, a plaintiff must 'link the defendant's purported material misstatements or omissions with the harm ultimately suffered.'" *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 499 (S.D.N.Y. 2018) (citation omitted). Because the vast majority of alleged corrective disclosures have nothing to do with any alleged misstatement, they cannot satisfy CAOF's loss causation burden.

CAOF also points to the social media platform Voice and suggests that Mr. Larimer's statements about it, and a potential corresponding token, reflect that defendants were distracted from EOSIO software by other projects. (Compl. ¶¶ 183, 185-87.) Mr. Larimer's tentative

---

[27] The Second Circuit has "not yet resolved whether allegations as to loss causation must be pled with the specificity required by Rule 9(b)." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015), though other circuits have concluded that Rule 9(b)'s heightened pleading standard applies. *See, e.g.*, *Or. Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). Under Rule 8 or Rule 9(b), CAOF's allegations fail.

discussion of a hypothetical new token in no way "corrected" any previous claim by him or any other defendant.  Defendants never represented that they would not work on other projects or would not participate in social media projects.  In fact, they listed social media among potential EOSIO "[p]opular use cases."  (*Id.* ¶ 54.)  Thus, creating a new EOSIO application, such as Voice, does not constitute a correction of any alleged misstatement, which concerned different topics: decentralization, support of the ecosystem, and blockchain governance.  *Cf. Bratusov v. ComScore, Inc.*, 2020 WL 3447989, at \*12 (S.D.N.Y. June 24, 2020) (rejecting effort to establish an actionable misstatement or omission where the plaintiff could not show that changing strategies were in conflict).  Block.one's alleged investment in Voice was consistent with its commitment to support the EOSIO blockchain ecosystem—a commitment to which CAOF alleges defendants did not dedicate sufficient resources.

In the end, CAOF alleges only two "disclosures" that it even attempts to claim "reveal" any of the alleged misleading statements: (1) actions by the EOS Core Arbitration Forum— which is wholly unrelated to defendants' conduct or control—that CAOF claims undercut defendants' claims that EOS would be decentralized (Compl. ¶¶ 177, 181); and (2) Mr. Pierce's remark about geographical preponderance in China.  (*Id.* ¶ 188.)  But neither of these "statements" revealed anything new or different about the structure of the EOS network.  Further, CAOF does not allege that Mr. Pierce's statement was related to any statement that was misleading or knowingly false when made.

The White Paper made clear that block producers would have "limited and checked authority to freeze accounts, update defective applications, and propose hard forking changes to the underlying protocol."  (*Id.* ¶ 66.)  It also disclosed that token holders could choose to adopt a constitution that contained dispute resolution procedures, including arbitration, which could

serve as a "counterbalance" to block producers.  (*See* White Paper, Ex. 1, p. 12; EOS: An Introduction, Ex. 3, p. 7.)  The arbitrators' exercise of power they openly possessed in no way constitutes a "corrective disclosure."  *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x. 72, 75 (2d Cir. 2013) (citation omitted).  Similarly, to the extent power became concentrated on the EOS network, it was a result of voting conducted on public, open source code functioning as advertised.  The White Paper states that "power [would] originate[] with the token holders who delegate [their] power to block producers."  (Compl. ¶ 66 (alterations in original).)  The Complaint alleges that it is this voting mechanism—which was announced in the *public* White Paper and implemented in open source code—that allegedly made EOS susceptible to power concentration.  (*Id.* ¶ 151.)

Likewise, nothing about Mr. Pierce's statement constitutes a corrective disclosure because the relevant statement does not contradict any prior alleged statement.  *See Lentell*, 396 F.3d at 175 n.4; *In re Omnicom Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008).[28]

## IV.    CAOF'S CONTROL PERSON LIABILITY CLAIMS SHOULD BE DISMISSED

Because the Complaint has failed to plead a primary violation of the securities laws for the reasons set forth above, all of its control person claims also fail and must be dismissed.  *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017); *Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 641 (S.D.N.Y. 1999).

### CONCLUSION

For the foregoing reasons, defendants request that the Court dismiss the Complaint with prejudice.

---

[28] CAOF does not seek any recovery based on alleged misstatements about EOS native tokens being securities.  These alleged misstatements are not described in the false statement section of the Complaint, and CAOF does not attempt to plead scienter or loss causation based on them.

Dated: November 2, 2020

BAKER MARQUART LLP

DAVIS POLK & WARDWELL LLP

By:   */s/ Brian E. Klein*
     Brian E. Klein
     Scott M. Malzahn
      (*pro hac vice* application pending)
     Teresa L. Huggins
     Jose R. Nuno
      (*pro hac vice* application forthcoming)
     777 S. Figueroa Street, Suite 2850
     Los Angeles, CA  90017
     Tel:    (424) 652-7800
     Fax:    (424) 652-7850
     Email:  bklein@bakermarquart.com
           smalzahn@bakermarquart.com
           thuggins@bakermarquart.com
           jnuno@bakermarquart.com

By:   */s/ Edmund Polubinski III*
     Greg D. Andres
     Edmund Polubinski III
     Andrew S. Gehring
     Gabriel Jaime-Bettan
     Antonio M. Haynes
     450 Lexington Avenue
     New York, New York 10017
     Tel:    (212) 450-4000
     Fax:    (212) 701-5800
     Email:  greg.andres@davispolk.com
           edmund.polubinski@davispolk.com
           andrew.gehring@davispolk.com
           gabriel.jaime@davispolk.com
           antonio.haynes@davispolk.com

     Neal A. Potischman
     1600 El Camino Real
     Menlo Park, California 94025
     Tel:    (650) 752-2000
     Fax:    (650) 752-2111
     Email:  neal.potischman@davispolk.com

*Attorneys for Defendants Block.one, Daniel Larimer, and Brock Pierce*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has

been served on all counsel of record through the Court's ECF System on November 2, 2020.


*/s/ Edmund Polubinski III*
Edmund Polubinski III