**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHASE WILLIAMS AND WILLIAM ZHANG, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Civ. No. 1:20-cv-2809-LAK |
| v. | <u>CLASS ACTION</u> |
| BLOCK.ONE, BRENDAN BLUMER, and DANIEL LARIMER, | |
| Defendants. | |
| CRYPTO ASSETS OPPORTUNITY FUND LLC and JOHNNY HONG, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | Civ. No.: 1:20-cv-3829 |
| v. | |
| BLOCK.ONE, BRENDAN BLUMER, DANIEL LARIMER, IAN GRIGG, and BROCK PIERCE, | <u>CLASS ACTION</u> |
| Defendants. | |

**CRYPTO ASSETS OPPORTUNITY FUND LLC's MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    FACTS .................................................................................................................. 6

    A.   Enticed by Decentralized Features, Investors Flocked to
       Cryptocurrencies in 2016 and 2017 ........................................................ 6

    B.   Defendants Conducted the Unregistered Sale of the EOS
       Securities Through the ICO to Capitalize on Cryptocurrency
       Investor Enthusiasm ................................................................................ 7

    C.   Defendants Deceived Investors Throughout and Following
       the ICO ..................................................................................................... 9

    D.   The Price of EOS Securities Dropped Precipitously as the
       Truth Was Revealed ............................................................................... 11

III.   ARGUMENT ...................................................................................................... 13

    A.   The ICO Violated Section 12 of the Securities Act ............................. 13

       1.   The Section 12 Claims Are Not Time-Barred ............................. 13

       2.   The ICO Violated Section 12(a)(2) of the Securities Act ........... 18

       3.   Plaintiff Has Standing to Assert Claims Under the Securities Act ...... 20

          a.   Defendants Are Statutory Sellers ................................... 20

          b.   Secondary Market Purchasers Such as Plaintiff Have
             Standing to Pursue Section 12 Claims ........................... 22

    B.   The ICO Violated Section 10(b)(5) of the Exchange Act ..................... 25

       1.   Defendants Made False and Misleading Statements ................... 25

          a.   Misstatements Concerning the Decentralized Features
             of the EOS Blockchain ................................................... 26

          b.   Misstatements Concerning the Integrity of the Block
             Producer Election Process .............................................. 29

          c.   Misstatements Concerning the Use of the ICO Proceeds
             and Efforts Invested in the EOS BlockChain Development ...... 31

       2.   Defendants Acted with Scienter .................................................. 33

       3.   The Complaint Alleges Loss Causation ....................................... 38

    C.   The Complaint Alleges Claims Under Section 20(a) of the Exchange
       Act and Section 15(a) of the Securities Act ......................................... 41

    D.   The Complaint Alleges Facts Demonstrating Domestic Transactions ........ 42

IV.    CONCLUSION ................................................................................................... 45

i

## TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012)............................................................................................42, 43

*Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*,
   2020 WL 3318029 (S.D.N.Y. June 18, 2020) ...............................................................20, 41

*Anegada Master Fund, Ltd. v. PXRE Grp. Ltd.*,
   680 F. Supp. 2d 616 (S.D.N.Y. 2010).................................................................................23

*In re Aphria, Inc. Sec. Litig.*,
   No. 18 Civ. 11376 (GBD), 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)...........................36

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018).................................................................................35

*Arco Cap. Corps. Ltd. v. Deutsche Bank AG*,
   949 F. Supp. 2d 532 (S.D.N.Y. 2013)...........................................................................42, 45

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*,
   18 F. Supp. 3d 482 (S.D.N.Y. 2014)...................................................................................28

*In re AstraZeneca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008).................................................................................35

*In re Bear Stearns Cos., Inc. Sec. Deriv. and ERISA Litig.*,
   No. 08 MDL 1963, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011)......................................45

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
   881 F. Supp. 2d 853 (S.D.N.Y. 2011).................................................................................31

*In re Chaus Sec. Litig.*,
   1990 WL 188921 (S.D.N.Y. Nov. 20, 1990).......................................................................21

*Competitive Assocs., Inc. v. Fantastic Fudge, Inc.*,
   58 F.R.D. 121 (S.D.N.Y. 1973) ....................................................................................13, 14

*In re Cosi, Inc. Sec. Litig.*,
   379 F. Supp. 2d 580 (S.D.N.Y. 2005).................................................................................24

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014)...................................................................................37

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003)........................................................................24, 25

*Ellul v. Congregation of Christian Bros.*,
  774 F.3d 791 (2d Cir. 2014)..............................................................................15

*In re Energy Sys. Equip. Leasing Sec. Litig.*,
  642 F. Supp. 718 (E.D.N.Y. 1986) ...................................................................13

*In re: EZCorp, Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016)................................................................41

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortgage Ass'n v. Nomura Holding Am.,
  In*c.,
  873 F.3d 85 (2d Cir. 2017)................................................................................21

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015)..............................................................................38

*Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................19

*In re Gas Reclamation, Inc. Sec. Litig.*,
  659 F. Supp. 493 (S.D.N.Y. 1987) ...............................................13, 14, 15, 16

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009)..............................................22, 23, 24, 25

*Gormley v. Magicjack Vocaltec Ltd.*,
  220 F. Supp. 3d 510 (S.D.N.Y. 2016)................................................................39

*Gruber v. Gilbertson*,
  216-cv-9727, 018 WL 1418188 (S.D.N.Y. Mar. 20, 2018)................................31

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995)............................................................................................23

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)................................................................17

*Holmberg v. Armbrecht*,
  327 U.S. 392 (1946)............................................................................................13

*In Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
  890 F.3d 60 (2d Cir. 2018)................................................................................45

*In re ITT Educ. Servs., Sec. Litig.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014)..................................................................38

*In re Jumei Int'l Hld. Ltd. Sec. Litig.*,
   2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ...........................................................19

*Katz v. Amos Treat & Co.*,
   411 F.2d 1046 (2d Cir. 1969).............................................................................13

*Komanoff v. Mabon, Nugent & Co.*,
   884 F. Supp. 848 (S.D.N.Y. 1995) ......................................................................24

*Lopez v. CTPartners Exec. Search Inc.*,
   173 F. Supp. 3d 12 (S.D.N.Y. 2016)....................................................................28

*Marbury Mgmt., Inc. v. Kohn*,
   470 F. Supp. 509 (S.D.N.Y. 1979) ......................................................................31

*Martinek v. AmTrust Fin. Servs., Inc.*,
   2020 WL 4735819 (S.D.N.Y. Aug. 14, 2020) ......................................................38

*In re Merrill Lynch Ltd. P'Ships Litig.*,
   154 F.3d 56 (2d Cir. 1998)..................................................................................17

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)..............................................................20, 21

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)................................................................................18

*Morrison Cartica Mgmt., LLC v. Corpbanca, S.A.*,
   50 F. Supp. 3d 477 (S.D.N.Y. 2014)...............................................................44, 45

*Morrison Giunta v. Dingman*,
   893 F.3d 73 (2d Cir. 2018)............................................................................42, 45

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ................................................................................. *passim*

*Nat'l Credit Union Admin. Bd. v. HSBC Bank USA, Nat'l Ass'n*,
   117 F. Supp. 3d 392 (S.D.N.Y. 2015)..................................................................16

*Nutriband, Inc. v. Kalmar*,
   2020 WL 4059657 (E.D.N.Y. July 20, 2020) .......................................................33

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Hldgs. SE*,
   763 F.3d 198 (2d Cir. 2014)................................................................................44

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
   153 F. Supp. 3d 628 (S.D.N.Y. 2015)..................................................................33

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017)..............................................................................................42

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015).............................................................................16

*Pinter v. Dahl*,
   486 U.S. 622 (1998)..................................................................................................20, 21

*Pollack v. Laidlaw Hldgs., Inc.*,
   1995 WL 261518 (S.D.N.Y. May 3, 1995) .....................................................................16

*Pope Invs. II, LLC v Deheng Law Firm*,
   No. 10 Civ. 6608 (LLS), 2013 WL 3946126 (S.D.N.Y. July 31, 2013)...............................42

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007).............................................................................20

*Ret. Sys. v. Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011).............................................................................31

*In re Salix Pharm., Ltd.*,
   No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................34

*Schwartz v. Novo Industri A/S*,
   658 F. Supp. 795 (S.D.N.Y. 1987) .................................................................................31

*Sec. & Exch. Comm'n v. Riel*,
   282 F. Supp. 3d 499 (N.D.N.Y. 2017).......................................................................34, 37

*Shain v. Duff & Phelps Credit Rating Co.*,
   915 F. Supp. 575 (S.D.N.Y. 1996) .................................................................................21

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015)...................................................................34, 35, 38

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
   2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001).................................................................22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).....................................................................................................34

*In re Tezos Sec. Litig.*,
   Case No. 17-cv-06779-RS, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ..................5, 43, 44

*In re Toronto-Dominion Bank Sec. Litig.*,
   No. CV 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) ...............................41

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) .............................................................................20, 21

*U.S. Secs. & Exch. Comm'n v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007).......................................................................................17

*In re Vale S.A. Sec. Litig.*,
    2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..................................................................28, 29

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).......................................................................................18

*Wallace v. IntraLinks*,
    2013 WL 1907685 (S.D.N.Y. May 8, 2013) ............................................................................19

*Yi Xiang v. Inovalon Hldgs, Inc.*, 327 F.R.D. 510 (S.D.N.Y. 2018)..........................................25

*Yung v. Lee*,
    432 F.3d 142 (2d Cir. 2005)....................................................................................23, 24, 25

*Zakinov v. Ripple Labs, Inc.*,
    18-cv-06753, 2020 WL 922815 (N.D. Cal. Feb. 26, 2020)................................................21, 22

**Statutes**

15 U.S.C. §77b(a)(10)...........................................................................................................18

15 U.S.C. § 77d....................................................................................................................22

15 U.S.C. §77e(b)(2)............................................................................................................22

15 U.S.C. §77l................................................................................................................18, 23

15 U.S.C. § 77m...........................................................................................................13, 14

15 U.S.C. § 78u-4(b)(2)(A)....................................................................................................33

Fed. R. Civ. P. 8...................................................................................................................38

Fed. R. Civ. P. 15(a)(2).........................................................................................................45

Lead Plaintiff Crypto Assets Opportunity Fund, LLC ("Plaintiff" or "CAOF") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF Nos. 85-88), submitted on behalf of defendants block.one ("block.one" or the "Company"), Brendan Blumer, Daniel Larimer, Ian Grigg and Brock Pierce (collectively, "Defendants").

## I.      PRELIMINARY STATEMENT

In 2017, investor frenzy underlying skyrocketing prices of cryptocurrencies such as Bitcoin was reaching an all-time high.  Defendants Blumer, Larimer, Grigg and Pierce (together, the "Individual Defendants") sought to get in on this action.  They determined that they would offer a new cryptocurrency – the EOS tokens ("EOS Securities") – to investors.  Thus, they launched an "initial coin offering" ("ICO"), in which they sold millions of EOS Securities to cryptocurrency investors.  However, they did not register the EOS Securities with the SEC, which was a violation of Section 12(a)(1) of the Securities Act of 1933, ("Securities Act") and they effectuated the sale of the EOS Securities through false and misleading statements, which violated Section 12(a)(2) of the Securities Act and Section 10(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act").

