UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHASE WILLIAMS and WILLIAM ZHANG, individually and on behalf of all others similarly situated,<br><br>                   Plaintiffs,<br><br>       v.<br><br>BLOCK.ONE, BRENDAN BLUMER, and DANIEL LARIMER,<br><br>                    Defendants. | Civ. No. 1:20-cv-02809-LAK<br><br><u>CLASS ACTION</u> |
| CRYPTO ASSETS OPPORTUNITY FUND LLC and JOHNNY HONG, Individually and on Behalf of All Others Similarly Situated,<br><br>                   Plaintiffs,<br><br>       v.<br><br>BLOCK.ONE, BRENDAN BLUMER, DANIEL LARIMER, IAN GRIGG, and BROCK PIERCE,<br><br>                    Defendants. | Civ. No. 1:20-cv-03829-LAK<br><br><u>CLASS ACTION</u> |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

_____

PAGE

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................ 2

I.      CAOF HAS FAILED TO REBUT THE PRESUMPTION AGAINST
        EXTRATERRITORIALITY ....................................................................................... 2

II.     CAOF'S SECURITIES ACT CLAIMS FAIL ........................................................... 4

        A.      CAOF Has Not Pleaded Facts Showing Defendants Solicited Its
                Purchases ........................................................................................................ 4

        B.      Defendants Had No Obligation to Distribute a Prospectus to CAOF ......... 6

        C.      CAOF's Registration Claim Is Untimely ...................................................... 8

                1)      CAOF Has Not Pleaded Fraudulent Concealment ......................... 8

                2)      CAOF's Failure to Plead Any Facts About Its Own
                        Knowledge or Due Diligence Is Fatal to Its Claim of
                        Fraudulent Concealment ................................................................ 9

        D.      CAOF Has Failed to State a Section 12(a)(2) Claim ................................. 11

III.    CAOF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED .................. 13

        A.      CAOF Fails to Plead Any Actionable Misstatements or Omissions ........ 13

                1)      CAOF Fails to Plead that Defendants Made False or
                        Misleading Statements About the Ability to Generate Software
                        that Could Create a Decentralized Blockchain ............................ 13

                2)      CAOF Fails to Plead that Defendants Made False or
                        Misleading Statements About the Governance of the EOS
                        Blockchain .................................................................................... 15

                3)      CAOF Fails to Plead that Defendants Made False or
                        Misleading Statements About Plans to Support the EOSIO
                        Blockchain Ecosystem .................................................................. 16

        B.      CAOF Fails to Allege Facts Giving Rise to a Strong Inference of
                Scienter ........................................................................................................ 18

C.      CAOF Fails to Plead Loss Causation........................................................... 19

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ........................................................................... 2

*Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*,
   2020 WL 3318029 (S.D.N.Y. June 18, 2020) ............................................. 4, 5

*Arco Capital Corps. Ltd. v. Deutsche Bank AG*,
   949 F. Supp. 2d 532 (S.D.N.Y. 2013) .......................................................... 4

*Banco Safra S.A. v. Samarco Mineracao S.A.*,
   2019 WL 2514056 (S.D.N.Y. June 18, 2019)................................................ 3

*Caiafa v. Sea Containers Ltd.*,
   2008 WL 11516813 (S.D.N.Y. May 15, 2008) ............................................. 7

*Competitive Assocs., Inc. v. Fantastic Fudge, Inc.*,
   58 F.R.D. 121 (S.D.N.Y. 1973) ................................................................. 8, 9

*Credit Suisse Sec. (USA) LLC v. Simmonds*,
   566 U.S. 221 (2012) ................................................................................... 10

*DeLeonardis v. Berg*,
   1998 WL 760338 (E.D.N.Y. Sept. 15, 1998).............................................. 9

*DeMaria v. Andersen*,
   318 F.3d 170 (2d Cir. 2003) ....................................................................... 7

*Ellul v. Congregation of Christian Bros.*,
   774 F.3d 791 (2d Cir. 2014) ...................................................................... 10

*Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*,
   804 F. Supp. 2d 141 (S.D.N.Y. 2011) ......................................................... 7

*Feiner v. SS&C Tech., Inc.*,
   47 F. Supp. 2d 250 (D. Conn. 1999).......................................................... 7, 8

*Fresno Cnty. Emps.' Ret. Assoc. v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ........................................................ 11

*Griffin v. PaineWebber, Inc.*,
   2001 WL 740764 (S.D.N.Y. June 29, 2001) ............................................... 5

iii

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ................................................................................. 12

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) ..................................................... 10

*Homburger v. Venture Minerals, Inc.*,
    1982 WL 1346 (S.D.N.Y. Nov. 3, 1982) .................................................... 9

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) ...................................................... 12

*In re Chaus Sec. Litig.*,
    1990 WL 188921 (S.D.N.Y. Nov. 20, 1990) .............................................. 5

*In re CityGroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010) ..................................................... 12

*In re Cosi, Inc. Sec. Litig.*,
    379 F. Supp. 2d 580 (S.D.N.Y. 2005) ....................................................... 7

*In re Energy Sys. Equip. Leasing Sec. Litig.*,
    642 F. Supp. 718 (E.D.N.Y. 1986) ............................................................ 8

*In re Gas Reclamation, Inc. Sec. Litig.*,
    659 F. Supp. 493 (S.D.N.Y. 1987) ............................................................ 8

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009) ....................................................... 7

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998) ............................................................... 10, 11

*In re Smart Techs., Inc. S'holder Litig.*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ................................................................ 7

*In re Tezos Sec. Litig.*,
    2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ........................................... 4

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ...................................................... 6

*Ingenito v. Bermec Corp.*,
    376 F. Supp. 1154 (S.D.N.Y. 1974) ....................................................... 11

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ................................................................... 19

*Katz v. Amos Treat & Co.*,
    411 F.2d 1046 (2d Cir. 1969) ............................................................... 8

*Koch v. Christie's Int'l PLC*,
    785 F. Supp. 2d 105 (S.D.N.Y. 2011) .................................................. 10

*Mark v. Park Ave. Synagogue*,
    2011 WL 3611322 (S.D.N.Y. Aug. 11, 2011) ........................................ 9