With Bitcoin well-established as the market leader, and many other cryptocurrency options crowding the arena, Defendants knew they would have to entice investors with promises that the EOS Securities would improve upon their competitors' products.  Knowing well that cryptocurrency investors most valued a "decentralized" platform and governance system, Defendants claimed that the EOS Securities would incorporate features that would enhance decentralization, by spreading decision-making authority over 21 independent "block producers," who would be elected through a democratic, fair and transparent process.

Excited by the prospect of a genuinely decentralized blockchain, which is a ledger on which cryptocurrency transactions are recorded, cryptocurrency traders poured their funds into the EOS

Securities, driving up their price to a high exceeding $22 per token during the frantic ICO, which occurred via a Dutch Auction lasting for 350 days.  The fervor generated by the ICO surpassed all expectations and yielded $4 billion: the most funds ever raised in a cryptocurrency ICO.  The majority of these funds passed directly to the pockets of the Individual Defendants and a handful of other block.one equity owners.

As would later become apparent, however, the blockchain that block.one promised, the "EOS Blockchain," lacked any enhanced decentralized features, as evidenced when "arbitrators" unilaterally reversed certain transactions that had been verified by the block producers.  Further, the block producer voting process was anything but fair and democratic; it was marred by corruption, which resulted in power being concentrated in a few Chinese oligarchs, rather than spread among the 21 independent block producers that investors had been promised.  As these facts were revealed, investors lost interest in the EOS Securities.  With each negative piece of news about the EOS Securities and EOS Blockchain, investors sold off their holdings, driving down the price of the EOS Securities to as low as $2.70 on the date the Amended Class Action Complaint ("Complaint") (ECF No. 66) was filed.  Investors who did not sell their EOS Securities early enough were left holding a worthless bag of cryptocurrency tokens that no buyer would touch.

In contrast to the investors looking for a decentralized cryptocurrency, the Individual Defendants, who personally orchestrated the entire scheme, fared well by anyone's standards.  The 350-day ICO raised over $4 billion, a massive sum which was not invested back into the EOS Blockchain or any purported efforts to develop a decentralized cryptocurrency and blockchain platform as promised.  Rather, these funds were classified as revenue to block.one and then channeled to its venture capital arm located in Hong Kong, where Blumer, block.one's CEO, was investing in *other* cryptocurrencies and more traditional securities such as government bonds.  The

EOS Securities investors did not share any stake in the venture capital fund; rather the profits of these investments inured to the benefit of the Individual Defendants and a few other high-profile, investors, such as Peter Thiel, who struck deals with block.one that were far more lucrative and preferential than those available to the public.

Defendants knew that their scheme was unlawful; that is why they went to great lengths to try to escape the reach of the Securities and Exchange Acts, by stating that the EOS tokens were not securities (and thus declining to register them), and by half-heartedly pretending to prevent sales of the EOS Securities to U.S.-based investors.  Investors took Defendants at their word, and believed that the EOS tokens were not securities.  But given that they marketed the EOS Securities within the U.S., and to U.S. investors, so vigorously and directly, U.S. investors did, indeed, purchase the EOS Securities.

Notwithstanding these efforts, Defendants are unable to avoid liability under the Securities and Exchange Acts.  On September 30, 2019, the SEC determined that the EOS tokens are securities that should have been registered pursuant to the Securities Act.  Thus, Defendants' gamble not to register the EOS Securities constituted a violation Section 12(a)(1) of the Securities Act.  In addition, Defendants knowingly (or at least recklessly) used false and misleading statements to convince investors to purchase the EOS Securities, in violation of Section 12(a)(2) of the Securities Act and of Section 10(b)(5) of the Exchange Act.

Defendants now seek to dismiss the Amended Complaint. But their "kitchen sink" approach falls short on all fronts.

*First*, Defendants seek dismissal of the Section 12 claims, arguing that Plaintiff does not have standing to assert such claims because no Defendant is a statutory seller.  MTD at 22-23.[1] But they ignore that in this Circuit, statutory sellers encompass market participants aiming to enrich themselves, which is the case here, where the Individual Defendants pocketed the $4 billion raised in the ICO.  *See infra* Section III(A)(3)(a).

*Second*, Defendants claim that Plaintiff cannot assert Section 12 claims because it did not purchase its securities directly in the ICO.  MTD at 23-24.  But Defendants overlook the entirety of the Securities Act regime, which permits secondary market liability whenever a prospectus was required to be delivered.  Here, because Defendants were offering new securities daily for 350 days, each daily offering triggered the duty to deliver a prospectus, and CAOF's purchases in April and May 2018 occurred within that time frame.  *See infra* Section III(A)(3)(b).

*Third*, Defendants assert that the Securities Act claims are time-barred because they were not asserted within one year of the ICO.  MTD at 24-28.  But again, Defendants overlook the law of this Circuit, which holds that the statute of limitations does not begin to run until the *discovery* of the violation, where fraudulent concealment of the relevant facts occurred.  *See infra* Section III(A)(1).  Plaintiff has alleged facts establishing such fraudulent concealment occurred here, and thus its claims are not time-barred because the action was brought within one year of discovery: i.e., September 30, 2019, the date on which the SEC determined that the EOS tokens are securities. *Id.*

*Fourth*, Defendants claim that no Section 12(a)(2) claim can stand because the ICO was not effected "by means of a prospectus or oral communication."  MTD at 28-29.  But its overly

---

[1] References to "MTD" are to the Memorandum in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint," ECF No. 86.

narrow interpretation of these terms finds no support in the law, and the various sales methods it employed to foist the EOS Securities on investors qualify as "prospectuses." *See infra* Section III(A)(2).

*Fifth*, Defendants argue that Plaintiff did not allege a single actionable misstatement or omission, and thus its claims arising under Section 12(a)(2) of the Securities Act and under Section 10(b)(5) of the Exchange Act fail.  MTD at 30-39.  But as explained in Section III(B)(1), *infra*, Plaintiff has pled actionable false and misleading statements that (i) the EOS Blockchain would be decentralized, when in fact, single arbitrators had the ability to act unilaterally; (ii) the integrity of the block producer election process, and Defendants' efforts to remedy widespread corruption; and (iii) the use of the ICO proceeds, which were accounted for as revenue to block.one, and placed into a Hong Kong venture capital fund.

*Sixth*, Defendants assert that they lacked the requisite scienter necessary to sustain Plaintiff's 10(b)(5) claim. MTD at 39-42. But they ignore that they alone, as the founding and controlling employees and officers of block.one, designed and orchestrated the entire scheme, and personally enriched themselves from the proceeds of the ICO.  *See infra* Section III(B)(2).

*Seventh*, Defendants contend that Plaintiff has not sufficiently pled loss causation.  MTD at 42-45.  But Plaintiff's extensive allegations tying the various corrective disclosures to drops in the price of the EOS Securities more than satisfy the low bar for pleading loss causation. *See infra*, Section III(B)(3).

*Eighth*, Defendants argue that Plaintiff cannot satisfy the requirement that the EOS Securities were transacted in the U.S. under *Morrison v. National Australia Bank Ltd*, 561 U.S. 247 (2010).  MTD at 19-21.  This highly-fact intensive inquiry should not be resolved on a motion to dismiss, however.  Further, Plaintiff has alleged sufficient facts to satisfy *Morrison* under the

developing jurisprudence, which has examined the issue in the context of cryptocurrencies.  *See infra* Section III(D).

## II.   FACTS

### A.   Enticed by Decentralized Features, Investors Flocked to Cryptocurrencies in 2016 and 2017

Cryptocurrencies are digital assets, which can serve as a vehicle of exchange or to store value.  ¶ 40. [2]  Bitcoin was the world's first, and is still to this day the most prominent and popular, cryptocurrency.   Investor enthusiasm for bitcoin fueled a large appetite for cryptocurrency, particularly during the period of 2016-2017. *Id.*

The principal feature that distinguishes cryptocurrencies from other forms of currency is the use of "blockchains," which are ledgers that record digital transactions between two parties. ¶¶ 3, 41.  The most important feature of blockchains is that they are "decentralized," in contrast to "centralized" platforms, which are run by a single controlling authority (such as Yahoo! and Facebook).   ¶ 4.   The benefit of decentralization is that power and authority is spread among many users.  The information is stored on a shared and continually reconciled database, hosted across a network of "nodes", making it nearly impossible to submit a false transaction, as the malicious actor would have to gain control of a majority of the nodes to achieve its end.   ¶ 41. Additional benefits of a decentralized blockchain are that there are no intermediaries to the transactions, enhancing efficiency, and transparency, through the blockchain itself.   ¶ 5.

In order to encourage users to participate in the process of validating and verifying information on the blockchains, their creators devise methods to reward users for this work.  In the case of bitcoin, the process of validating transactions is called "mining," and miners are rewarded

---

[2] References to "¶__" are to the Complaint filed on September 18, 2020, ECF No. 66.

with bitcoin.  ¶ 42.  In the case of the EOS Securities and the EOS Blockchain, these individuals are called "block producers."

Although it sputtered at first, investor demand for cryptocurrencies hit its stride in late 2016.  ¶ 48.  Seeking to exploit this voracious appetite, entrepreneurs heralded the launch of new cryptocurrencies through "initial coin offerings," or "ICOs."   ¶ 49.  These were typically accompanied with "white papers" and other marketing materials to generate enthusiasm for the ICO.  *Id.*

### B.   Defendants Conducted the Unregistered Sale of the EOS Securities Through the ICO to Capitalize on Cryptocurrency Investor Enthusiasm

In the spring of 2017, to capitalize on this cryptocurrency fervor, Defendants devised a scheme to promote, offer, and sell EOS tokens (the "EOS Securities").  ¶¶ 72-76, 113.  Defendants sold over $4 billion worth of the EOS Securities in a year-long Initial Coin Offering ("ICO"), that ran from June 26, 2017 through June 1, 2018.  ¶¶ 9, 78, 144.  The ICO was operated as a "Dutch auction."  The Company sold 200 million of EOS Securities on the first day, and another 700 million in equal installments of two million over the next 350 consecutive days.  ¶ 9.  During the ICO, anyone could purchase EOS tokens on the EOS.IO website, hosted on a web server in California, USA.  ¶¶ 72, 78.  At the end of the ICO, Defendants had raised $4 billion.

The EOS Securities were issued as a type of crypto-asset known as an "ERC-20" token. *Id.*   ¶ 47. Although ERC-20 tokens were promoted to technically inexperienced investors as functionally analogous to cryptocurrencies like bitcoin, they are not.  The EOS Securities have no functionality or utility at issuance and derive their entire value from the hope that the issuer, block.one, would fulfill its promise to create some utility in the future.  ¶ 6.

At the time of the ICO, however, Defendants obscured and concealed the nature of EOS and its underlying software EOSIO in a highly technical White Paper they issued to prospective

purchasers.  ¶¶ 7-8.  Although EOS was a security, block.one omitted the disclosures that are essential to investor protections and public offerings under U.S. securities laws.  ¶ 9.  Having failed to make the disclosures required to accompany issuance of a security, Defendants sold nearly 900 million EOS tokens in the year-long ICO that ran from June 26, 2017 through June 1, 2018.  ¶¶ 57, 78.  Through the ICO, Defendants raised in excess of $4 billion. ¶¶ 67, 78.