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999) ...................................................... 5

*Myun-Uk Choi v. Tower Research Capital LLC*,
    890 F.3d 60 (2d Cir. 2018) .................................................................... 3

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ............................................................................... 4

*Pollack v. Laidlaw Holdings, Inc.*,
    1995 WL 261518 (S.D.N.Y. May 3, 1995) ............................................. 9

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019) ............................................................................ 8

*SEC v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007) .................................................. 10

*Shain v. Duff & Phelps Credit Rating Co.*,
    915 F. Supp. 575 (S.D.N.Y 1996) ..................................................... 4, 5

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F. 3d 406 (2d Cir. 2008) ............................................................... 11

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ....................................... 5

*United States v. Harmon*,
    474 F. Supp. 3d 76 (D.D.C. 2020) ...................................................... 14

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ........................................................... 8

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016) ................................................... 5

*Yung v. Lee*,
    432 F.3d 142 (2d Cir. 2009) .................................................................. 6

*Zakinov v. Ripple Labs, Inc.*,
  2020 WL 922815 (N.D. Cal. Feb. 26, 2020)..........................................................................6, 7

**Statute**

15 U.S.C. § 77d(a)(1)..........................................................................................................7

## PRELIMINARY STATEMENT

CAOF's Opposition reveals the Complaint's flaws.  CAOF obscures relevant details rather than grappling with their import.  For instance, the case involves two distinct tokens that operate on two different blockchains.  CAOF nevertheless refers to both tokens as one.  The Opposition likewise ignores that many of the allegedly misleading statements refer only to one token or the other, or in fact to neither and instead to blockchain-related *software* that Block.one was developing.  These attempts to blur distinctions fail.

CAOF has failed to show that U.S. securities laws apply to its alleged purchases of either token.  Relegating this threshold issue to the end of its brief, CAOF remains silent on the location of the secondary exchange(s) where it made its purchases.  Instead, in addressing *Morrison*, it speculates about *other* transactions, involving *other* purchasers, that occurred using *other* means.  But CAOF does not identify *any* allegations tying *its* purchases to the U.S.

Even if CAOF could overcome this threshold hurdle, its Securities Act claims would still fail.  Wherever CAOF made its token purchases, it is clear that CAOF did not purchase tokens from defendants.  Nor has CAOF pleaded that defendants directly *solicited* its purchases.  Moreover, CAOF's Section 12(a)(1) claims are time-barred.  CAOF does not allege that defendants concealed any actual *facts*.  And even if an allegedly undisclosed legal conclusion could toll a limitations period, the disclosures by defendants themselves about whether tokens might be deemed to be securities would have put any token purchaser on notice of this issue.

Finally, CAOF has failed to plead any actionable misstatement, much less with particularity.  CAOF seeks to create a fraud claim out of grievances about community-approved blockchain governance.  But defendants did what they promised: they built software that allowed others to create community-governed blockchain projects.  The Complaint pleads no facts to support the conclusion that any defendant made any false statement, much less with scienter.

## ARGUMENT

### I.    CAOF HAS FAILED TO REBUT THE PRESUMPTION AGAINST EXTRATERRITORIALITY

At the end of the Opposition, CAOF attempts to address the threshold issue of the applicability of U.S. securities laws, acknowledging its burden to show that transactional liability was "incurred . . . in the U.S." (Opp. 42.) CAOF has this burden as to *both* of the alleged securities at issue in the case: ERC-20 tokens and native EOS tokens.[1] It meets it as to neither.

CAOF does not dispute that it made its secondary market purchases on one or more exchanges and that it has failed to plead the location of those exchanges. CAOF likewise does not dispute that it has failed to plead any other facts showing that its purchases occurred in the U.S. Instead, it tries to rely on purchases made by others allegedly in the U.S. (*Id*. 43.) But CAOF cannot use others' transactions to meet its burden. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012) (finding allegations about third-party investors' transactions irrelevant, and focusing on the plaintiffs' transactions).

CAOF makes various attempts to avoid this intractable problem. *First*, CAOF asserts that others might have bought ERC-20 tokens directly from Block.one on a website that CAOF alleges was U.S.-hosted. (Opp. 43; Compl. ¶ 72.) But CAOF does not claim that *it* purchased from Block.one, on that website or otherwise. (Compl. ¶¶ 10, 27, 76.)

*Second*, CAOF argues that a *minority* of Ethereum blockchain nodes, on which ERC-20 Token Sale purchases were verified, and a *minority* of EOS Blockchain block producers, who verify transactions on the EOS Blockchain, are located in the U.S. (Opp. 43; *e.g.*, Compl. ¶ 74

---

[1] As the Motion explained, CAOF uses the term "EOS Securities" to describe two different digital tokens—ERC-20 and native EOS—that operate on different blockchains. (Mot. 11 n.9.) Block.one sold ERC-20 tokens in the Token Sale. Native EOS tokens were created later, when the first EOS blockchain was launched by third parties, which the Motion refers to as the "EOS Blockchain." Native EOS tokens do not operate on the Ethereum blockchain.

(28% of Ethereum nodes), ¶¶ 136, 140 (concentration of block producers in China).)  This is irrelevant for a number of reasons.  Most fundamentally, CAOF pleads no facts indicating that its *secondary-market exchange-based* purchases of either token implicated *any* Ethereum nodes (ERC-20) or block producers (native EOS).  Even if it had, its position still would be fatally flawed.  With respect to transaction verification, nodes and block producers serve a similar function: they do not execute or settle trades; rather, they are witnesses who say, "I saw this, this was said at this time."  (Compl. ¶ 125; *see also id.* ¶ 73.)  But a contract is formed on execution, not when a third party *witnesses* an executed copy.  Here, irrevocable liability was incurred when the exchange(s) on which CAOF bought tokens matched purchase and sale orders.  *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 66 (2d Cir. 2018) (irrevocable liability is incurred upon "a meeting of the minds").  CAOF cannot overcome the presumption of extraterritoriality by arguing that an overseas trade might later have been "witnessed" by a U.S. computer.  *See Banco Safra S.A. v. Samarco Mineracao S.A.*, 2019 WL 2514056, at *6 (S.D.N.Y. June 18, 2019) (reporting of transactions to a U.S. system does not render them domestic).  Indeed, CAOF's argument has no limiting principle.  If the presence of a *minority* of nodes or block producers in the U.S. could trigger invocation of U.S. securities laws, effectively *every* transaction on the blockchains—including those exclusively between foreigners—would be subject to the U.S. securities laws.[2]

*Third*, CAOF argues that purchases of "EOS securities" by unspecified investors were prompted by marketing targeted at U.S. customers.  (Opp. 43 (citing Compl. ¶¶ 63-65).)  But "[c]ourts have repeatedly held that allegations" of even "'heav[y] market[ing] in the United

---

[2] And even if the location of nodes or block producers could be relevant to *Morrison*, CAOF fails to plead any facts about their location at the relevant time: the time of its purchases.  (*E.g.*, Mot. 20 n.17; *see also* Compl. ¶ 75 (referring to selective historical block producer location).)