Shortly after the beginning of the ICO, and while the ICO was ongoing, the EOS Securities were listed, promoted, and sold on U.S. and other cryptocurrency exchanges, ¶¶ 10, 76, 79, including domestic exchanges Coinbase, Kraken, and Poloniex.  Block.one also advertised that it was partnering with leading venture capital investors, including Peter Thiel and Mike Novogratz's Galaxy Digital in New York, "to develop the EOS ecosystem."  ¶¶ 155, 162.

Although block.one purports to have prevented U.S.-based investors from purchasing the EOS Securities, Defendants continued to expressly promote and solicit purchases of the EOS Securities in the U.S. at cryptocurrency industry events and in the media. ¶¶ 51, 96.  Throughout the Class Period, Defendants touted EOSIO and solicited sales of the EOS Securities at conferences across the U.S., including in this District.  ¶¶ 51, 64, 96. Defendants also continuously promoted the EOS Securities through the EOS.IO website, online message boards, and social media. ¶¶ 65, 95-96, 104, 113.

A reasonable investor could not have concluded that the EOS Securities were securities at all until, at the earliest, September 30, 2019, when the SEC issued a cease-and-desist order, concluding that EOS tokens are securities and should not have been sold without registration with the SEC (or pursuant to an exemption) and ordering block.one to cease and desist its violations of securities laws.  ¶¶ 25, 77, 111.  Even following the publication of the cease-and-desist order, Defendants never registered EOS Securities as required under Section 5 of the Securities Act.

### C.     Defendants Deceived Investors Throughout and Following the ICO

The ICO was conducted at a time when there were already several, well-established cryptocurrencies investors could choose to purchase.   ¶ 48.  Thus, to generate demand for the EOS Securities, Defendants had to convince investors that their cryptocurrency was unique; that it would offer an improvement upon the increasingly crowded field of options.  Defendants knew that what attracted to investors to cryptocurrencies was that their operation and governance were decentralized, which offers enhanced security and transparency.  Thus, Defendants promised investors that the EOS Securities and the EOS Blockchain would improve upon decentralized features over those available in the existing cryptocurrencies and blockchains.  ¶¶ 122-123.

To accomplish this, Defendants told investors that the EOS Blockchain would be governed by 21 "block producers," whose function was analogous to the nodes that verified transactions on the Bitcoin blockchain.  ¶ 123.  The 21 block producers were touted as an improvement over the decentralized features in cryptocurrencies such as Bitcoin, which was dominated by fewer than ten mining entities.  ¶¶ 123-124.  Defendants described block producers as the "central brain" of the block chain.  ¶ 124.  Furthermore, investors were told that block producers would be elected through a democratic process: owners of EOS Securities could vote for block producers, and their voting power would stand in direct proportion to the number of EOS Securities they held.  ¶ 125.

Despite these promises of decentralization and a fair democracy, in reality, the governance system was *not* decentralized.  To the contrary, "arbitrators" were employed to resolve disputes, and they exercised unilateral authority to reverse transactions and refuse to process transactions from certain addresses.  ¶¶ 130-132.  The 21 separate block producers thus did not have ultimate authority; their collective determinations could be overridden by the wave of the wand of a single

arbitrator.  When news of arbitrator interference surfaced, investors began to understand that the promises of "decentralization" were, at a minimum, overstated, if not downright false.

At least equally troubling, however, was the rampant corruption in the block producer election process.  ¶¶ 133-140.  Although Defendants promised "honesty, integrity, and fairness" and "transparency of identity," the system that they themselves had designed allowed for the buying and selling of votes.  ¶ 135.  The result of this corruption was that a handful of entities controlled multiple block producers.  ¶¶ 135, 136, 139.  Thus, in stark contrast to the decentralized governance regime spread over 21 block producers, in fact, some number of entities much smaller than that controlled the EOS Blockchain.

Defendants eventually admitted to these problems.  On October 1, 2018, Blumer, the Company's CEO, stated that he was "aware of some unverified claims regarding irregular block producer voting" and that he believed "it is important to ensure a *free and democratic election process within EOS.*" ¶ 135.  Blumer promised, falsely, that the Company would do what it could to ensure the "integrity of this process," including voting its own EOS Securities with other holders, to further its "goal of empowering the intent of the greater community." ¶ 135.  Despite these promises, block.one did not cast a single vote from its 10% holdings of EOS Securities, ¶ 144, and by June 2019, Pierce, block.one's co-founder, admitted that the EOS Blockchain was governed by a "Chinese oligarchy," the exact opposite result that investors were promised.  ¶ 136.  Not only did this undermine any claims of decentralization, it also permitted unqualified and technically non-proficient actors be selected as block producers.  ¶¶137-138.  The corrupt voting process also led other prominent investors, who had sought unsuccessfully to be elected as block producers through fair processes to surrender and sell their EOS Securities.  ¶¶ 138-139.

10

The co-founders Pierce and Blumer, and architect of the system, Larimer, for their part, had little incentive to remedy these problems or put any efforts into the development of the EOS Blockchain.  The ICO had raised $4 billion in funds, which more than doubled the proceeds of any previous ICO.  ¶ 12.  EOS Security holders did not have any claim to the $4 billion.  Instead, the funds flowed to the Defendants themselves, and to a handful of high-net worth equity investors who signed on early to generate enthusiasm for the ICO.  ¶ 71.  Despite that investors had been led to believe that at least a portion of the proceeds of the ICO would be used to develop the decentralized blockchain they were promised, ¶155, in fact the proceeds were funneled to an investment fund in Hong Kong, which focuses on *other* cryptocurrencies and more traditional investments like government bonds.  ¶¶ 24; 144-148, 156.

### D.    The Price of EOS Securities Dropped Precipitously as the Truth Was Revealed

The price of the EOS Securities plummeted as the realities underscoring their essence was revealed to the cryptocurrency community. ¶¶ 173-192.

*First*, concerns with the development in the production and launch of the EOS Blockchain were leaked in a June 8, 2018 report that block.one's internal system was hacked, and that the EOSIO software, which was used to run the EOS Blockchain, was plagued by system bugs.  ¶ 174. As this news was revealed, the price of the EOS Securities declined by $3.00 per token, more than 21%, from a price of $14.09 on June 9, 2018 to a price of $11.09 on June 10, 2018.  ¶ 176.

*Second*, on June 18, 2018, arbitrators issued an order directing block producers not to process transactions from 27 different addresses, demonstrating that the arbitrators, and not the elected block producers, actually controlled the EOS Blockchain.  This shook investors' faith in the decentralized properties of the EOS Blockchain, and the price of the EOS Securities dropped

11

by 15%, from a price of $10.27 on June 21, 2018 to a price of $8.75 on June 22, 2018.  ¶¶ 177-178.

*Third*, on November 13, 2018, news of a unilateral action by an arbitrator was disseminated, further demonstrating that the EOS Blockchain did not offer enhanced decentralization as promised.  ¶ 181.  The price of EOS Securities fell by 17% on this news, from $5.42 on November 13, 2018 to $4.51 on November 14, 2018.

*Fourth*, investors sold their EOS Securities in reaction to evidence that the Individual Defendants were abandoning efforts to develop the EOS Blockchain.  On November 28, 2018, Larimer posted a message on a messaging app that he was considering developing a new cryptocurrency.  ¶ 183.  Concerns about abandonment drove the price of the EOS Securities down by 14.5%.  ¶ 184.

*Fifth*, in a similar vein, news that block.one was planning to launch a new social media platform called the "Voice" drove the price of the EOS Securities down by 9%.  ¶¶ 185-187.

*Finally*, investor concerns that the governance system was not decentralized, as promised, were confirmed in early June 2019, when Pierce announced at a conference in San Francisco that the EOS "ecosystem is a little bit of a Chinese oligarchy right now."  This drove down the price of EOS Securities 21% over two days, from $7.95 on June 2, 2019 to $6.09 on June 4, 2019.  ¶¶ 188-189.

The net effect is that the investors who believed in Defendants' promises to deliver a decentralized blockchain, which would be run by fairly elected block producers, and which would enjoy the continued support of the Company and the Individual Defendants, were left "holding the bag," and suffered tremendous damages at the hands of Defendants.  The price of the EOS Securities reached their height of $22.89 on April 29, 2018, towards the end of the ICO.  ¶ 10.  As

of the date the Complaint was filed, the price of the EOS Securities was $2.70, a decline of 88%.

¶ 26.

## III.    ARGUMENT

### A.    The ICO Violated Section 12 of the Securities Act

#### 1.    The Section 12 Claims Are Not Time-Barred

Plaintiffs' Section 12 claims are timely under the statute of limitations because they were

brought within one year of the violations being discovered.

Under Section 13 of the Securities Act, a plaintiff must bring a Section 12 claim "within

one year after the violation upon which it is based."  15 U.S.C. § 77m.  Courts in this Circuit allow

the application of a discovery rule, such that a cause of action under Section 12 accrues only when

a plaintiff discovers, or should reasonably have discovered, the alleged violation.[3]  *See Katz v.*

*Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir. 1969) (applying equitable estoppel to Section

12(a)(1) claims) (citing *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-34 (1959)); *In re*

*Gas Reclamation, Inc. Secs. Litig.*, 659 F. Supp. 493, 507 (S.D.N.Y. 1987) (applying equitable

tolling to Section 12(1) claim where defendants concealed the need to register the securities with

the SEC); *see also Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) ("Equity eschews

mechanical rules; it depends on flexibility. Equity has acted on the principle that laches is not, like

limitation, a mere matter of time; but principally a question of the inequity of permitting the claim

to be enforced . . . .") (quoting *Galliher v. Cadwell*, 145 U.S. 368, 373) (1892)); *Competitive*

*Assocs., Inc. v. Fantastic Fudge, Inc.*, 58 F.R.D. 121, 123 (S.D.N.Y. 1973) ("[W]here a federally

---

[3] Defendants' reliance on out-of-Circuit case law for the proposition that a plaintiff  "can *never* rely on common law doctrines such as equitable tolling or fraudulent concealment to plead around the one-year limitations period for Section 12(a)(1)" is improper where, as here, the Second Circuit has a well-developed body of law that directly controls the issues at hand.  *See* MTD at 25-26.

created cause of action has been fraudulently concealed . . . a federally established period of limitations does not begin to run until discovery."); *In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718, 745 (E.D.N.Y. 1986) ("The better rule, and the rule within the Second Circuit . . . is that where the existence of a cause of action under the securities laws has been concealed from prospective plaintiffs as a result of fraudulent concealment by defendants . . . the statute of limitations should be tolled.").

The Second Circuit has routinely applied the principles of equitable tolling and equitable estoppel in the context of Section 12(a)(1) claims and tolled the one-year statute of limitations where, as here, defendants concealed the need to register the securities with the SEC.  *See, e.g., In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. at 507 (finding that the allegations of fraudulent concealment of the need to register the securities at issue were sufficient to toll the statute of limitations); *Competitive Assocs., Inc.*, 58 F.R.D. at 123 (denying motion to dismiss where there was a question of fact as to the existence of the alleged fraudulent concealment).