States' . . . do not satisfy the transactional test announced in *Morrison*." *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542 (S.D.N.Y. 2013) (citing cases).  In any case, the cited portions of the Complaint relate to the sale of ERC-20 tokens in the Token Sale, *not* the later launch of the separate EOS Blockchain by third parties.  They thus provide no basis for the application of U.S. law to native EOS token transactions, much less to any purchase by CAOF.

*Fourth*, CAOF alleges that "EOS Securities" trade on certain U.S. exchanges.  (Opp. 43 (citing Compl. ¶ 76).)  As noted, however, CAOF has *never* alleged that its secondary market transactions were made on such a domestic exchange.  If CAOF could have asserted so, it surely would have done so.

This case differs starkly from *In re Tezos Sec. Litig.*, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) (cited at Opp. 43-44).  There, the plaintiff alleged that he purchased tokens *directly* from the defendant on its U.S. website, maintained by a U.S. team.  *Id.* at *8.  Here, by contrast, CAOF does not allege any facts tying *its* purchases to the U.S.

## II.   CAOF'S SECURITIES ACT CLAIMS FAIL

### A.   CAOF Has Not Pleaded Facts Showing Defendants Solicited Its Purchases

The Opposition does not dispute that defendants never sold tokens to CAOF or solicited its purchases.  That is fatal to all of CAOF's Securities Act claims.  (Mot. 22-23; *Pinter v. Dahl*, 486 U.S. 622, 623 (1988).)  *Pinter* and its progeny confirm that persons are not liable for solicitation "unless they directly or personally solicit the buyer."  *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 581 (S.D.N.Y 1996); *see also Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020) ("[P]laintiffs must show that [defendant] actually solicited their investment.").  CAOF attempts to dismiss *Shain* by asserting that "it predates *Pinter* and thus applies a different standard" (Opp. 21), but this is wrong both as to chronology and as to what *Shain* actually says.  *Shain* was decided after

*Pinter* and discusses it extensively, and *Shain*'s analysis is directly on point here.[3]  915 F. Supp. at 579-80.  Because CAOF has failed to allege that defendants directly or personally solicited its purchases and that it made its purchases as a result of that solicitation, defendants are not liable as statutory sellers.  (Mot. 22-23.)

CAOF contends that defendants were "involv[ed] in drafting and disseminating the White Paper" (which discussed the EOSIO software) and "active[ly] promot[ed]" the Token Sale (Opp. 20), but this does not remotely constitute the sort of *direct* and *personal* solicitation contemplated by *Pinter*.  Even if such allegations could trigger liability to persons who purchased ERC-20 tokens from Block.one in the Token Sale, CAOF is not one of them, since it concededly purchased in secondary trades.  *Griffin v. PaineWebber, Inc.*, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) (dismissing Section 12 claims where plaintiff did not purchase security from defendant, despite allegations of solicitation of others); *see also Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 522-23 (S.D.N.Y. 2016) (rejecting Section 12(a) claim where defendants did no more than "distribute[] the marketing materials" to brokers).

The additional cases that CAOF cites are in no way inconsistent with *Pinter*'s foundational principles.  In most, an issuer conducted an offering by having underwriters sell the alleged securities *directly* to the purchaser on the issuer's behalf.  *See Alpha Capital*, 2020 WL 3318029, at *5; *see also Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229-30 (S.D.N.Y. 1999); *In re Chaus Sec. Litig.*, 1990 WL 188921, at *10 (S.D.N.Y. Nov. 20, 1990); *In re Twinlab Corp. Sec.*

_____

[3] CAOF also mischaracterizes *Steed Financial LDC v. Nomura Securities International, Inc.* (Opp. 21-22.)  *Steed* stated that signing a registration statement can constitute an act of solicitation, but that was not enough to make the signor liable to every purchaser.  2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (dismissing plaintiff's claim because it "failed to allege any specific acts by [defendant] to directly solicit it to purchase the Certificates and has failed to allege that plaintiff in fact purchased the Certificates as a result of [defendant's] solicitation").

*Litig.*, 103 F. Supp. 2d 193, 205 (E.D.N.Y. 2000) (explaining that "Twinlab stood to gain more than $300 million" from the offering conducted by its underwriters).  Here, CAOF purchased its tokens from wholly unidentified third-party sellers, not from Block.one, its agents, or anyone operating under its control.  (Compl. ¶ 27.)  *Zakinov v. Ripple Labs, Inc.*, 2020 WL 922815, at *12 (N.D. Cal. Feb. 26, 2020), on which CAOF relies, is even more obviously inapposite.  (Opp. 22.)  There, the complaint expressly alleged that the defendants sold "significant quantities of XRP *directly* to the general public on cryptocurrency exchanges" and that plaintiff purchased tokens directly "from defendants."  *Zakinov*, 2020 WL 922815, at *3-4 (emphasis added).  CAOF, however, does not allege anything of the sort.

## B.   Defendants Had No Obligation to Distribute a Prospectus to CAOF

Even assuming defendants had an obligation to provide a prospectus to purchasers who acquired ERC-20 tokens in the Token Sale, they owed no such obligation to CAOF, which admittedly acquired its tokens on the secondary market.  CAOF's argument that it may bring a misleading prospectus claim under Section 12(a)(2) because its purchases occurred "at the [same] time" as the Token Sale—for which it cites no authority—has no merit.  (Opp. 22.)