*In re Gas Reclamation, Inc. Securities Litigation*, 659 F. Supp. at 507, is particularly instructive. There, the plaintiffs' claims arose out of their purchase of Gas Reclamation Units ("units"), which were investment contracts, and therefore securities under the federal securities laws. *Id.* The plaintiffs alleged misrepresentations and omissions of material facts by the defendants that involved, *inter alia*, the need for registration with the SEC. *Id.* at 499-500. The defendants moved to dismiss the claims as untimely, arguing that the plaintiffs did not file suit within one year of when they purchased the units, which the defendants argued constituted the "violation."  659 F. Supp. at 507.  The court rejected this position, finding that the allegations in the complaint were "sufficient to toll the statute of limitations by virtue of the alleged fraudulent concealment of the need to register the reclamation units with the SEC."  *Id.* at 507.

14

Similar to the plaintiffs in *In re Gas Reclamation*, 659 F. Supp. at 507, Plaintiff here pleads sufficient allegations to toll the statute of limitations.  Specifically, the Complaint alleges that Defendants knowingly made misrepresentations to EOS investors by way of the Token Purchase Agreement and various communications with investors to give the misimpression that the EOS Securities were not securities (and therefore did not require registration with the SEC).  *See* ¶¶ 116-119.  The Complaint also alleges that Defendants failed to ensure that the EOS securities were registered.  ¶¶ 9, 116, 240.  Moreover, the Complaint alleges that Defendants participated directly in the sale of unregistered EOS Securities or directed and facilitated such sales.  ¶¶ 9, 81, 238-39.  Finally, the Complaint pleads that Plaintiff discovered Defendants' wrongdoing when the SEC determined on September 30, 2019, that the EOS Securities should have been registered.  This determination occurred less than one year prior to the filing of the first complaint in this action, on September 30, 2019.  ¶¶ 25, 111.  Accordingly, Plaintiff's claim under Section 12(a)(1) is timely.

In arguing otherwise, Defendants rely on wholly inapposite cases.  First, Defendants cite *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) (MTD at 26-28), to support their argument that Plaintiff has not sufficiently pleaded concealment of material facts relating to Defendants' wrongdoing.  But that case bears no resemblance to this.[4]  In *Ellul*, the court rejected the plaintiffs' claim of equitable tolling where the plaintiffs had possessed the necessary information to bring their claim and failed to identify what previously concealed information was ultimately revealed as to allow them to file the lawsuit.  *Id.*  In contrast, here, Plaintiff alleges that Defendants concealed that EOS tokens were securities (*see* ¶¶ 116-119), and that block.one's settlement with the SEC, which revealed that EOS tokens were in fact securities,

---

[4] As an initial matter, *Ellul* does not involve allegations of securities laws violations, nor is it a class action.  *See generally, Ellul v. Congregation of Christian Bros.*, 774 F.3d 721 (2d Cir. 2014).

15

were what notified Plaintiff that it had claims against Defendants. ¶¶ 111-112. Furthermore, whether Defendants did mislead investors is a question of fact, which cannot be resolved at the motion to dismiss phase. *Nat'l Credit Union Admin. Bd. v. HSBC Bank USA, Nat'l Ass'n*, 117 F. Supp. 3d 392, 404 (S.D.N.Y. 2015); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 385 (S.D.N.Y. 2015) ("[W]hether a plaintiff has sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).").

Second, Defendants rely on *Pollack v. Laidlaw Holdings, Inc.*, 1995 WL 261518, at \*16 (S.D.N.Y. May 3, 1995) to suggest that Defendants' misrepresentation that EOS tokens were not securities was a matter of legal conclusion, and not a fact, and therefore insufficient to trigger the application of equitable tolling (MTD at 27). But *Pollack* does not stand for that proposition. In fact, this Court in *Pollack* rejected the plaintiffs' equitable tolling argument only because they had failed to "allege some conduct that would have caused the plaintiffs to believe that the Notes were in fact registered when they were not." *Id.* Here, Plaintiff does not allege that it believed that EOS tokens were registered with the SEC; rather, Plaintiff alleges that Defendants misrepresented that EOS tokens were *not securities*, and by virtue of not being securities were not subject to federal and state securities laws. *See* ¶¶ 116-119. Unlike the plaintiffs in *Pollack*, Plaintiff here has alleged conduct that caused it to believe that EOS tokens did not require registration with the SEC. *See* ¶¶ 116-119. These are precisely the type of affirmative misrepresentations that are sufficient to toll the one-year statute of limitations in this case. *See In re Gas Reclamation*, 659 F. Supp. at 507.

Next, Defendants assert that Plaintiff's allegation that Defendants' concealment would have misled a *reasonable investor* (¶ 121) is insufficient to show that the concealment prevented its own discovery that the EOS tokens are securities that required to be registered (MTD at 27). Yet, they fail to cite a single case to support that argument, presumably because they cannot.

16

Curiously, in the same paragraph, Defendants make a conclusory assertion – again, without any support – that several "storm warnings" relating to the regulatory treatment of token sales should have made any *reasonable person* aware that EOS tokens were securities.  Those "storm warnings," however, did not specifically concern the EOS tokens, and Defendants, throughout and following the ICO, continued to represent affirmatively that EOS tokens were *not* securities.

Finally, Defendants argue that fraudulent concealment does not apply because Plaintiff has not alleged that it exercised due diligence in pursuing the discovery of their Section 12(a)(1) claim, citing *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 60 (2d Cir. 1998) and *Hinds County, Mississippi v. Wachovia Bank N.A.*, 620 F.Supp.2d 499, 521-22 (S.D.N.Y. 2009). Neither is applicable in this case. *Merrill Lynch* held that, for plaintiffs' RICO claim, the limitations period began to run when defendants' disclosures put the plaintiffs on inquiry notice of the claim, and the plaintiffs failed to plead fraudulent concealment as a tolling exception.  154 F.3d at 60.  Unlike the defendants in that case, however, block.one and its executives never made any disclosures that would have put Plaintiff on notice of its claim. Instead, Defendants made affirmative misrepresentations that EOS tokens were not securities, and were not subject to registration with the SEC.  Defendants neither attempted to register the EOS Securities with the SEC, nor did they file for an exemption from registration.  *See* ¶¶ 116-119.  *Hinds County* addressed fraudulent concealment in the context of tolling the statute of limitations for an antitrust violation.  620 F. Supp. 2d at 521-22.   There, the court found that the plaintiffs failed to meet their burden of pleading reasonable diligence to uncover the concealed violations – not affirmative misrepresentations, as Plaintiff alleges here.  *See id.*; ¶¶ 116-119; *cf. U.S. Secs. & Exch. Comm'n v. Power*, 525 F. Supp. 415, 426 (S.D.N.Y. 2007) (finding that allegation of affirmative acts to conceal the violation satisfied diligence requirement at the pleading stage).

## 2. The ICO Violated Section 12(a)(2) of the Securities Act

The Complaint also alleges that Defendants violated Section 12(a)(2) of the Securities Act by offering and selling securities by means of prospectuses and communications containing material misstatements and omissions. ¶¶ 149-168. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Section 12(a)(2) holds liable any person who uses a "prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. §77l(a)(2); *In re Wachovia Equity Sec. Litig*., 753 F. Supp. 2d 326, 367 (S.D.N.Y. 2011). For the reasons explained in Section III(B)(1), *infra*, Plaintiff pled actionable misstatements contained in the White Paper, the June 22, 2017 press release, the July 5, 2017 Grigg paper, the January 13, 2018 press release, and the May 15, 2018, May 24, 2018 and June 20, 2018 videos. *See also* ¶¶ 149-168.

"Prospectus" is defined broadly in the context of the Securities Act to include nearly any written or oral offer or confirmation of sale. 15 U.S.C. § 77b(a)(10). The term "prospectus" as defined in the Securities Act thus easily encompasses the EOS White Paper as well as other announcements and statements used to entice investor appetite in the ICO. ¶¶ 65, 149-168, 248.

Defendants erroneously contend that Plaintiffs' Section 12(a)(2) claim should be dismissed because Plaintiffs did not specifically identify one singular document as a prospectus. MTD at 29. In no place does the statute require that Plaintiffs name a document as *the* prospectus, nor do Defendants cite any case law to support the notion that they must. Moreover, documents and videos containing the false statements all served as offers of the EOS Securities. *See* ¶¶149-168 (identifying the White Paper, "EOS-AN Introduction," press releases and YouTube videos with false statements designed to sell the EOS Securities); ¶ 255 ("statements made in the White Paper, and at all associated conferences, YouTube videos, press releases, interviews, and other statements

18

made for the purpose of offering and/or selling the EOS Securities—fall within the broad definition of 'prospectus.'").

Defendants also argue that the PSLRA's heightened pleading standard should apply here. MTD at 36-37.  However, the Complaint expressly disclaims all allegations of fraud with regard to 12(a)(2) claims and alleges only that Defendants acted "negligently" by not exercising reasonable care to ensure that statements made in connection with the offer were not false or misleading, clearly distinguishing between its fraud-based and negligence-based claims.  ¶¶ 253-54.  As a result, the negligence-based claims in the complaint are not subject to any heightened pleading standard.  *See Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (holding that Plaintiffs are allowed to "plead [fraud and negligence] claims in the alternative" and that where the structure of a complaint "draw[s] a clear distinction between [the at most] negligence and fraud claims," a heightened pleading standard does not apply to the negligence-based claims) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007)); *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176 at *3 (S.D.N.Y. Jan. 10, 2017) ("[T]he rule that has emerged is that plaintiffs "may plead Section 10(b) fraud and Section 11 negligence claims as alternatives, as long as the complaint is organized in a way that allows the court to determine which allegations support which claim."); *Wallace v. IntraLinks*, 2013 WL 1907685 at *12 (S.D.N.Y. May 8, 2013) ("Plaintiffs have properly separated their Section 10(b) allegations based on fraud, from their Section 11 and 12(a)(2) allegations based on negligence.  The complaint offers a different theory for liability for the latter claims [sic] that defendants negligently failed in their duty to investigate and ensure the truth of statements in the registration and prospectus . . . .  The Section 11 and 12(a)(2) claims are thus governed by the pleading standard in Rule 8(a)."); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632-33 (S.D.N.Y. 2007) (holding

that Section 11 and 12(a)(2) claims expressly pleading negligence are not subject to a heightened pleading standard).