*First*, the rule that secondary market purchasers (like CAOF) lack standing to maintain a prospectus claim is not—as CAOF asserts—"outdated."  (Opp. 24.)  Since *Yung v. Lee*,[4] courts in this Circuit have continued to apply this rule to dismiss claims from secondary market purchasers.  *See, e.g.*, *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 57 (S.D.N.Y.

---

[4] Contrary to CAOF's argument, the Second Circuit's decision in *Yung* precluded secondary market purchasers from asserting a prospectus claim.  (*Yung v. Lee*, 432 F.3d 142, 148-49 (2d Cir. 2009); Opp. 23.)  In *Yung*, the plaintiffs purchased the securities *directly* from the defendants "pursuant to a series of private subscription and letter agreements."  432 F.3d at 145.  The Second Circuit held that "a private transaction, whether primary or secondary," cannot sustain a Section 12 claim because it is "not subject to the prospectus delivery requirements of the [Securities] Act."  *Id.* at 146, 149.  If anything, *Yung* confirms that an issuer need *not* distribute a prospectus to every purchaser.

2013).  They also have cited with approval the same authorities in defendants' opening brief. *See, e.g.*, *Caiafa v. Sea Containers Ltd.*, 2008 WL 11516813, at *3 (S.D.N.Y. May 15, 2008) (a Section 12(a)(2) "'claim may only be maintained by a purchaser who purchased [securities] in the public offering at issue rather than in a secondary market transaction'" (quoting *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005), with approval)); *Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 151 (S.D.N.Y. 2011).[5]

*Second*, CAOF improperly attempts to trace back the chain of title for its purchases to the Token Sale.  (Opp. 22-24; Compl. ¶¶ 246, 257.)  Traceability is irrelevant to claims under Section 12(a)(2).  (Mot. 24; *see DeMaria v. Andersen*, 318 F.3d 170, 177-78 (2d Cir. 2003) (privity requirement stems "from the specific language of § 12").)

*Third*, CAOF's cases addressing a dealer's obligation to distribute a prospectus to its purchasers are inapposite.  In *In re Giant Interactive Group, Inc. Securities Litigation*, the plaintiffs made aftermarket purchases from dealer-underwriters that had a regulatory obligation to provide them with a prospectus.  643 F. Supp. 2d 562, 574 (S.D.N.Y. 2009); *see also Feiner v. SS&C Tech., Inc.*, 47 F. Supp. 2d 250, 254 (D. Conn. 1999) (Section 12(a)(2) claims may be asserted for aftermarket sales to the extent underwriters "reacquired shares in aftermarket trading and then resold them on the aftermarket").  Here, CAOF identifies no underwriter or dealer, let alone connects them to its purchases.  *See* 15 U.S.C. § 77d(a)(1) (provisions that require distribution of a prospectus shall not apply to "transactions by any person other than an issuer, underwriter, or dealer").  These cases therefore have no application here; in fact, the *Feiner* court

---

[5] The fact that CAOF does not allege that it purchased any tokens directly from defendants also distinguishes this case from *Ripple Labs*.  2020 WL 922815, at *3-4.

ruled that purchasers who did not acquire shares from the underwriters lacked standing, rejecting the argument that "everyone who purchases [] shares within the class period" can sue.  47 F. Supp. 2d at 254.[6]

C.      **CAOF's Registration Claim Is Untimely**

CAOF urges the Court to read a discovery rule into the one-year limitations period for a Section 12(a)(1) claim.  (Opp. 13.)  CAOF's argument is inconsistent with Section 13 and with the case law.  (Mot. 24-25.)  The Supreme Court recently interpreted a similarly worded statute and declined to read a discovery rule into it.  *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019).

1)      **CAOF Has Not Pleaded Fraudulent Concealment**

CAOF's assertion that the "Second Circuit has routinely . . . tolled the one-year statute of limitations where . . . defendants concealed the need to register the securities with the SEC" is not accurate.  (Opp. 14.)  The only cited Second Circuit decision has no application here.  (*Id*. 13 (citing *Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir. 1969) ).)  As explained in the Motion, the defendant in *Katz* concealed the *fact* that a registration statement had not been filed, falsely telling the plaintiff that a registration statement was at the SEC and "would come out momentarily."  411 F.2d at 1055 (cited at Mot. 27).[7]  Here, there is no dispute that Block.one

---

[6] CAOF's argument that the Court should wait until class certification to determine if CAOF has standing is baseless.  (Opp. 25.)  "[T]here must be a named plaintiff sufficient to establish jurisdiction over each claim advanced."  *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 520-21 (S.D.N.Y. 2018).

[7] CAOF also cites three distinguishable district court cases.  (Opp. 14-15.)  As with *Katz*, the alleged concealment in two of those cases involved misrepresentations of fact, not an allegation that defendants misrepresented whether registration was legally required.  *In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718, 724, 745 (E.D.N.Y. 1986); *Competitive Assocs., Inc. v. Fantastic Fudge, Inc.*, 58 F.R.D. 121, 123-24 (S.D.N.Y. 1973).  Although the third involved allegations that the defendants fraudulently concealed "the need to register the reclamation units with the SEC," *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 507 (S.D.N.Y. 1987), that case did not involve the risk disclosures present here.  Block.one

disclosed that no registration statement would be filed, and that "the regulatory status of tokens is unclear or unsettled." (Compl. ¶ 116; Mot. 9.) CAOF also does not allege that defendants *knew* that this TPA risk disclosure was false at the time. *See Competitive Assocs., Inc. v. Fantastic Fudge, Inc.*, 58 F.R.D. 121, 123 (S.D.N.Y. 1973).