### 3. Plaintiff Has Standing to Assert Claims Under the Securities Act

#### a. Defendants Are Statutory Sellers

Defendants here are statutory sellers within the meaning of Section 12. A defendant is a statutory seller if he "successfully solicit[ed] the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1998); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020) (holding that the owner of the securities is a statutory seller). The Complaint alleges that Defendants block.one, Larimer, Blumer, Pierce and Grigg all solicited the purchase of EOS Securities via their involvement in drafting and disseminating the White Paper and through active promotion of EOS Securities on the EOS website, on various social media platforms, and through online videos. ¶¶ 65, 68, 71, 94, 96, 104. Further, Defendants reaped over $4 billion in profit from the sale of EOS Securities. ¶ 12. *See In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (holding that an allegation of financial gain in a complaint was "clearly sufficient" to establish the requisite motivation); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) (holding that the profits the defendants earned from the offering were sufficient to establish that the defendants were motivated by their own financial interests). These funds were not invested back into the EOS Blockchain; rather, they were diverted to a venture capital enterprise investing in other cryptocurrencies and more traditional investments such as government bonds, giving the ultimate beneficial owners of block.one, namely the Individual Defendants, huge personal gains at the expense of Plaintiffs, making them billionaires in some cases. ¶¶ 144-148. Similar facts have led to findings of statutory

sellers.  *See, e.g.*, *Zakinov v. Ripple Labs, Inc.*,180cv06753, 2020 WL 922815, at *5 (N.D. Cal. Feb. 26, 2020) (allegations that defendants "have earned over $1.1 billion through the sale of" cryptocurrencies and "published various tweets, interviews and articles pushing the adoption of" the cryptocurrency at issue were enough to allege that the defendants were statutory sellers).

Defendants here err in adopting an overly narrowly interpretation of the term "statutory seller" to argue that they did not have the requisite privity with Plaintiff to create liability.  MTD at 30.  Interpreting *Pinter*, the Second Circuit held that the term 'statutory seller' "'is not limited to persons who pass title' for value" and that related statutory terms are "expansive enough" to "encompass the entire selling process."  *Fed. Hous. Fin. Agency for Fed. Nat'l Mortgage Ass'n v. Nomura Holding Am., In*c., 873 F.3d 85, 138 (2d Cir. 2017) *citing Pinter*, 486 U.S. at 647. Whether a transaction occurs directly does not bear on the question of whether the defendant is a statutory seller.  *See Twinlab*., 103 F. Supp. 2d at 204 ("even in a 'firm commitment underwriting' transaction, [the defendant] could be held liable as a statutory seller"); *Milman*, 72 F. Supp. 2d at 229 (holding that issuers who sell stock through underwriters can be considered statutory sellers); *In re Chaus Sec. Litig*., 1990 WL 188921, at *9-10 (S.D.N.Y. Nov. 20, 1990) (holding that the defendants were statutory sellers where they "authorized the actions by the underwriters and their promotional efforts, assisted in the preparation of and signed the offering documents," and "received a tremendous financial gain through the public offering.").

Defendants' dearth of supporting authority demonstrates their exaggeration of the level of privity required under Section 12(a)(2).  Of the two cases Defendants reference, one predates *Pinte*r and thus applies a different standard entirely.  *Shain v. Duff & Phelps Credit Rating Co*., 915 F. Supp. 575, 581 (S.D.N.Y. 1996).  The other explicitly held that even a mere signature on a registration statement is sufficient to establish that a plaintiff purchased securities "as a result" of

the defendants' solicitation.  *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at \*7 (S.D.N.Y. Sept. 20, 2001).  The allegations here – that Defendants Blumer, Larimer, Brock and Grigg were actively promoting the sale of the EOS Securities and benefited enormously therefrom – more than satisfy the requirements.

### b.  Secondary Market Purchasers Such as Plaintiff Have Standing to Pursue Section 12 Claims

Plaintiff has standing to assert claims under §§12(a)(1) and 12(a)(2) of the Securities Act notwithstanding the fact that it did not purchase the EOS Securities directly in the ICO.  With regard to Plaintiff's Section 12(a)(1) claim, courts have squarely held that a purchaser need not have purchased the security in an "initial distribution" to have standing for a claim of unregistered securities.  *Ripple Labs, Inc.*, 2020 WL 922815, at \*12 (holding that purchaser of cryptocurrency units had standing to assert claims for unregistered securities despite not having purchased in the initial offering).

Further, Plaintiff has standing to assert its Section 12(a)(2) claim because Defendants had a "legal obligation to provide a prospectus" at the time that Plaintiff purchased its EOS Securities. *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 575 (S.D.N.Y. 2009) (citing *Yung v. Lee*, 432 F.3d 142, 148-49 (2d Cir. 2005)); 15 U.S.C. §§ 77d, 773; 17 C.F.R. § 230.174). 15 U.S.C. §77e (b)(2) makes it "unlawful for any person, directly or indirectly . . . to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose or sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title."  15 U.S.C. § 77d exempts certain actors from this requirement, but does not exempt issuers.  ("The provisions of section 77e of this title shall not apply to transactions by any person other than an issuer, underwriter, or dealer.").

In *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 588-78 (1995), the Supreme Court held that Section 12(a)(2) did not apply to private transactions, but rather only to public offerings by an issuer or controlling shareholder.  In reaching this conclusion, the Court held that "the liability by § 12(2) cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption)."  The Second Circuit echoed this sentiment in *Yung v. Lee*, 432 F.3d 142, 148-49 (2d Cir. 2005).  While *Yung* held that no Section 12(a)(2) liability could attach because the transaction at issue was a private sale of the security, it has been interpreted to mean that Section 12(a)(2) liability *does* attach wherever there *is* a "legal obligation to provide a prospectus." *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 574 (S.D.N.Y. 2009) (citing *Yung*, 432 F.2d at 148-49) ("In so holding, the [*Yung*] court established that the relevant inquiry in determining whether Section 12(a)(2) liability could attach was whether the sale of the security carried with it the legal obligation to provide a prospectus.").  *Giant Interactive* noted that this holding "is consistent with the language of Section 12(a)(2) itself, which 'draws no express distinction between shares purchased in the initial distribution and shares purchased in the aftermarket,' but instead requires that 'a plaintiff have purchased a security, from a seller, pursuant to a misleading prospectus.'"  *Id.* at 575 (quoting *Feiner v. SS & C Techs., Inc.*, 47 F. Supp. 2d 250, 252 (D. Conn. 1999) ("This court now holds that §12(a)(2) extends to aftermarket trading of a publicly offered security, so long as that aftermarket trading occurs 'by means of a prospectus or oral communication.'  15 U.S.C. §77l. . . . [A]ll that is necessary is that delivery of a prospectus have been required under the statutory and regulatory framework."); *see also Anegada Master Fund, Ltd. v. PXRE Grp. Ltd.*, 680 F. Supp. 2d 616, 624 (S.D.N.Y. 2010) ("The legal obligation to distribute a prospectus in connection with an offering serves as the predicate for section 12(a)(2)

liability.").   Thus, purchasers on the secondary market have standing so long as delivery of a prospectus is required.

Here, such delivery was plainly required throughout the entire ICO process, which lasted nearly one year.   This is because of the nature of the ICO itself, whereby Defendants sold the EOS Securities in 2 million increments each day for 350 consecutive days, thus requiring Defendants to distribute prospectuses with each daily offering.   Liability therefore attaches because there was a "legal obligation to provide a prospectus" each day throughout the ICO. *In re Giant Interactive Group*, 643 F. Supp. 2d at 575.   Plaintiff made a host of purchases during April and May 2018, (*see* ECF 23-3 (Schedule A showing CAOF's purchases of EOS Securities) at 5), and thereby have standing to assert Section 12 claims against Defendants.

The cases Defendants cite are inapposite.   MTD at 32.   First, nearly all of them predate the 2005 *Yung* decision wherein the Second Circuit clarified that the relevant inquiry in determining Section 12 standing.   *Yung*, 432 F.3d at 149.   Accordingly, *In re Cosi, Inc. Securities Litigation*, 379 F. Supp. 2d 580,589 (S.D.N.Y. 2005) which Defendants rely onto argue that only purchasers who purchased stock in a primary offering can maintain a Section 12 claim (MTD at 24), has been rejected on the grounds that "*Cosi* and the cases it relied upon were decided without the benefit of the Second Circuit Court of Appeal's decision in *Yung v. Lee*."   *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d at 574.

Like *Cosi*, both *Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 857 (S.D.N.Y. 1995) and *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003), which Defendants also cite, predate *Yung* and are thus outdated precedent on this point.   In *DeMaria*, moreover, the court opined that "[a]llowing suit by aftermarket purchasers of shares issued in a public offering does not conflict with this goal because the focus of the claim remains on deceptions occurring during the public

offering," and concluded that aftermarket purchasers could maintain '33 Act claims at least under Section 11. *DeMaria v. Andersen*, 318 F.3d at 177. The court withheld judgment on standing for Section 12 cases because the question was not necessary to the *DeMaria* case, instead addressing it two years later in *Yung* where, as noted, it concluded that after-market purchasers could have standing. Defendants cite to only one case that postdates *Yung*: *In re Smart Technologies, Inc. Shareholder Litigation*, and that case itself implies that secondary market purchasers likely have standing if their shares were acquired by means of a prospectus. 295 F.R.D. 50, 57 (S.D.N.Y. 2013) (holding that disallowing Section 12(a)(2) claims by secondary market purchasers "likely derives from section 12(a)(2)'s requirement that the sale be made "by means of a prospectus or oral communication.").

Further, determination of standing to assert claims pursuant to the ICO is properly reserved for the class certification phase, at which point the Court will assess the typicality adequacy of Plaintiff to serve as the lead plaintiff for the proposed class. *Yi Xiang v. Inovalon Hldgs, Inc.*, 327 F.R.D. 510, 520-21 (S.D.N.Y. 2018) (noting that a lead plaintiff need not have standing to sue on every claim); *In re Giant Interactive*, 643 F. Supp. 2d at 574 (S.D.N.Y. 2009) (holding that defendants' arguments regarding the initial distribution of securities was a premature attempt to limit the scope of the class at the pleading stage).

### B. The ICO Violated Section 10(b)(5) of the Exchange Act

#### 1. Defendants Made False and Misleading Statements

The Complaint alleges with particularity three categories of actionable misstatements that violate the Securities Act and the Exchange Act: (i) statements concerning the decentralized features of the EOS Blockchain and EOS Securities; (ii) statements concerning the integrity of the block producer election process; and (iii) statements concerning Defendants' willingness to invest

in the Company and the EOS Blockchain.  Defendants argue that the statements were not false at the time they were made, or that they constituted inactionable puffery or optimistic statements about the future.  MTD at 30.  For the foregoing reasons, these arguments fail.

### a. Misstatements Concerning the Decentralized Features of the EOS Blockchain

The Complaint alleges that Defendants falsely touted the Company's ability to offer a decentralized blockchain platform.  ¶¶ 150-159.  The key feature of a decentralized platform is that governance and decision-making are spread out among many users.  ¶ 123.  In the case of block.one, investors were promised that control would be dispersed among 21 independent block producers.  ¶¶ 18, 122-126. In fact, final decision-making authority was vested in one or more "arbitrators," who could unilaterally reverse transactions and freeze accounts.  ¶¶ 151, 154. Further, the "block producers," who supposedly represented the decentralized nature of the power, were actually a handful of Chinese oligarchs, who were elected through a fraudulent voting process. ¶ 152, 170. Thus, the following statements were false and misleading:

- In the "EOS.IO technical White Paper," issued on June 5, 2017 and authored by Defendant Larimer, the Company stated that "EOS.IO software *utilizes the only decentralized consensus algorithm* capable of meeting the performance requirements of applications on the blockchain." ¶150.  It further stated that "[t]he EOS.IO software *introduces a new blockchain architecture designed to enable vertical and horizontal scaling of decentralized applications*." *Id.*

- The White Paper further states that EOS.IO software *"represents fundamental advancements in blockchain technology,"* because it had "*decentralized applications [which could be] easily deployed and governed,*" and that would "*allow[] for quick and easy deployment of decentralized applications.*" *Id.*

- On July 22, 2017, block.one issued a press release stating that "EOS is being designed to support distributed applications that have the same look and feel of their centralized counterparts," thus falsely implying that the EOS blockchain was decentralized.  ¶ 152.