The great weight of authority confirms that CAOF cannot toll the statute of limitations by alleging that defendants somehow concealed a legal conclusion—*i.e.*, that registration of the Token Sale was *legally* required. *See, e.g.*, *Pollack v. Laidlaw Holdings, Inc.*, 1995 WL 261518, at *16 (S.D.N.Y. May 3, 1995) (for equitable tolling under *Katz*, requiring "conduct that would have caused the plaintiffs to believe that the Notes were in fact registered");[8] *DeLeonardis v. Berg*, 1998 WL 760338, at *3 (E.D.N.Y. Sept. 15, 1998) (same), *aff'd*, 199 F.3d 1321 (2d Cir. 1999); *Homburger v. Venture Minerals, Inc.*, 1982 WL 1346, at *4 n.2 (S.D.N.Y. Nov. 3, 1982) (*Katz* applied equitable tolling "where defendants had fraudulently concealed the existence of a claim for nonregistration"). A party's ignorance or mistaken understanding of the law is not an extraordinary circumstance that warrants equitable tolling. *See Mark v. Park Ave. Synagogue*, 2011 WL 3611322, at *3 (S.D.N.Y. Aug. 11, 2011).

### 2) CAOF's Failure to Plead Any Facts About Its Own Knowledge or Due Diligence Is Fatal to Its Claim of Fraudulent Concealment

Even if CAOF's allegations were sufficient to satisfy the first element of fraudulent concealment, the Opposition still does not identify any facts to establish that *CAOF* was misled,

---

affirmatively disclosed the risk that authorities could conclude that ERC-20 tokens are "regulated financial instruments that require registration." (TPA, Ex. 4, § 7.19.)

[8] CAOF's admission that it does not allege that it "believed that EOS tokens were registered with the SEC" does not support its argument that *Pollack* is distinguishable. (Opp. 16.) The plaintiff in *Pollack* made no such allegation either. As here, there was a dispute as to whether certain notes sold to the plaintiff required registration. 1995 WL 261518, at *6. And the district court there concluded that the plaintiff could have filed suit in the limitations period. *Id*. at *16.

when *it* discovered the alleged violation, or what due diligence *it* conducted.  CAOF argues that

it is sufficient to allege that a "reasonable person" would have been misled.  (Opp. 16-17.)  But

that is not the law.  CAOF is not permitted to ignore defendants' warnings and other facts that

were available to it with little research.  The fraudulent concealment doctrine applies "where a

plaintiff is unaware of his cause of action because of defendant's fraudulent conduct."  *Koch v.*

*Christie's Int'l PLC*, 785 F. Supp. 2d 105, 117 (S.D.N.Y. 2011).  Tolling "ceases when those

facts are, or should have been, discovered by *the plaintiff*."  *Credit Suisse Sec. (USA) LLC v.*

*Simmonds*, 566 U.S. 221, 227 (2012) (emphasis added); *see also Ellul v. Congregation of*

*Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) (because the "plaintiffs possessed the

necessary information to bring" a claim, "Defendants' concealment . . . did not prevent them

from discovering their cause of action").[9]

Moreover, defendants' alleged misrepresentation that ERC-20 tokens were not securities

is not inherently self-concealing, as CAOF claims.  (Opp. 17.)  *SEC v. Power* is distinguishable

because the defendant there used secret sham transaction fees to cook its books.  525 F. Supp.

2d 415, 417-18 (S.D.N.Y. 2007).  The SEC alleged that this fraudulent device was "inherently

self-concealing" and that it thus "did not learn of the fraud until late 2003."  *Id*. at 425.  There

are no such allegations here.  It was a matter of public record that Block.one did not register the

Token Sale with the SEC.  Contrary to CAOF's assertion that "block.one and its executives

never made any disclosures that would have put Plaintiff on notice of its claim" (Opp. 17),

---

[9] CAOF's attempt to distinguish *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56
(2d Cir. 1998) and *Hinds County, Mississippi v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499
(S.D.N.Y. 2009) fails.  (Opp. 17.)  As here, the plaintiffs in both cases failed to allege that they
exercised due diligence and instead argued that defendants' "active concealment" "excuses any
inquiry notice or . . . justifies the delay in bringing the suit."  *In re Merrill Lynch*, 154 F.3d at 60.
The courts rejected this argument.  *Id.*; *Hinds Cty.*, 620 F. Supp. 2d at 520.

Block.one warned purchasers of the risk that governmental authorities could determine that registration was required.  (Mot. 9.)  Even without other storm warnings, this written disclosure should have placed any token purchaser on inquiry notice.  *In re Merrill Lynch*, 154 F.3d at 60 (risk disclosures placed plaintiffs on inquiry notice of the alleged fraud).

CAOF also attempts to discount other "storm warnings" that "did not specifically concern the EOS tokens."  (Opp. 17.)  But the Second Circuit has "expressly declined to limit a finding of inquiry notice to company-specific storm warnings."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F. 3d 406, 428 (2d Cir. 2008).  CAOF represented to the Court that it has "significant experience with and knowledge of" the cryptocurrency industry (Dkt. 27 at 7), and the Complaint cites industry-wide facts.  (Compl. ¶¶ 77, 120.)  These industry-wide warnings placed any token purchaser on inquiry notice that any digital token might be treated as a security.  (*E.g.*, DAO Report, Ex. 13 (Senate testimony by SEC chairman that "I believe every ICO I've seen is a security").)

Finally, CAOF does not identify any questions of fact that preclude resolution of this Motion at the pleading stage.  (Opp. 16.)  Indeed, it has not alleged any facts about its discovery of the alleged fraud and thus has failed to satisfy its burden to show compliance with the statute of limitations.  *Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1173 (S.D.N.Y. 1974).

### D.    CAOF Has Failed to State a Section 12(a)(2) Claim

Seeking to avoid the heightened pleading standard for fraud, CAOF argues that the Complaint "clearly distinguish[es] between its fraud-based and negligence-based claims."  (Opp. 19.)  CAOF is wrong.  Its citation to *Fresno County Employees' Retirement Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017), disproves its point.  The complaint there was "segregated into two parts, [one for counts] which sound in fraud, and the [other for counts] which plead [] negligence."  *Id.* at 558.  CAOF's Complaint is not.  The Section 12 claims

incorporate each allegation of the Exchange Act claims (Compl. ¶¶ 244, 252, 255), and CAOF

combines the factual background in a single section under the heading: "DEFENDANTS MADE

FALSE STATEMENTS IN VIOLATION OF THE SECURITIES ACT AND THE

EXCHANGE ACT." (*Id*. at 34.)  In its Opposition, CAOF again relies entirely on its discussion

under Section 10(b) to support its argument that it pleaded a misleading prospectus claim.  (Opp.