- On July 5, 2017, Ian Grigg published "EOS-An Introduction," and explained that a "*block that is accepted by a quorum of producers is declared immutable*, and the

chain of immutable blocks becomes in effect a checkpoint." In fact, the arbitrator had final say over what blocks were immutable. ¶153-154.

- On May 15, 2018, block.one posted a YouTube video, in which Defendant Blumer claimed that on the EOS.io blockchain, tokenholders would be "able to elect 21 block producers," which would have the effect of "*restor[ing] power or distribut[ing] the power amongst the tokenholders*." ¶ 157.

- During the same May 15, 2018 YouTube video, Bart Wyatt, a block.one engineer stated that "EOSIO as a blockchain, as a technology, as a community, is probably *one of the most decentralized versions of this technology we have ever seen*," and further stated that "*the biggest difference between us and any of the competitors in the field is how much we have decentralized even some of the core concepts of the chain*." ¶158.

Defendants do not argue that the ability of arbitrators to override the conclusions of the block producers does not render statements about the decentralized features of the EOS Blockchain and EOS Securities false. Instead, they point to a statement by Grigg (in "EOS: An Introduction") that token holders "may choose to adopt a constitution that empowered arbitrators to serve as a 'counterbalance' to block producers and to resolve disputes," MTD at 33-34, and that Defendants did not know what dispute resolution procedures would be adopted by token holders. *Id.* at 34. However, nowhere in this paper did Grigg state or even imply that an arbitrator might override the will of the 21 elected block producers. In fact, to the contrary, he stated that "[a]rbitrators publish rulings, which *producers might enforce, or users might seek external enforcement.*" ECF 87-3 at 7. This portrays the opposite: that the arbitrator rulings would be merely advisory, and that final authority lay with the block producers. But this is not what happened. Instead, on June 9, 2018, arbitrators "directed EOS block producers not to process transactions from 27 different addresses," ¶ 131, and on November 8, 2018, a single arbitrator reversed certain EOS transactions. ¶ 132. These activities outraged the community. Further, Grigg stated that a "counterbalanced arrangement ensures that no party or group has total power." ECF 87-3 at 7. This turned out to be false. The arbitrators, in fact, had "total power."

Defendants also claim that the ability of a single arbitrator to reverse transactions and freeze accounts does not render false the statement that the blocks recorded by block producers would be "immutable" because the arbitrators did not have the "power to erase an individual block after it was approved by a quorum of block producers." MTD at 34. But Defendants do not explain how that exact event occurred, when an arbitrator reversed a transaction. Further, this does not address the arbitrators' ability to freeze accounts.

Defendants further argue that statements concerning the decentralized features of the EOS Blockchain were "so vague as to be inactionable." MTD at 35.[5] In fact, the statements were anything but vague; the White Paper explained in painstaking detail how the block producers would be elected and the role they would play in decentralization. ¶ 126. Furthermore, Defendants' use of adjectives to describe, falsely, the EOS Blockchain does not immunize them from liability. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *10 (E.D.N.Y. May 20, 2020) ("While Vale's allegedly misleading statements . . .rely on adjectives that may be vague in other circumstances, many are sufficiently specific to survive a motion to dismiss given their context and clear accuracy"). In addition, the inquiry of whether a false statement constitutes inactionable puffery is specific to each situation. Thus, "while a term like 'high quality'" might be mere puffery . . . in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless," *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014), or where, as here, the product was not decentralized and offered no

---

[5] *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 27-28 (S.D.N.Y. 2016), which Defendants rely upon for this point, does not help them. This case deals with vague statements about a company's culture and integrity. Here, Defendants misled investors about the core features of the EOS Blockchain that they were selling: its decentralization. Decentralization would be effectuated through specific processes, but these processes (the fair election process and the vesting of power in the 21 block producers as opposed to arbitrators) were explained in specific – and false – terms.

improvements over its competitors.  Nor are the statements "optimism about potential future events."  MTD at 34.  When read in full, the statements are "neither aspirational nor vague.  In fact, if credited by the factfinder, [they] may just as easily be called a lie."  *Vale*, 2020 WL 2610979, at *11 (E.D.N.Y. May 20, 2020) (finding that details about how safety of mines was being achieved rendered such statements concerning safety actionable).  Here, too, Defendants' statements that the EOS Blockchain and EOS Securities "represent[] fundamental advancements in blockchain technology," and would run "decentralized applications" were lies.

Further, to the extent Defendants attempt to disclaim responsibility for their false promises because they purportedly ceded control of the EOS Blockchain to third parties, *see, e.g.*, MTD at 33, it makes their promises all the more misleading.  If it is Defendants' position that they had no control over the centralization of the EOS Blockchain, they should not have been promising investors a decentralized platform.  In any event, Defendants' modesty rings hollow.  In fact, the EOS Securities and EOS Blockchain were the brainchild of the Individual Defendants, including the use of arbitrators.  As they are responsible for the conception and initial implementation of their "decentralized" cryptocurrency, ¶¶ 30-33, 52-54, 64, 70, 105, and they are likewise responsible for statements uttered to sell the EOS Securities, and the fallacies therein.

### b. Misstatements Concerning the Integrity of the Block Producer Election Process

Defendants also misled investors about their efforts to confront unfairness and corruption in the block producer election process.  ¶¶133-143; 166-172.  Specifically, in a YouTube video, block.one assured investors that "the community" would be "electing the producers to fulfill their own vision of what the blockchain should be."  ¶ 167.  Block.one also stated on June 28, 2018 that it had responsibility to "participate as an active minority voting member," to ensure that block producers were elected who "share the core values necessary to maximize the integrity and

potential of the EOS public blockchain network," which include "honesty, integrity and fairness." ¶ 169.  Finally, on October 1, 2018, Mr. Blumer stated that Defendants were "aware of some unverified claims regarding irregular block producer voting," and that they "believe it is important to ensure a free and democratic election process."  ¶ 171.

In fact, these statements were false and misleading.  Although block.one knew that the voting process had been corrupted and concentrated in the hands of a few, Defendants never, in fact, used its 10% stake to attempt to sway the voting process.  ¶¶ 133-135, 141.  Instead, they allowed the rampant buying and selling of votes, which eventually led to a concentration of power in the hands of a few Chinese oligarchs to continue unabated.[6]  ¶¶ 136-140.  This rendered false the statements concerning the integrity of the election process as well as statements concerning the decentralized features of the blockchain.

Defendants' primary answer to these allegations is to claim that they did not represent that they "could *prevent* third parties from participating in voting pools," MTD at 33, suggesting, incorrectly that investors should have known of this risk. Further, this does not square with Defendants' statements that buying and selling votes constituted "*irregular* block producer voting," and the need to "ensure a free and democratic election process."  ¶ 171.

Defendants further argue that they disclosed that voting power would be "directly proportional to the amount of tokens held," which was all investors needed to know.  MTD at 32-33.  But this did nothing to alert investors that large token-holders would actually be permitted to *buy* votes from other token-holders, thereby subverting the integrity of process.

---

[6] Defendants focus on the geography of the "Chinese oligarchs," but that is not central to Plaintiff's claim.  MTD at 35.  Although this concentration of power in a single geographic location does suggest an even stronger inference that the EOS Blockchain was not decentralized, the principle point is that Defendants promised that 21 separate, unique, independent block producers, not a handful of oligarchs, would control the EOS Blockchain.

Defendants also claim that their statement that block.one would "begin allocating votes to block producers that share the core values necessary to maximize the integrity and potential of the EOS public blockchain network" is not false because there are no allegations "to demonstrate when or how block.one should have allocated its votes" and that the statement was not "false when it was made." MTD at 36. But they do not explain why Plaintiff needs to have alleged "when or how block.one should have allocated its votes." The fact remains, and Defendants do not dispute, that block.one did *not* allocate its votes, in any manner. ¶ 141.

Further, Defendants argue that they could not "predict perfectly" who the block producers would be. MTD at 35. But this is a question of scienter, and for the reasons explained in Section III(B)(2), infra, scienter has been established.[7] *See Gruber v. Gilbertson*, 16-cv-9727, 2018 WL 1418188, at *9 (S.D.N.Y. Mar. 20, 2018) (rejecting argument that statements were not false because Defendants did not know of falsity). Furthermore, this is not a question of fraud-by-hindsight or the inability of Defendants to predict who the block producers would be. The language speaks in certain terms: Block.one would "soon begin allocating votes" to address the corruption in the voting process. ¶¶ 134, 169. Block.one failed to do so. ¶ 141.

### c.  Misstatements Concerning the Use of the ICO Proceeds and Efforts Invested in the EOS Blockchain Development

Defendants misled investors about the use of the proceeds for the ICO and their willingness to devote resources towards the development of the decentralized blockchain it had promised investors. On January 13, 2018, block.one issued a press release announcing the "formation of

---

[7] The cases Defendants cite in support are inapposite and do not address the falsity of the statements. *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 874 (S.D.N.Y. 2011) (explaining that the highest members of management were not expected to be "clairvoyant" with respect to pricing policies in the context of scienter); *Schwartz v. Novo Industri A/S*, 658 F. Supp. 785 (S.D.N.Y. 1987) (dismissing "fraud-by-hindsight" claims); *Marbury Mgmt., Inc. v. Kohn*, 470 F. Supp. 509, 512-13 (S.D.N.Y. 1979) (discussing scienter).

EOS VC, block.one's program to deploy over 1 billion USD in partnership capital with leading venture capital firms to develop the EOS ecosystem." ¶ 155.  Defendant Blumer confirmed this "formal commitment to deploy over $1 billion through leading global venture capital firms to deploy capital back to entrepreneurs to create innovation in the EOS ecosystem." ¶ 155.  However, block.one did not plan to give $1 billion to third parties for the purpose of improving the blockchain.  Rather, it funneled these funds to a fund in Hong Kong for the purpose of trading in other cryptocurrencies and ordinary stock markets.  ¶ 156.  Likewise, Defendant Blumer's statement during a May 17, 2018 YouTube video that block.one had "taken a billion dollars of capital" and was "deploying it to leading VCs throughout the world" to "foster the innovation of this technology" was false and misleading.  ¶¶ 162-163.  These statements were false.  In fact, Defendants withdrew funds from the block.one "funding wallet" throughout the ICO process, ¶¶ 57-60, and instead funneled the proceeds to its venture capital arm in Hong Kong, ¶¶ 144-148.  After receiving the proceeds of the ICO, Defendants essentially abandoned any support of the EOS Blockchain, instead focusing on irrelevant projects such as "the Voice." ¶¶ 185-186.