3, 18.)  This makes the prospectus claim subject to the same heightened pleading standard.  *See*

*In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 742 (S.D.N.Y. 2015).

       Even under a Rule 8 pleading standard, CAOF's claim falls short.  The Supreme Court

has refused to read the term "[p]rospectus" as broadly as CAOF requests; it must be read to refer

to writings that are "wide[ly] disseminat[ed]" and that "from a functional standpoint, are similar

to the terms 'notice, circular, [and] advertisement.'"  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574-

76 (1995).  Congress simply did not intend to subject all secondary market communications to

Section 12(a)(2) liability.  *Id.* at 578.  Although Rule 8 may not require CAOF at the pleading

stage to "identify one singular document as a prospectus" (Opp. 18), CAOF still "must identify a

particular purchase from a particular defendant pursuant to a particular prospectus that it

contends contained a particular false or misleading statement."  *In re CityGroup Inc. Bond Litig.*,

723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010).  CAOF has not done so.  Instead, CAOF broadly

cites the White Paper[10] and a laundry list of other "announcements and statements."  (Opp. 18.)

The Complaint does not even limit itself to communications that took place before or during the

alleged offering (*i.e.*, the Token Sale).  This blunderbuss approach should fail.

---

[10] The White Paper does not even mention the Token Sale and expressly states that it does not
refer to the ERC-20 tokens.  (March 16, 2018 White Paper, Ex. 2.)

III.    **CAOF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED**

    A.    **CAOF Fails to Plead Any Actionable Misstatements or Omissions**

CAOF's claims are predicated on three categories of statements: those about

(1) decentralization; (2) block producer elections; and (3) supporting the EOSIO blockchain

ecosystem through venture capital funding.  (Mot. 31; Opp. 25-26.)  None are actionable.

    1)    **CAOF Fails to Plead that Defendants Made False or Misleading Statements About the Ability to Generate Software that Could Create a Decentralized Blockchain**

CAOF fails to grapple with the fact that decentralization has no single meaning and

"occurs in degrees."  (Mot. 11.)  Indeed, CAOF never defines what *it* thinks the term means.  In

arguing that defendants did not deliver on their supposed promise of "a decentralized blockchain

platform," CAOF makes two specific complaints that (1) arbitrators "could unilaterally reverse

transactions and freeze accounts"; and (2) block producers "were actually a handful of Chinese

oligarchs . . . elected through a fraudulent voting process."[11]  (Opp. 26.)  It claims that these

supposed facts render various statements, set forth in a series of six bullets, false.  (*Id.* 26-27.)  That

is wrong.

The first, second, third, and sixth bullets reflect technical descriptions of the EOSIO

software or its ability to support distributed applications.  (*Id.* 26.)  The first two bullets are from

the White Paper, which describes decentralization in a specific technical context: that EOSIO

software would use a decentralized *consensus algorithm* and enable the deployment of

decentralized *applications*.  CAOF nowhere alleges that EOSIO software did not function as

described.  Moreover, what is *in* the Complaint confirms that the White Paper descriptions were

accurate.  (*See, e.g.*, Compl. ¶¶ 122-27, 191.)  Similarly, the third and sixth bullets describe

---

[11] The Opposition confirms that CAOF's reliance on the phrase "Chinese oligarchy" is meant to refer to the "concentration of power" in a "handful" of individuals.  (Opp. 30 n.6.)

technical aspects of the EOSIO software.  CAOF pleads no facts showing that any of those descriptions is false.  They reflect, at most, puffery about software design quality.  (Opp. 26 (stating that "EOS.IO software utilizes the only decentralized consensus algorithm capable of meeting the performance requirements of applications on the blockchain" and that the software "represents fundamental advancements in the technology").)

The fourth statement—that a "block that is accepted by a quorum of producers is declared immutable"—is not rendered false because an arbitrator may have ordered a transaction reversed. A blockchain consists of a "ledger of transactions" that are recorded in blocks.  (Compl. ¶¶ 3, 41.) Once a block is accepted by a quorum of producers, it "is declared immutable" such that the data in that block cannot be changed.  (*Id.* ¶ 153.)  Though the block is immutable, a transaction reflected by the data in a block may be reversed by generating and approving a new block in the blockchain. *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020) (explaining that a blockchain contains an "immutable history of all transactions ever logged on the blockchain").

CAOF acknowledges that a July 5, 2017 paper disclosed that token holders "may choose to adopt a constitution that empowered arbitrators to serve as a 'counterbalance' to block producers and to resolve disputes."  (Opp. 27; Mot. 33-34.)  CAOF's assertion that this paper implied that "arbitrator rulings would be merely advisory" is without basis.  In fact, the paper contemplated different possible enforcement mechanisms.  (*See* EOS: An Introduction, Ex. 3, p. 7 ("Arbitrators publish rulings, which producers might enforce, or users might seek external enforcement.").)  The White Paper also described the option to freeze accounts.  (Mot. 44.) Against this backdrop, CAOF cannot show that defendants made any false statement about expected arbitrator power.  (*Id.* 12-13.)

The fifth statement—that token holders would be "able to elect 21 block producers"—is

14

not rendered false because token holders may have allegedly bought or sold votes.  CAOF does

not dispute that token holders in fact were able to elect 21 block producers, or that they did so

pursuant to the "continuous approval voting system" that Block.one disclosed in the White

Paper.  (*Id*. 6.)  Nor does it dispute that it had been disclosed that a token holder's "[v]oting

power" depended on "the amount of tokens held; thus the larger token holders [would] have

more sway in electing block producers."  (*Id*.)  CAOF does not identify any statement in which

defendants represented that the software could prevent people from forming voting pools.

Even if these statements could be read to contain an implicit representation about the

degree of "decentralization" in any future blockchain, they would reflect at most non-actionable

generalized optimism.  (*Id*. 6 n.4, 31, 35.)  CAOF contends that such statements were "anything

but vague" in the context of the White Paper.  (Opp. 28.)  But the White Paper did not make any

representations about the governance of any specific blockchains that might be launched in the

future.  (White Paper, Ex. 1.)  Indeed, the TPA expressly *disclosed* that future EOS blockchains

may involve changes to the platform.  (TPA, Ex. 4 § 7.14.)  Given that the EOS Blockchain had

not been built as of the Token Sale, and governance rules were independently proposed by block

producers and required community approval, the statements at issue are far from actionable

representations of fact.  (Mot. 34.)