Defendants' chief response is that block.one *did* invest funds in the EOSIO blockchain. MTD at 37-38.  But this is based on a blatant mischaracterization of the allegations in the Complaint, with a false claim that the "Complaint alleges that Block.one has already committed $675 million to support the 'growth and development of the EOSIO blockchain ecosystem." MTD at 38 (citing ¶¶ 145-146).  In fact, what the Complaint alleges is that these "funds were funneled to Defendants' personal piggybank, an investment fund located in Hong Kong." ¶ 144. Specifically, block.one had asserted that it had "committed a minimum of $675 million in its Hong Kong venture capital fund," which it said it had spread to various other funds, including an "EOSIO Ecosystem Fund," a "Europe-focused fund," and "Asia-focused EOSIO projects." ¶ 146.  But the

use of the term "EOSIO" to describe the funds does not mean that these funds were focused on development of the EOSIO blockchain.   The Complaint explains that that Defendants' investing partners, Galaxy and FinLab, "focus[ed] explicitly on finance-related projects."   ¶ 147.

Defendants also suggest that the "diversification" of the ICO proceeds into traditional investments such as government bonds is "wholly sensible."  MTD at 38.  This falsely suggests that these funds were held in reserve for the betterment of the EOS Blockchain and ultimately, the investors.   In fact, the proceeds of these funds were enjoyed by a select few, high-net-worth individual equity investors, including Defendants.  ¶¶ 71, 144-48.

Finally, Defendants argue that they were permitted to change their strategy even after promising investors they would invest in development of the EOS Blockchain.  MTD at 39.  But Defendants did not change their strategy; the statement was false when made because it was always their plan to invest the proceeds of the ICO in block.one's venture capital arm, as they withdrew funds from block.one's funding wallet during the ICO.  ¶¶ 57-60, 212.   Statements of corporate planning or intention are actionable if they are false when made.  *Nutriband, Inc. v.* Kalmar, 19-cv-2511, 2020 WL 4059667, at *8 (E.D.N.Y. July 20, 2020).  Further, the case Defendants rely upon, *Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*, 153 F. Supp. 3d 628, 645-46 (S.D.N.Y. 2015) involves a situation where a company allocated resources to expand the business, not one where individuals took revenues and invested them in a venture whose proceeds would never inure to the investors.

### 2.      Defendants Acted with Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A). A "strong inference" is one that a reasonable person would deem "cogent and at least as compelling

as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The inference favoring a plaintiff's claim "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. (citations omitted). Rather, a plaintiff must demonstrate only that an inference of scienter is at least as compelling as any nonculpable explanation, and "the tie . . . goes to the plaintiff." *In re Salix Pharm., Ltd.,* No. 14-CV-8925 (KMW), 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

Scienter can be established by alleging facts to show either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 93 (S.D.N.Y. 2015) (citation omitted). Additionally, scienter is pled when the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (citation omitted).

When assessing Defendants' motive and opportunity here, it is important to understand that the crux of Defendants' fraudulent scheme was to raise as much money as they could from the sale of EOS Securities, and then use that money for unrelated projects that had nothing to do with EOSIO and would not benefit holders of EOS Securities. Defendants' motive was thus to inflate the price of EOS Securities, because doing so allowed them to maximize the amount of money they could siphon into whatever projects they wished for their own personal gain. *Sec. & Exch. Comm'n v. Riel*, 282 F. Supp. 3d 499, 521 (N.D.N.Y. 2017) (scienter supported by allegations that the defendant "did not invest the majority of investors' funds" in a way that would benefit those investors, and instead diverted the money to himself). Rather, they were personally enriched from the inflation of the price of the EOS Securities.

34

It is also important to understand that EOS Securities do not represent equity in block.one, so ventures that benefit block.one do not necessarily benefit EOS tokenholders.  As such, Defendants here were not seeking to inflate the price of the Company's stock under a more classic securities fraud scenario; they were trying to bolster the price of a separate security they had created—EOS—which had the primary purpose of being their vehicle for self-enrichment.  In that vein, Defendants' motive (enriching themselves at the exclusion and expense of EOS Securities purchasers) is distinguishable from the "motives that are common to most corporate officers," such as desiring to make a corporation appear profitable or to keep stock prices high to improve officer compensation, which courts typically find to be inadequate for the purpose of pleading scienter. *Cf. Credit Suisse*, 127 F. Supp. 3d at 80.  Defendants had the opportunity to act on that motive, raising billions of dollars in the ICO, diverting much of that money to investments unrelated to EOSIO, and hiding that fact from investors.  ¶¶ 211-214.

Defendants' argument that "revenue maximization" cannot support an inference of scienter (MTD at 41) thus fails, because it is grounded on the principle that the revenue would inure to the benefit of the *company* and its *investors.*  The cases they cite are likewise inapposite because they equate a high *stock* price with a successful company, not personal enrichment.  *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008) ("Any potential motive to keep the share price high in order to have a more successful placement is just an example of a generalized motive that any officer or director who desires to operate a successful company will have."); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764-65 (S.D.N.Y. 2018) (holding that a desire to keep stock price high in light of a secondary offering where the proceeds would be used to pay off a company debt did not evidence scienter).  Here, the revenue flowed directly to the Defendants and the handful of high-net-worth equity investors.

Separately, the Individual Defendants were the co-founders of the Company and chief architects of its ICO and EOS Blockchain technology, and had intimate first-hand knowledge that their statements were false.  ¶¶ 30-33, 209.  Defendants attempt to dismiss these allegations with a pro forma argument that the Complaint "attempt[s] to presume scienter by virtue of [Defendants'] positions," MTD at 40, but this ignores the allegations demonstrating the Defendants' critical and unique roles in the development of block.one, the EOS Blockchain, and the sale of the EOS Securities.

Defendant Blumer has been block.one's CEO since the beginning of the Class Period, and as such had, at a minimum, access to internal plans related to how block.one would spend the billions of dollars it was raising in the ICO.  More likely, he was writing those plans himself.  ¶ 30.  Indeed, it is difficult to conceive who at block.one could possibly have had greater authority than Blumer to direct the use of such massive sums of money.  *See, e.g.*, *In re Aphria, Inc. Sec. Litig.*, No. 18 Civ. 11376 (GBD), 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (finding inference that the CEO and CFO had access to "crucial information" concerning assets was "at least as compelling" as other inferences "given their positions" at the company).

Defendant Larimer himself wrote the bulk of the code for the EOS Blockchain and authored the misleading EOSIO White Paper, and as such had perhaps a more complete knowledge than anyone else of EOSIO's features and capabilities.  ¶¶ 52, 206.  Defendant Grigg also demonstrated his early, intimate knowledge of EOSIO when he published his misleading paper in July 2017 explaining and analyzing in detail the technology behind the EOS project, pitching EOSIO as intended for "high-performance messaging with business logic," and proposing uses such as supply chain, resource management, social media, and gaming.  ¶ 54.  Highlighting the level of detail in that report, Defendant Grigg included an example of early code drafted by

Defendant Larimer that was ultimately abandoned.   ECF No. 87-3 at 8.   Far from any other inferences that can be drawn, the Individual Defendants had unique, first-hand knowledge about block.one's business plan and the functionality and capabilities of EOSIO.

At the time they began making false statements during the Class Period, the Individual Defendants were also among very few individuals working at block.one.   Thus, this is not a scenario where a few lower-level rogue employees were carrying out a scheme of which management was unaware.   When the ICO was first announced in June 2017, the Company made clear that its EOS team was "being led by blockchain veterans," namely Defendants Blumer, Larimer, Pierce, and Grigg.   ¶ 53.   That team was relatively tiny: nearly one year later, as of May 17, 2018, block.one still had only ten software engineers building the EOS Blockchain.   ¶ 209. Thus, the Individual Defendants comprised a high percentage of the total employees at block.one. As the leaders of such a small team focused on a single project, the most reasonable inference is that the Individual Defendants were intimately aware of EOSIO's capabilities and what block.one planned to do with the money raised in the ICO.   *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014) (finding that scienter was established where the company was "a small company that focused on the production of just one product" and the false statements related to that product) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005))).

This is particularly so for Defendants Larimer and Blumer.   Thus, when Defendant Larimer spoke about the EOSIO code that he wrote, the most reasonable inference is that he had full knowledge of the code's traits and capabilities.   When Defendant Blumer spoke about what he had done and planned to do with money raised by block.one, there is no inference but that he knew precisely what he had done and would do.   *Riel*, 282 F. Supp. 3d at 521 (finding scienter was

37

established where the individual defendant "was the only person who operated" the investment fund from which investors' money was stolen).

Even if, by some far-fetched possibility, the Individual Defendants did not have direct knowledge of the falsity of their statements, they chose to speak about the decentralized features of the blockchain; about the unfairness of the voting process and their remedial plans; and about their commitment to invest in the development of the EOS Blockchain. In choosing to speak, they had a duty to educate themselves about the facts underlying their statements. *Martinek v. AmTrust Fin. Servs., Inc.*, 2020 WL 4735819, at *14-15 (S.D.N.Y. Aug. 14, 2020) (holding that defendants had an obligation to avoid making statements that amounted to half-truths where the misleading nature of those statements was knowable by the defendants).

### 3. The Complaint Alleges Loss Causation

"The purpose of the loss causation element is to require a plaintiff 'to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind,' not to make a conclusive proof of that causal link." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). At this stage, "the plaintiff must plead economic loss that is proximately caused by the information concealed" such that "when the truth became known . . . the stock price fell." *In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014). Ordinary notice pleading under Fed. R. Civ. P. 8 is all that is required for allegations of loss causation. *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015) ("[C]ourts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8 . . . . In keeping with the prevailing practice . . . a short and plain statement that provides defendant with notice of the loss and its causal connection to the alleged misconduct is therefore sufficient to assert loss causation.").

38

Unlike the other elements of a securities fraud claim, "[p]leading loss causation with particularity is not required as 'a short and plain statement that provides the defendant with notice of the loss and its causal connection to the alleged misconduct is [ ] sufficient to assert loss causation.'" *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 517 (S.D.N.Y. 2016) (quoting *Credit Suisse*, 127 F. Supp. 3d at 80).

Defendants' primary challenge to loss causation is that the corrective disclosures pled in the Complaint did not actually correct any of their prior statements.  MTD at 42-45.  Those arguments simply recycle Defendants' assertions that their Class Period statements were not false or misleading, but as explained, Defendants materially misled EOS investors, *supra* § III(B)(1).

The corrective disclosures can be divided into two key categories: (1) disclosures that corrected Defendants' false statements regarding the level of their investment in the EOSIO platform; and (2) disclosures that corrected Defendants' false statements that EOSIO offered a superior, decentralized blockchain solution, including their false statements about the selection of block producers through elections.

Defendants' false statements conditioned investors to expect that block.one would invest heavily in developing and supporting EOSIO and its applications.  Thus, when on June 8, 2018 reports circulated that the launch of the EOS Blockchain was delayed amid a hack on block.one's internal system and revelations that the EOSIO software had bugs and was susceptible to certain types of attacks, tokenholders rightfully began to doubt the level and quality of block.one's investment in the software.  ¶¶ 174-76.  Unsurprisingly, the price of EOS Securities fell 21% in response.  ¶ 176.  Concerns over how block.one was using its money only grew when a cryptocurrency news outlet observed on October 27, 2018 that block.one had never issued a promised audit that was supposed to have put an end to rumors over potential wash trading during

the ICO—conduct which could have inflated the price of EOS Securities and ballooned block.one's income in the ICO.  ¶ 179.  Those concerns led to a 6% decline in the price of EOS Securities over the following days.  ¶ 180.