### 2) CAOF Fails to Plead that Defendants Made False or Misleading Statements About the Governance of the EOS Blockchain

CAOF's argument that defendants "misled investors about their efforts to confront

unfairness and corruption in the block producer election process" is baseless.  (Opp. 29-30.)  The

White Paper states that an algorithm in the EOSIO software would be written so that "those who

hold tokens on a blockchain may select block producers through a continuous approval voting

system" and that "21 unique block producers are chosen" by preference of votes cast by token

holders.  (White Paper, Ex. 1, p. 4.)  CAOF does not dispute that the software was written in that

manner, and it acknowledges that token holders on the EOS blockchain have the right to (and do)

elect block producers.  (Opp. 30.)  Moreover, defendants made no representation that the

software would prevent token holders or block producers from coordinating with one another or

would ensure that block producers would be "independent" or geographically dispersed.  (*Id*. 30

n.6.)

      CAOF's other arguments fare no better.  CAOF contends that the statement that

Block.one intended to "begin allocating votes to block producers" that "share [certain] core

values" was false because it "did not [subsequently] allocate its votes."  (Opp. 31.)  But CAOF's

*post hoc* assertion demonstrates nothing about the truth of the statement *when made*.  (Mot. 36.)

Similarly *post hoc* is the contention that defendants did not use their "10% stake to attempt to

sway the voting process."  (Opp. 30.)  Nor does the Complaint plead facts showing how any

particular vote allocation by a *minority* holder of EOS tokens would have stopped the alleged

vote-buying or resulted in the selection of different block producers.  Had Block.one somehow

acted to overcome the community's selection of block producers, such an action would have

been indicative of precisely the *centralized* authority that CAOF otherwise contends that EOSIO-

based blockchains were designed to prevent.  (Mot. 36.)  Finally, CAOF pleads no facts showing

that defendants did not believe in "a free and democratic election process" or did not actually

consider the ideals of "honesty, integrity, and fairness" in their decision-making.  (Opp. 30.)  In

any event, such statements are not actionable.  (Mot. 36-37.)

      **3)**    **CAOF Fails to Plead that Defendants Made False or Misleading Statements About Plans to Support the EOSIO Blockchain Ecosystem**

      CAOF contends that defendants made misstatements about how EOS VC—a program "to

deploy over 1 billion USD in partnership capital with leading venture capital firms to develop the

EOS ecosystem" (Compl. ¶ 155; *id.* ¶ 162)—would use its funds. (Opp. 32.) The only supporting allegations that CAOF marshals are the conclusory assertions that funds from Block.one's "funding wallet" were "funneled to Defendants' personal piggybank, an investment fund located in Hong Kong (*i.e.*, EOS VC), and that defendants then "essentially abandoned any support of the EOS Blockchain." (*Id.* 32-33.) Even if CAOF had pleaded particularized facts supporting this narrative (which it has not done), CAOF's version of events does not contradict any of defendants' contemporaneous statements.[12]

CAOF cannot dispute that Block.one *did* commit over $675 million to the "EOSIO blockchain ecosystem" through EOS VC.[13] (Compl. ¶¶ 145-46.) Nor does CAOF allege that the commitment to deploy "over 1 billion USD" was time-limited, much less that Block.one has stopped funding new projects. CAOF's only real response is to criticize the fact that certain EOS VC's partners focused on "finance-related projects"; it also speculates that the funds may not have been used for EOS-related projects. (Opp. 32-33.) Such speculation is not actionable. Finance projects, which may be used on EOSIO-based blockchains, present no conflict with Block.one's commitment to the development of the ecosystem.

CAOF also complains that Block.one devoted an additional $150 million (above and beyond the $675 million EOS VC commitment) to develop Voice, an EOSIO-based social media

---

[12] CAOF argues that the Token Sale benefitted only "a select few" equity investors. (Opp. 33.) Whether investors profited, however, has no relevance to Block.one's deployment of its capital. (Mot. 38.) In any event, the Complaint alleges that as of March 2019, the company still had "approximately" $3 billion in assets—*i.e.*, 75% of the Token Sale's proceeds. (Compl. ¶ 148.)

[13] CAOF appears to take issue generally with defendants' "withdr[awal] [of] funds from the block.one 'funding wallet'" (Opp. 32), but use of those funds is a prerequisite to Block.one's funding EOS VC and its business more generally. The Complaint acknowledges that withdrawal was not prohibited (Compl. ¶ 60), and it is undisputed that Block.one disclosed that proceeds from the sale of ERC-20 tokens in the Token Sale were "considered 'revenue' to block.one" and could be used by Block.one in its "sole discretion" (Mot. 10).

application.  (Compl. ¶ 186; Mot. 15, 43-44.)  Even though CAOF based its fraud claim in part on Block.one's support of Voice (*e.g.*, Compl. ¶¶ 185-87), CAOF now characterizes Voice as "irrelevant."  (Opp. 32.)  Yet CAOF admits that Voice utilizes the "EOSIO protocol" and was launched on a "purpose-made EOSIO blockchain."  (Compl. ¶ 191.)  The EOSIO ecosystem needs applications to thrive; CAOF's assertion that applications such as Voice are irrelevant misunderstands the technology.

### B.     CAOF Fails to Allege Facts Giving Rise to a Strong Inference of Scienter

CAOF's Opposition abandons all but two bases for its scienter allegations: (1) defendants had "motive and opportunity" to "maximize the amount of money" they could collect; and (2) by virtue of their roles and technical expertise, the individual defendants had "intimate first-hand knowledge that their statements were false."  (Opp. 34-38.)  Neither suffices to plead scienter.