Investors were therefore already on edge when, only one month later on November 28, 2018, Defendant Larimer stated that he was "exploring" a new cryptocurrency token idea, giving rise to worries that Larimer was following his "tendency to hop between projects and simply create a new coin if the previous one fails."  ¶¶ 183-84.  Concerns that Larimer and block.one were losing focus on EOSIO led to a 14.5% drop in the price of EOS Securities during the next two days. ¶ 184.  Similarly, when block.one announced Voice on June 1, 2019, investors were underwhelmed that their $4 billion injection into EOSIO technology had so far yielded only a single social media platform of questionable use.  ¶ 185-87.  The resultant 9% drop in the value of EOS reflects the continuing decline of investor sentiment in EOSIO's utility and block.one's commitment to the platform.  ¶ 187.  Indeed, Defendants have since given up any pretense that they will continue to support or invest in EOSIO, and Defendant Larimer admitted during an interview on September 11, 2020 that purchasers of EOS Securities had "already received everything" they would.  ¶ 192.

Defendants' false narrative regarding EOSIO's decentralized characteristics also fell apart over a series of partial corrective disclosures.  On June 22, 2018, investors were stunned when an arbitrator—without offering any explanation—directed block producers not to process certain transactions.  ¶ 177.  As one commentator observed, the move was "anathema" to the decentralized ethos of blockchain technology, and indeed it was a stark demonstration to investors that power over the EOS Blockchain was in fact highly centralized, as reflected in the subsequent 15% decline in the price of EOS Securities.  ¶¶ 177-78.  An arbitrator again undercut the decentralization story on November 8, 2018 when the arbitrator issued an order reversing certain transactions to restore

control of an account to its original owner.  ¶ 181.  When cryptocurrency news outlets began to take notice days later, the move was subject to ridicule and one commentator noted that it "speaks to a degree of centralized governance that's unheard of in the bitcoin network."  *Id.*  The subsequent 17% decline in the price of EOS Securities was evidence of investors' growing disillusionment with any claims of "decentralization" by Defendants.  ¶ 182.  The final nail came during the Tulip Conference in San Francisco in early June 2019, when Defendant Pierce admitted that the EOS Blockchain was a "Chinese oligarchy" in that much of its power had consolidated in a small number of block producers in China, and further proposed how to "solve this issue." ¶ 188.  That admission, which precipitated a 21% decline in the price of EOS Securities, extinguished any remaining hope that the EOS Blockchain was actually decentralized.  ¶ 188-89.

### C.    The Complaint Alleges Claims Under Section 20(a) of the Exchange Act and Section 15(a) of the Securities Act

Plaintiff has established that it alleged predicate violations of both Section 12(a)(1) and 12(a)(2) of the Securities Act, and of Section 10(b)(5) of the Exchange Act.  It further has alleged that the Individual Defendants controlled block.one by virtue of their positions within the Company, ownership stakes and specific actions.  ¶¶ 262, 287-291. Defendants do not dispute that the Individual Defendants controlled block.one. Plaintiff has thus pled a violation of Section 15(a) of the Securities Act.  *Alpha Cap. Anstalt*, 2020 WL 3318029, at *5 (holding where predicate violation of Securities Act was pled, and defendants did not dispute control, Section 15(a) claim was also pled).   In addition, Plaintiff has pled Defendants' culpable participation in the fraud, *see supra* Section III(B)(2), and thus has pled a violation of Section 20(a).  *In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016); *In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS), 2018 WL 6381882, at *20 (D.N.J. Dec. 6, 2018).   Defendants' argument that control person liability was not pled therefore fails.  MTD at 45.

41

### D.      The Complaint Alleges Facts Demonstrating Domestic Transactions

Defendants argue, incorrectly, that Plaintiffs' claims should be dismissed because the U.S. securities laws do not apply to foreign transactions.  MTD at 19-21.  This assertion lacks merit.

First, at the pleading stage, Plaintiff needs only to allege that Defendants incurred liability for its transaction in the U.S. to satisfy the second prong of *Morrison*. *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  It is evident that Plaintiff has more than satisfied that burden.

The U.S. securities laws apply to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010). In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012), the Second Circuit clarified *Morrison*'s "domestic transaction" requirement and held that "to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States." *Id*. A plaintiff pleads a domestic transaction by alleging facts including, but not limited to, "the formation of the contracts, the placement of purchase orders, or the exchange of money[.]" *Id.* at 70; *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017).

As Defendants acknowledge, the citizenship of the parties is irrelevant to determining whether a transaction is domestic. *Absolute Activist*, 677 F.3d at 69. Rather, the most critical question is whether the transaction was actually effectuated in the U.S., meaning that the parties could no longer withdraw from or alter the transaction. *See Pope Invs. II, LLC v Deheng Law Firm*, No. 10 Civ. 6608 (LLS), 2013 WL 3946126, at *16 (S.D.N.Y. July 31, 2013) ("[O]nce the parties signed the Securities Purchase Agreement, the signing purchaser had no right to unilaterally withdraw from his purchase obligation, and [defendants] incurred irrevocable liability when they signed that agreement."); *see also Arco Cap. Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d

532, 535 (S.D.N.Y. 2013) (holding that plaintiffs had plausibly alleged a domestic transaction because the language of the contract between the parties made the transaction irrevocably binding only when funds were deposited in the defendant's bank account located in New York).

The Complaint demonstrates that investors in EOS securities incurred irrevocable liability for their investments in the U.S.. ¶¶ 72-76.  These allegations include: (1) the fact that investors who purchased EOS Securities in the ICO initially purchased ERC-20 tokens on the EOS.IO website, hosted on a server in California, ¶ 72; (2) a plurality of the "nodes" which verified (and thus made irrevocable) the ERC-20 purchases during the ICO were located in the U.S. and ¶ 74; (3) many of the block producers—who reviewed and verified EOS blockchain transactions thus making them irrevocable —were located in the U.S., ¶ 75; (4) EOS Securities investors' purchases of the EOS Securities were prompted by an aggressive marketing campaign for EOS Securities to U.S.-based customers, ¶¶ 63-65; and (5)  EOS Securities continue to trade on US-based cryptocurrency exchanges such as Coinbase, Kraken, and Polointex, ¶ 76.

Taken together, these facts show that Plaintiff and other investors incurred irrevocable liability for their purchases of EOS Securities in the U.S.  Investors placed orders for EOS Securities on U.S.-based websites and when their transactions were submitted and verified by the network of nodes and EOS block producers within the U.S., they could no longer change or cancel their purchase of EOS Securities. Thus, purchasers of EOS Securities became "bound to effectuate" their purchase of EOS Securities in the U.S. *Absolute Activist*, 677 F.3d at 67.

In *In re Tezos Sec. Litig.*, Case No. 17-cv-06779-RS, 2018 WL 4293341, at *7 (N.D. Cal. Aug. 7, 2018), another case relating to purchases of a cryptocurrency, the court considered facts similar to those alleged in the Complaint and concluded that the plaintiff had sufficiently alleged a domestic transaction under the federal securities laws.  *Tezos* held that the lead plaintiff had

incurred irrevocable liability for his purchase of "Tezos" tokens in the U.S. because: (1) the plurality of nodes, which verified the plaintiff's purchase of Tezos tokens, were located in the U.S., (2) Tezos tokens were purchased on an interactive website hosted on a server in Arizona, (3) the transaction at issue was conducted by the plaintiff in the U.S. and (4) the plaintiff's purchase was induced by the marketing of Tezos tokens to US-based customers. *Id.,* at *9.  The Court reasoned that "[w]hile no single one of these factors is dispositive . . . together they support an inference that [the plaintiff's] alleged securities purchase occurred inside the United States." *Id.* at 8.  As in *Tezos*, both ICO and secondary market purchasers of EOS Securities were targets of Defendants' aggressive marketing of those securities to U.S.-based customers. EOS investors also similarly placed their orders for EOS Securities on a website hosted by U.S. servers and had their blockchain transactions verified by nodes and block producers located in the U.S.

Finally, Defendants' cases are inapposite. MTD at 20. Almost all of the transactions at issue in the cases cited by Defendants involved traditional securities transactions by foreign plaintiffs effected on foreign exchanges and markets. *See Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 213 (2d Cir. 2014) (holding that "[p]laintiffs' swaps were the functional equivalent of trading the underlying VW shares on a German exchange . . . that [the swaps] are essentially 'transactions conducted upon foreign exchanges and markets,' and not 'domestic transactions' that merit the protection of § 10(b)") (quoting *Morrison. Cartica Mgmt., LLC v. Corpbanca, S.A*., 50 F. Supp. 3d 477, 492 (S.D.N.Y. 2014))  Another case was dismissed because the plaintiff's purchases predated the alleged false statements—a holding that ultimately had nothing to do with the principles explained in *Morrison. See Cartica Mgmt., LLC v. Corpbanca, S.A*., 50 F. Supp. 3d at 492 (dismissing claims based solely on purchases of ADRs

traded on the NYSE, where those purchases occurred approximately one year before any alleged false statements were made). *Cartica*, of course, has no relevance here.

Several of Defendants' own cases support a finding that *Morrison* is satisfied here, particularly because the transactions at issue were comprised of more foreign components than those here. For example, in *In Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 68 (2d Cir. 2018), the Second Circuit rejected the defendant's argument that the parties had not incurred irrevocable liability in the U.S. simply because the foreign exchange could cancel or modify a trade at any time prior to the "clearing and settlement" abroad. The court explained, "[w]hether an exchange can cancel or modify trades . . . says nothing about whether either trading party is free to revoke its . . . acceptance of a trade'" and "that the exchange has the power to rectify errors in the parties' contracts does not render those contracts 'revocable' in any meaningful sense." *Id.* In *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018), a domestic transaction was plausibly alleged because the investor and the owner of a Bahamian company formed and executed an investment agreement in the U.S. *Id.* at 78-79. Finally, in *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 535 (S.D.N.Y. 2013), the transaction was domestic because irrevocable liability was incurred when the funds were delivered in New York, even though the transaction involved a foreign purchaser and issuer who agreed to the transaction overseas. *Id.* at 542-43.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.[8]

---

[8] If the Court determines to grant Defendants' Motion to Dismiss for any reason, Plaintiff requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2) (noting that leave to amend should be granted "freely"); *see, e.g.*, *In re Bear Stearns Cos., Inc. Sec. Deriv. and ERISA Litig.*, 2011 WL 4357166, at *3 (S.D.N.Y. 2011).

Dated: New York, New York
December 2, 2020

Respectfully submitted,

*/s/ Daniel L. Berger*
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: jeisenhofer@gelaw.com
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com


J. Samuel Tenenbaum
**Bluhm Legal Clinic of the Northwestern Pritzker School of Law
Complex Civil Litigation and Investor Protection Center**
375 East Chicago Ave.
Chicago, IL 60611
Tel: (312) 503-4808
Email: s-tenenbaum@law.northwestern.edu


*Counsel for Crypto Assets Opportunity Fund LLC*

46