*First*, revenue maximization is a motive possessed by virtually all corporate insiders and, as such, cannot establish scienter.  (Mot. 41.)  CAOF's response is hopelessly muddled and without legal support.  Assiduously avoiding identifying the tokens to which it is referring, the Opposition refers to an alleged incentive that defendants supposedly had to inflate the value of "EOS securities."  (Opp. 34-35.)  But that is a textbook example of the type of incentive present in any actual or alleged offering, and which courts therefore consistently find insufficient to establish scienter.  CAOF claims—without authority and, ironically, at odds with the very premise of its claims—that this case is different because "EOS securities do not represent equity in block.one."  (*Id.* 35.)  But CAOF never explains what incentive defendants would have to inflate the price of native EOS tokens.  CAOF does not, for example, allege that defendants sold any native EOS tokens to take advantage of an inflated price.

*Second*, it is well-established that scienter allegations that are "founded on nothing more than a defendant's corporate position are entitled to no weight."  (Mot. 40-41.)  CAOF responds

by claiming that its allegations "demonstrat[e] [the individual defendants'] critical and unique roles." (Opp. 36.)  In this respect, CAOF speculates that Mr. Blumer "likely" wrote "internal plans related to how block.one would spend the billions of dollars it was raising in the ICO."[14] (*Id.*)  But unsupported suspicions about an individual's duties cannot support a strong inference of scienter.  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  In any case, even if CAOF could allege Mr. Blumer's activities with any specificity, the TPA disclosed that Token Sale proceeds could be used by Block.one in its "sole discretion" (Mot. 10), and CAOF does not attempt to connect its speculation to knowledge of any allegedly misleading statement.

As to the other individual defendants, CAOF argues for scienter on the basis of their technical expertise.  (Opp. 36-37.)  But the Complaint does not identify any *technical* statements about the design plans for the EOSIO software that were false.  (Mot. 32.)  To the extent CAOF challenges statements about decentralization or block immutability in technical documents authored by Messrs. Larimer or Grigg (Opp. 26-27), CAOF has not shown that those statements were false, much less that they had contemporary access to contradictory facts.  (Mot. 40-42.)

### C.    CAOF Fails to Plead Loss Causation

CAOF fails to connect isolated declines in the price of "EOS Securities" to any alleged misstatement.  (Mot. 42-43 (citing cases).)  The Opposition identifies only two categories of disclosures that CAOF claims to be "corrective" of anything: those about (1) defendants' "level of . . . investment in the EOSIO platform"; and (2) whether EOSIO was a "decentralized blockchain solution."  (Opp. 39.)  Neither bears any relation to any actual alleged misstatement, and therefore neither suffices to plead loss causation.

The "disclosures" that CAOF claims relate to Block.one's "investment in the EOSIO

---

[14] CAOF's other contentions only reflect that Mr. Blumer was performing duties typical of a CEO and are impermissible attempts to presume scienter by virtue of his position.  (Mot. 40-41.)

platform" in fact have no such connection.  *First*, CAOF cites reports of a "hack" on Block.one's "internal system" (which has no relevance to EOSIO or the EOS Blockchain) and claims that the EOSIO software "had bugs."  (*Id.*)  But the White Paper expressly warned that "[a]ll non-trivial software is subject to bugs" (Mot. 12), and CAOF never connects any alleged bugs to Block.one's level of investment.  *Second*, CAOF notes an "observ[ation]" that Block.one had not issued an audit report (Opp. 39), but CAOF never explains how that has any relevance to Block.one's level of investment in the platform.  *Third*, a statement that one defendant was "exploring" a new "token idea" (*id*. 40) is likewise unrelated to Block.one's level of investment.  *Finally*, the announcement of Voice (Opp. 40) affirmatively evinced Block.one's *investment* in the ecosystem; it was not a corrective disclosure of anything.

As to decentralization, defendants affirmatively disclosed that block producers could have "limited and checked authority" and that token holders could adopt a constitution with arbitration as a dispute resolution procedure.  (Mot. 44-45.)  To the extent that power later became allegedly concentrated on the EOS Blockchain, it was due to community voting, which was also disclosed in the White Paper.  (*Id*. 45.)  Thus, here too the putative corrective disclosures (Opp. 40-41), are not corrective of anything.

## CONCLUSION[15]

For all of the foregoing reasons, as well as those set forth in the Motion, the Complaint is deficient.  CAOF has not asserted, much less demonstrated, that it would be able in good faith to amend the Complaint to cure its shortcomings.  Accordingly, defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice.

---

[15] In the absence of a predicate violation, CAOF's control person claims in the third and fifth causes of action must likewise be dismissed.

Dated: January 11, 2021

BAKER MARQUART LLP                          DAVIS POLK & WARDWELL LLP

By:  */s/ Brian E. Klein*                   By:  */s/ Edmund Polubinski III*
    Brian E. Klein                           Greg D. Andres
    Scott M. Malzahn                         Edmund Polubinski III
      (admitted *pro hac vice*)             Andrew S. Gehring
    Teresa L. Huggins                        Gabriel Jaime-Bettan
    Jose R. Nuno                             Antonio M. Haynes
      (*pro hac vice* pending)              450 Lexington Avenue
    777 S. Figueroa Street, Suite 2850       New York, New York 10017
    Los Angeles, California 90017            Tel:    (212) 450-4000
    Tel:    (424) 652-7800                   Fax:    (212) 701-5800
    Fax:    (424) 652-7850                   Email: greg.andres@davispolk.com
    Email:  bklein@bakermarquart.com               edmund.polubinski@davispolk.com
         smalzahn@bakermarquart.com                andrew.gehring@davispolk.com
         thuggins@bakermarquart.com                gabriel.jaime@davispolk.com
         jnuno@bakermarquart.com                   antonio.haynes@davispolk.com

                                         Neal A. Potischman
                                         1600 El Camino Real
                                       Menlo Park, California 94025
                                       Tel:    (650) 752-2000
                                       Fax:    (650) 752-2111
                                       Email: neal.potischman@davispolk.com


*Attorneys for Defendants Block.one, Daniel Larimer, and Brock Pierce*

**<ins>CERTIFICATE OF SERVICE</ins>**

I hereby certify that a true and correct copy of the above and foregoing document has

been served on all counsel of record through the Court's ECF System on January 11, 2021.

/s/ *Edmund Polubinski III*
Edmund Polubinski III