

485 Lexington Avenue, 29th Floor, New York, NY 10017    tel: 646.722.8500   fax: 646.722.8501

Daniel L. Berger
Director
+1 (646) 722 8522
dberger@gelaw.com

123 Justison Street
7th Floor
Wilmington, DE 19801
tel: 302.622.7000
fax: 302.622.7100

30 N. LaSalle Street
Suite 2350
Chicago, IL 60602
tel: 312.610.5350
fax: 312.214.0001

201 Mission Street
Suite 1200
San Francisco, CA 94105
tel: 415.293.8210
fax: 415.789.4367

www.gelaw.com

November 10, 2021

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    *Crypto Assets Opportunity Fund et al v. Block.One et al.* (1:20-cv-2809)

Dear Judge Kaplan:

      Lead Counsel hereby respectfully submits this response to the Court's November 3, 2021 Order (ECF No. 39) that requested that Lead Counsel submit (1) a restated consolidated lodestar spreadsheet detailing each timekeeper's hours, tasks, and historical and blended hourly rates and explanation of the categories of work for which compensation is sought; (2) biographical information for the individuals for whom compensation is sought and whose biographical information was not previously submitted; (3) supplemental facts and explanation regarding the reasonableness of hourly rates; (4) an explanation of expenses; (5) additional information regarding the composition of EOS token purchasers, *i.e.* the number foreign vs. domestic purchasers; (6) supplemental facts and argument regarding whether CAOF is typical of other class members with regards to the classification of its EOS token purchases as foreign or domestic; (7) additional information regarding the proposed method for administering the settlement; (8) additional information regarding the claims administration process; (9) documentation required for ownership of tokens post May 18, 2020; (10) additional information regarding the *pro rata* allocation of the settlement fund; (11) information regarding the plan for the distribution of any remaining balance of the settlement fund; and (12) additional information regarding the determination of cryptocurrency transaction dates.

      Set forth below and attached hereto are the responses to the Court's request for information:

      **1.**    **A consolidated summary lodestar spread sheet setting forth, for each individual for**

Page 2

> **whom compensation is sought, (a) the number of hours at each hourly rate in effect for that individual at the time the hours were devoted and (b) a summary line reflecting the total hours and the individual's blended historical hourly rate over the course of the litigation.**

We have attached hereto as Exhibit A, a consolidated spreadsheet identifying each timekeeper involved in the litigation by name and title. The spreadsheet also shows each timekeeper's hourly rate and the total number of hours worked during the pendency of this litigation. No timekeeper's hourly rate changed during the course of the litigation, thus the current rates and blended historical rates are the same.

2.  **An analysis of the categories of work for which compensation is sought, the hours devoted to each category by each individual for whom compensation is sought, and the "lodestar" for that category of work by each individual based on historical rates. For the guidance of counsel, the Court found the categories used in *In re IndyMac Mortgage-Backed Sec. Litig*., 94 F. Supp.3d 517, 529 (S.D.N.Y. 2015).**

Exhibit A also provides the total hours spent by each timekeeper across twelve categories of litigation activity. These categories are:

- Investigation of claims and preparation of Complaint
- Motion for Appointment of Lead Plaintiff
- Investigation for and preparation of Consolidated Amended Complaint
- Research re: and work in connection with the motion for class certification
- Communication with class members and potential class members
- Service of Complaint on foreign defendants and related research and motion
- Research for and Drafting of Response to Defendants Motion to Dismiss
- Pre-trial Discovery
- Analysis of Damages
- Settlement discussions and negotiations
- Preparation of settlement stipulation, motion for entry of order authorizing notice and related paper
- Preparation of papers in support of settlement and application for fees and expenses.[1]

3.  **The Court notes that biographical information has not been provided for all persons for whom compensation has been sought. That deficiency should be remedied.**

In addition to the attorney and paraprofessional biographical information submitted to this Court on October 19, 2021 together with Lead Plaintiff's Motion for Award of Attorneys' Fees

---

[1] These categories are different from, and more expansive than the categories used in *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 526 (S.D.N.Y. 2015), *aff'd sub nom. DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016), We have chosen these categories because theymore clearly reflect the work performed in this litigation given that the action did not reach the discovery phase.

and Expenses and Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(A)(4), see Dkt. Nos. 125-2, 126-3, 127-3, and 128-3, biographical information for the remaining persons for whom compensation has been sought is attached hereto as Exhibit B.

**4.     It is the burden of plaintiff's counsel to establish the reasonableness of the hourly rates on which the lodestar is based. That involves, among other considerations, the time keepers' titles and roles (including whether persons performing similar roles typically are billed to paying clients on an hourly basis), years and quality of experience, and market rates for similar professionals, among other factors. Counsel would be well advised to address these and related issues.**

The rates reflected in the block.one lodestars are commensurate with each listed attorney and paraprofessional's litigation experience. These rates are equivalent to the rates billed by the relevant firms to clients who pay hourly rates for the work of these and similarly experienced persons. *See* Declarations of Daniel L. Berger, James L. Koutoulas, Ievgeniia P. Vatrenko, and Samuel Tenenbaum in Further Support of Lead Plaintiff's Motion for Attorneys' Fees, attached hereto in Exhibits C-F.

**Daniel L. Berger** is a director at G&E and has been litigating complex securities and discrimination cases on behalf of plaintiffs since 1979. Mr. Berger served as the lead principal for G&E in the block.one action. Mr. Berger has served as principal lead counsel in many of the largest securities class action cases in history, achieving successful recoveries for classes of investors. The $1,000 per hour rate at which Mr. Berger's time is billed is in line with rates billed by similarly experienced attorneys. *See* Rosen Decl. in Support of Mot. for Attys' Fees, Ex. 5, Lodestar Chart, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-CV-0256 (LAK), 2021 WL 2453972 (S.D.N.Y. April 9, 2021), Dkt. No. 427-5, at page 2 ($1,150 rate for partner who graduated in 1986); Rosen Decl. in Support of Mot. for Attys' Fees, *Christine Asia Co. Ltd. v. Ma*, No. 1:15-md-02631, 2019 WL 5257534 (S.D.N.Y. September 12, 2019), *appeal withdrawn sub nom. Tan Chao v. William*, No. 19-3823, 2020 WL 763277 (2d Cir. Jan. 2, 2020), Dkt. No. 132-5 at pages 3, 9 ($975 rate for partner who graduation in 2002); Brower Decl. in Support of Mot. for Attys' Fees and App., *Guevoura Fund Ltd. v. Sillerman*, No. 1:18-cv-9784 (S.D.N.Y. October 12, 2019), Dkt. No. 59, at page 47 and Dkt No. 59-1, at page 117 ($995 rate for managing director who graduated in 1982). By comparison, experienced litigation partners at Defendants' counsel Davis Polk & Wardwell LLP bill at hourly rates of $1,685 and $1,790. Debtor's Fourth Appl. For Prof'l Comp., Ex. C, Professional and Paraprofessional Fees, *In re Purdue Pharma L.P.*, No. 19-23649-RDD, 2021 WL 3502611 (Bankr. S.D.N.Y. March 17, 2021), Dkt. No. 2512-3, at p. 1.

**Deborah A. Elman** is a principal at G&E with nearly two decades of experience representing plaintiffs and defendants in high-profile securities and antitrust class actions. Ms. Elman has represented institutional clients and individuals in an array of complex civil litigation cases. Prior to joining G&E, Ms. Elman represented clients before the SEC, DOJ, and state regulators and participated in numerous appearances before federal and state courts as an associate with a leading New York law firm. **Christine Mackintosh** is a principal at G&E, practicing in the areas of corporate and securities litigation. Ms. Mackintosh has represented investors in

corporate cases in the Delaware Court of Chancery and in securities fraud cases in federal courts throughout the country. Both Ms. Elman and Ms. Mackintosh graduated from law school in 2001.

The $800 per hour rate at which Ms. Elman's and Ms. Mackintosh's time is billed is in line with rates billed by similarly experienced attorneys. *See* Lodestar Chart, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, *supra* at 2 ($935 rate for principal who graduated in 1998; $830 rate for partner who graduated in 2006); Rizio-Hamilton Decl. in Support of Mot. for Atty's Fees, Ex. 4, Time Report, *In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468 (S.D.N.Y. June 16, 2020), Dkt. No. 258-4, at pages 8 and 40 (rate of $825 and $975 for partners who graduated in 2007 and 2004, respectively); Enright Decl. in Support of Mot. for Attys' Fees, Exs. 1 and 3, Lodestar Report and Firm Biographical Information, *Guyer v. MGT Cap. Invs., Inc.*, No. 1:18-cv-9228 (ER), 2019 WL 8403029 (S.D.N.Y. Apr. 22, 2010), Dkt. Nos. 65-1, at page 1 and Dkt. No. 65-3, at pages 15, 23 ($925 rate for partner who graduated in 1996; $765 for partner who graduated in 2006); Rosen Decl., *Christine Asia Co. v. Yun Ma*, *supra*, at pages 3, 9. By comparison, a litigation partner at Davis Polk & Wardwell LLP with a similar number of years of experience to Ms. Elman and Ms. Mackintosh bills at hourly rates of $1,765 and $1,655. Professional and Paraprofessional Fees, *In re Purdue Pharma L.P.*, *supra*, at page 1.

**Caitlin M. Moyna** is senior counsel at G&E with nearly 20 years of experience in U.S. and foreign securities fraud class action and opt-out litigation, shareholder derivative actions, merger litigation, and international arbitration. Prior to joining G&E, Ms. Moyna was associated with two leading law firms where she represented corporations in securities fraud class actions and government investigations, as well as a boutique litigation firm specializing in investor representation. The $750 rate at which Ms. Moyna's time is billed is in line with rates billed by similarly experienced attorneys. *See* Lodestar Chart, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, *supra*, at page 2 ($775 rate for Of Counsel who graduated in 2007); Time Report, *In re Signet Jewelers Ltd. Sec. Lit.*, *supra*, at pages 8, 40 (rate of $750 for senior counsel who graduated in 2000); *See* Rosen Decl., *Christine Asia Co. v. Yun Ma*, *supra* ($750 rate for Counsel and Senior Associates). By contrast, Litigation Counsel at Davis Polk & Wardwell LLP bill at hourly rates of $1,395 and $1,295. Professional and Paraprofessional Fees, *In re Purdue Pharma L.P.*, *supra*, at page 1.

**Rachel A. Berger** is an associate in G&E's securities litigation practice. Ms. Berger earned her J.D. in 2019 from Fordham University School of Law, where she was a member of the *Fordham Urban Law Journal*. **Cecilia Stein** is likewise an associate in G&E's securities litigation practice. Ms. Stein graduated in 2020 from the Benjamin N. Cardozo School of Law where she was a member of the *Cardozo Arts & Entertainment Law Journal* and involved in the *Bet Tzedek* Civil Litigation Clinic. The $365 rate at which Ms. Berger and Ms. Stein's time is billed is in line with rates billed by similarly experienced attorneys. *See* Lodestar Chart, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, *supra*, at page 2 (rates $250 and $450 for junior associates); Time Report, *In re Signet Jewelers Ltd. Sec. Lit.*, *supra*, at pages 8, 40 (rate of $425 for junior associate); Lodestar Report and Firm Biographical Information, *Guyer v. MGT Cap. Invs., Inc.*, *supra* at pages 1 and 15, 23, respectively ($325 and $425 rates for junior associates). By comparison, litigation associates who joined Davis Polk & Wardwell LLP in 2019 billed at hourly rates of at least $690, and Law Clerks who joined in 2020 billed at rates of at least $560, as

of March, 2021.  Professional and Paraprofessional Fees, *In re Purdue Pharma L.P.*, *supra*, at page 1.

   **Valisity Beal**, **Remi Hovsepian**, and **Toby Saviano** are litigation paralegals currently or previously employed by G&E.  Ms. Beal joined G&E in 2007 and is currently a Senior Paralegal with the firm.  Ms. Hovsepian has been a litigation paralegal at G&E for over a year, and previously worked as a litigation paralegal at Seyfarth Shaw.  Mr. Saviano was a Senior Paralegal at G&E from August 2015 through December 2020 and has over twenty-five years of paralegal experience. Prior to joining G&E, Mr. Saviano worked as a paralegal and senior paralegal at several top New York law firms. The $210 and $220 hourly rates at which Ms. Beal, Ms. Hovsepian, and Mr. Saviano's time is billed are at the low end of rates reported for paralegal work in similar cases.  *See* Lodestar Chart, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, *supra*, at page 4 ($350 rate for paraprofessional); Time Report, *In re Signet Jewelers Ltd. Sec. Lit.*, *supra*, at page 10 (rates of $255 to $375 for paralegals).  The recorded paralegal rates are also equivalent to the rates charged by G&E to clients who pay the firm directly for hours worked.  See Berger Decl. ¶ 3.

   **Ievgeniia Vatrenko** is a legal practitioner with over 10 years of litigation experience, who specializes in blockchain, cryptocurrencies, and securities litigation and enforcement. Ms. Vatrenko has obtained several private settlements for investors against cryptocurrency issuers, served as co-counsel to Brown Rudnick, LLP in a FINRA investigation of a registered representative client, and advises several blockchain/digital asset startups on regulatory implications of business activity in the United States.  Prior to launching her solo operation, Ms. Vatrenko practiced for six years as a Litigation Associate for Boies Schiller Flexner LLP.   In that capacity, Ms. Vatrenko represented both plaintiffs and defendants in complex commercial matters. Ms. Vatrenko also practiced as a Special Assistant District Attorney in the Kings County District Attorney's office.   The $700 per hour rate reflected in Ms. Vatrenko's lodestar is the usual and customary rate at which she bills clients.   See Vatrenko Decl., ¶ 3.  This rate reflects the industry rate for attorneys with Ms. Vatrenko's skill, expertise, and reputation in the niche practice area of cryptocurrency law.   See *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 97 n. 6 (2d Cir. 2006) ("[C]ourts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner. . . . Indeed, it may be that in certain niche practice areas, attorneys of the highest 'skill, expertise, and reputation' have decided to maintain a solo practice instead of affiliating themselves with a firm. . . . The focus of the inquiry into the reasonable hourly rate must instead be determined by reference to 'prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation.'") citing *Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984).

   **James Koutoulas** is a securities lawyer, as well as a professional cryptocurrency hedge fund manager and software developer.  As part of his legal work, Mr. Koutoulas has represented fraud victims in several large actions.  Mr. Koutoulas served as Lead Customer Counsel to MF Global Bankruptcy and obtained a recovery of $6.7 billion for 38,000 victims.  He also served as Lead Customer Counsel to Peregrine Financial Group, leading recovery of $300 million in customer assets for 10,000 victims.   The $800 per hour rate reflected in Mr. Koutoulas's lodestar is the usual and customary rate charged by Koutoulas Law LLC for Mr. Koutoulas's time.   See Koutoulas Decl., ¶ 3.   Like Ms. Vatrenko, Mr. Koutoulas is a highly skilled practitioner of a niche

area of law.  See *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d at 97 n. 6 (2d Cir. 2006).  Mr. Koutoulas's rate reflects the industry rate for attorneys with Mr. Koutoulas's "skill, expertise, and reputation."  *Id.*  An updated version of Mr. Koutoulas's resume is included in Exhibit B.

**J. Samuel Tenenbaum** is an expert in litigation and a clinical professor of law at the Northwestern Pritzker School of Law.  Mr. Tenenbaum has close to fifty years of experience practicing and teaching law.  Mr. Tenenbaum bills private clients at an hourly rate of $400, as reflected in his lodestar.  *See* Tenenbaum Decl., ¶ 3.  This rate reflects the industry rate for attorneys with Mr. Tenenbaum's experience, skill, and expertise.

5. **Counsel has applied also for an award of a significant amount of expenses. But these include a $25,000 item described only as "PH," over $4,000 for undescribed "service fees," and other items for which greater explanation should be provided.**

The Court has asked for "greater explanation" for the following expenses: (1) at $25,000 item described only as PH; (2) over $4,000 for undescribed "service fees" and (3) other items.  Lead Counsel responds as follows:

1. The $25,000 expense described as "Expense Advance from PH" (see Koutoulas Declaration at Exhibit B (ECF No. 126-2)) was a contribution of $25,000 made by Koutoulas Law to the Litigation Fund established by Lead Counsel after Lead Plaintiff was appointed, to cover costs associated with prosecuting the action.  This is reflected in Exhibit B to the Berger Declaration (ECF No. 125-1).  An accounting of the specific disbursements from the Litigation Fund isis reflected in that Exhibit B.

2. The "Service Fees" (totaling $6,873.55, *see* Exhibit A to the Berger Declaration (ECF No. 125-1)) consist of two separate payments of $4,262.68 and $2,610.87.  These were payments made to process service firms in connection with attempting to serve the individual defendants both domestically and in Hong Kong.  (See ECF No. 104-5).  Lead Counsel has invoices reflecting these payments.

   The Berger Declaration schedule of expenses also includes payment to experts retained by Lead Counsel, including $46,875.19 paid directly by Grant & Eisenhofer and of $35,442.34 paid out of the litigation fund. The payments were made to experts on damages and the cryptocurrency retained by Lead Counsel.  In addition, Lead Plaintiff retained an investigative firm to assist with locating former block.one employees, investigating certain facts used to support the allegations in the Amended Complaint, and attempting to locate two of the defendants who were not in the United States.

3. Lead Counsel's expenses also include a "Publication Expense" of $62,000 paid out of the litigation fund.  (ECF No. 125-1.)  This was a payment made to Epiq Global, the claims administrator, to fund the media campaign used to publicize the Notice.

    4. There is a "Multicoin Consulting Fee" expense of $1,250. (ECF No. 126-2). This expense is an additional industry expert who was retained to provide background information regarding cryptocurrency to the litigation team.

    5. Finally, we have now determined that the "Squarespace" fee (ECF No. 126-2) of $129 is a website hosting fee that should not have been allocated to this litigation. Lead Counsel has reduced our requested expenses to eliminate this amount, reducing our request from $156,507.04 to $156,378.04.

**6. Plaintiff has informed the Court that "the majority of EOS purchasers were foreign," but has not provided the Court with any grounds for that assumption. Counsel should provide a detailed explanation of that statement and its impact on the settlement amount. In doing so, they should consider the analysis in *In re Tezos Sec. Litig*, No. 17-cv-06779 (RS), 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) and *Barron v. Helbiz Inc*., No. 20-cv-4703 (LLS), 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) *vacated and remanded on other grounds*, No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021), although the Court expresses no view with respect to the analysis in either case. Counsel further should address the implication of the Securities and Exchange Commission's recent instruction that trading platforms such as Poloniex qualify as national securities exchanges under the Exchange Act and Exchange Act Rule 3b-16(a). *See* Cease and Desist Order, *In re Poloniex*, SEC Rel. No. 92607 (Aug. 9, 2021).**

    Block.one conducted a sale of tokens over 341 days from June 26, 2017, to June 1, 2018, inclusive (the "Token Sale"). It sold 900 million ERC-20 tokens on the Ethereum blockchain. All purchasers of ERC-20 tokens from block.one during the Token Sale were required to agree to the terms of the Token purchase agreement (the "Purchase Agreement") that prohibited U.S. persons from purchasing the tokens. Because block.one did not take exhaustive measures to prevent U.S. persons from participating in the Token Sale (such as blocking purchasers who used virtual private network ("VPN") services to access the Token Sale website and conceal their geographic location), U.S. persons were still able to purchase the tokens from block.one. It is, however, possible that at least some U.S. person were deterred from purchasing the tokens by the restrictive language in the Purchase Agreement.

    During the Token Sale, the ERC-20 tokens were tradeable on secondary markets via digital asset trading platforms, including platforms that were accessible by U.S. persons, *e.g*.. Bitfinex (Source: https://www.bitfinex.com/posts/208). Following the Token Sale, once the EOSIO software went live, owners of ERC-20 tokens purchased in the Token Sale became eligible to receive native EOSIO-based tokens (the "EOS tokens"). EOS tokens now trade on digital asset trading platforms, including U.S.-based Coinbase, Kraken, and Binance US, and ERC-20 tokens are no longer transferrable.

    The Court specifically asked how we determined that most purchasers of EOS and ERC-20 Tokens were foreign. This conclusion was derived from an article titled, "How many active crypto traders are there across the globe?" by Patrick Bucquet, Mare Lermit and Ally Jo, which was identified by one of the industry experts hired to assist our understanding of the facts and composition of EOS investors. This article is attached hereto as Exhibit G. The article estimates

that there are a total of 42.2 million cryptocurrency traders worldwide, and that 15.3 million (36%) of them are located in the U.S. We extrapolated from that number to determine that it is likely that less than 50% of EOS and ERC-20 token purchasers were located in the U.S.

The Court also asked Lead Plaintiff to explain how this fact affected the settlement amount. To the extent that the proposed class includes foreign traders, at summary judgment and trial, Defendants would likely argue that any damages from transactions outside the United States are not eligible for recovery, thus decreasing the amount of recoverable damages. In the settlement negotiations and in considering the demands and offers, Lead Counsel considered the maximum recoverable damages, assuming we were to prevail at trial, and without consideration of the location of class member transactions. However, because at this point in the litigation Lead Counsel could not determine the actual split between foreign and domestic purchases, yet clearly some substantial portion were not domestic, we considered in conducting the settlement negotiations and damages analysis that approximately 36% of trading in block.one tokens was domestic based on the figure contained in the article to which we were directed by one of our industry experts. *See* Exhibit G.

The Amended Complaint (ECF No. 66) alleges several relevant facts that show that U.S. persons, including the Lead Plaintiff, effectuated their purchases of ERC-20 and EOS tokens in the United States. These facts include: (1) the plurality of the Ethereum nodes that verified U.S. persons' purchases from block.one are located in the U.S. (¶ 74); (2) U.S. persons purchased ERC-20 tokens during the Token Offering on the eos.io website, hosted on a server in California (¶ 72); (3) Lead Plaintiff is a U.S. entity, with principal place of business in Northbrook, IL, where conducted its purchases of EOS on secondary digital asset trading platforms (¶ 27); (4) U.S. persons' purchases of ERC-20 tokens were prompted by an aggressive marketing campaign to U.S. persons (¶¶ 63-65); and (5) EOS tokens continued to trade on U.S.-based digital asset trading platforms such as Coinbase, Kraken, and Poloniex (¶ 76).

Facts similar to those alleged in the Complaint were found to be determinative in finding that plaintiffs had sufficiently alleged a domestic token sale transaction in *In re Tezos Sec. Litig.*, No. 17-CV-06779 (RS), 2018 WL 4293341, at *7 (N.D. Cal. Aug. 7, 2018). *In Re Tezos* held that the lead plaintiff participated in the token sale transaction in the United States because: (1) the plurality of nodes that verified the plaintiff's purchase of Tezos tokens were located in the United States, (2) Tezos tokens were purchased on an interactive website hosted on a server in Arizona, (3) the transaction at issue was conducted by the plaintiff in the U.S., and (4) the plaintiff's purchase was induced by the marketing of Tezos tokens to U.S.-based customers. *Id*. at *8. The Court reasoned that, "[w]hile no single one of these factors is dispositive…together they support an inference that [Plaintiff's] alleged securities purchase occurred inside the United States." *Id*. citing *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1296 (D. Utah 2017) (holding that where non-exchange listed securities are offered and sold over the internet, the sale takes place in both the location of the seller and the location of the buyer). The holding in *In re Tezos* is consistent with this District's holding in *Barron v. Helbiz Inc.*, No. 20-cv-4703 (LLS), 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) *vacated and remanded on other grounds*, No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021), where the Court found that the token purchase transactions were effected in the jurisdictions where the purchasers were located at the time they purchased the digital asset at issue in that case.

The Securities and Exchange Commission's recent instruction that digital asset trading platforms such as Poloniex qualify as national securities exchanges under the Exchange Act and Exchange Act Rule 3b-16(a) (Cease and Desist Order, *In re Poloniex*, SEC Rel. No. 92607 (Aug. 9, 2021)) suggests that transactions in any digital asset securities that are listed and traded on such platforms are domestic transactions within the purview of U.S. federal securities laws. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). The implication here is that, if block.one-issued ERC-20 and EOS tokens are investment contracts under *SEC v. Howey Co.*, 328 U.S. 293 (1946), then trades in those tokens on U.S.-based digital trading platforms are domestic trades. As of the date of this filing, EOS is traded on the following U.S.-based exchanges: Coinbase, Binance.US, Kraken, Poloniex, and Bittrex. (Source: CoinMarketCap, https://coinmarketcap.com/currencies/eos/markets/). The number of U.S.-based trading platforms on which EOS is traded supports the conclusion that a significant number of EOS transactions are domestic trades under the *Poloniex* framework, despite the fact that this number almost certainly constitutes a minority proportion of all EOS transactions.

This analysis does not account for EOS trades by U.S. persons, from the U.S., on foreign-based digital asset trading platforms that do not qualify as "national securities exchanges," and which trades may be considered U.S. transactions under the analysis in *In re Tezos*, 2018 WL 4293341, and *Helbiz*, 2021 WL 229609.

7. **Counsel should address whether plaintiff Crypto Assets Opportunity Fund is typical of other putative class members with regard to the classification of its purchases as domestic or foreign and the basis for the assertion that it is an adequate class representative.**

Formed in 2017 and headquartered in Northbrook, IL, Crypto Assets Opportunity Fund ("CAOF") is a pooled investment fund that manages approximately $5.5 million worth of blockchain- and cryptocurrency-focused assets on behalf of 75 predominantly United States-based investors.

CAOF is typical of other putative class members with regard to the classification of its purchases as domestic or foreign. CAOF traded EOS on both U.S.-based and foreign exchanges, including Cayman Islands-based Binance; U.S.-based GDAX, which is now U.S.-based Coinbase Pro; and Tagomi, which was headquartered in Chicago, IL and acquired by U.S.-based Coinbase in 2020. Under the Court's analyses in *In re Tezos* and *Helbiz*, CAOF's trades in EOS tokens are domestic transactions because CAOF is a U.S.-based entity that was physically located in the U.S. when it conducted the trades. (ECF No. 66, ¶ 27). Under the SEC's analysis in the Cease and Desist Order, *In re Poloniex*, SEC Rel. No. 92607 (Aug. 9, 2021), CAOF's trades in EOS tokens include both domestic and foreign transactions because it traded EOS on both U.S.-based and foreign digital asset trading platforms.

The presence of foreign investors and/or foreign transactions is not a bar to certification of the Settlement Class or of approval of Settlement. These questions were squarely addressed in *In re Petrobras Securities Litigation*, 317 F. Supp. 3d 858, 866 (S.D.N.Y. 2018) (Rakoff, J.), where an objector took issue with a settlement class that was defined to include purchasers "who would

have been unable to join the litigation classes previously certified by the Court because of extraterritorial impediments" under *Morrison v. National Australia Bank*, 561 U.S. 247 (2010). The court noted that the Second Circuit permits settlement of "entirely non-meritorious claims" so that "defendants might "buy 'global peace.'"  *Id.* at 866 (citations omitted).  The court further noted that Article III standing was satisfied for foreign purchasers because they did suffer an injury-in-fact, and further elaborated that the issue decided in *Morrison* was not one of standing or jurisdiction, but rather simply one of whether the Exchange Act applies extraterritorially. *Petrobras*, 317 F. Supp. 3d at 866.   Thus, the court certified for settlement purposes a class which included claimants who may not have met the standards of *Morrison*.

The court also found that the proposed class representatives in *Petrobras* were adequate. *Id.* at 869.  Specifically, two of the proposed class representatives had exclusively domestic purchases, and one of them had a mix of domestic and foreign purchases.   Here, CAOF has a mix of foreign and domestic purchases, and is therefore adequate to represent all investors.

8.     **Plaintiff has submitted a proof of claim form which directs claimants to provide the wallet address from which crypto was contributed for the purchases of ERC-20 or EOS tokens. Please provide additional information regarding the claims administration process, including:**

   (i)     **How the administrator will confirm that the wallet address provided is owned by the individual requesting payment**.

8(i):  The Court has asked for information concerning how the administrator will confirm that the wallet address provided is owned by the individual requesting payment.  For claimants who traded on secondary digital asset trading platforms, trading account transaction records are sufficient to identify that the claimants are, in fact, the individuals associated with the accounts from which the trades were made, because those records are accessible only by persons with login credentials.

For claimants who purchased ERC-20 tokens in the Token Sale, public Ethereum wallet transaction records may not provide this information, and an additional verification process may be necessary.  E.g., purchasers who transferred their ERC-20 tokens for trading to a digital asset trading platform may be able to verify their ownership of the tokens by providing records of their transactions from the platform.   In the event that a claimant who purchased ERC-20 tokens cannot verify their transaction in this manner, the claimant may demonstrate their ownership by initiating a transaction in a specified nominal amount, at the instruction of the claims administrator.

   (ii)    **How the claims process will differ for investors who purchased EOS or ERC-20 through an exchange that allows for off-chain transactions (i.e., which wallet address will such claimants provide) and how the administrator will confirm purchases and sales made on such platforms.**

The Court has also asked how the claims process will differ for transactions that occurred on an exchange allowing for off-chain transactions.  As noted above, claimants may submit records of their trades that occurred on an exchange.  From a preliminary review of the supporting

documentation, Epiq has noticed that most filers have submitted wallet screenshots as proof of EOS or ERC-20 token purchases. These screenshots provide the date, type of purchase (ICO or exchange), exchange (if applicable), quantity, cost, and other relevant transactional information.

    (iii)    **Please address whether the information provided by claimants will be sufficient to identify how a purchase of EOS or ERC-20 tokens was made (i.e., through a particular exchange, platform, or other method) and whether that information will be sufficient to analyze whether a transaction should be deemed foreign or domestic (i.e., location of purchaser, location of validating node, etc.).**

Finally, the Court has asked whether the information that claimants provide will be sufficient to identify how a purchase of EOS or ERC-20 tokens was made, and whether the transaction should be deemed foreign or domestic. The screenshots that claimants have submitted have provided enough information to determine whether the transaction is foreign or domestic by providing information about the exchanges on which the trades were made and claimants' addresses.

**9.    Documentation Required for Ownership of Tokens Post May 18, 2020 For claimants who have not sold their EOS or ERC-20 tokens, the proof of claim form requires documentation confirming that claimants held these tokens on May 18, 2020. What documentation will be required? Please explain how that documentation would be sufficient to confirm ownership of tokens on May 18, 2020.**

The Court has also asked, with regard to claimants who have not sold their EOS or ERC-20 tokens, what documentation will be required to confirm ownership of the tokens on May 18, 2020. Again, the trading records that have been provided (and will be requested from claimants whose submissions are determined to be incomplete) – which include the dates of purchases and sales – allow the claims administrator to determine if tokens were held on May 18, 2020.

**10.    The plan of allocation described in the plaintiff's submission states that the "recognized loss amount" for each claimant will be used only to "weigh the claims of claimants against one another for the purposes of making pro raw allocations of the Net Settlement Fund." Please address whether a claimant's recovery from the settlement fund in any circumstances may exceed its recognized loss amount and, if that is the case, please explain why such a result is justified.**

The Court has asked Lead Plaintiff to address whether a claimant's recovery from the settlement fund may exceed its recognized loss amount. The answer is that Lead Plaintiff does not anticipate that a claimant's recovery will exceed its recognized loss amount. Epiq has provided claims data through November 9, 2021. To date, 107 claims have been submitted for a preliminary total recognized loss amount of $75,647,315.86, and this number will be adjusted following a full review and analysis of the supporting documentation provided with the claims. It is, therefore, unlikely that there will be anything left in the Settlement Fund.

**11.    The plan of allocation provides that any balance remaining in the settlement fund after the initial distributions will be allocated in an "equitable and economic fashion."**

**Please explain what that means.**

The Court has also asked Lead Plaintiff to explain what is meant by the statement that any remaining balance in the Settlement Fund would be allocated in an "equitable and economic fashion."  As explained above, Lead Plaintiff does not anticipate that there will be funds left in the Settlement Fund.  If any funds do remain, however, a second distribution will be made among the claimants on a *pro rata* basis.  If there are still funds left after the second distribution, Lead Plaintiff will seek this Court's approval before making additional distributions to claimants.

12. **The plan of allocation specifies that the dates of a claimants' purchases and sales "shall be deemed to have occurred on the 'contract' or 'trade' date as opposed to the 'settlement' or 'payment' date." Please explain what those terms mean in the context of a cryptocurrency transaction.**

Traditionally, the trade date is the day an investor or trader books an order to buy or sell a security, and the settlement date marks the date and time the legal transfer of shares is actually executed between the buyer and seller.

In the context of a cryptocurrency transaction, and in particular peer-to-peer transactions, the transfer of digital assets, or cryptocurrency, is usually instantaneous, and the trade date is the same as the settlement date. In rare instances, however, usually involving third-party digital asset trading platforms, cryptocurrency settlement date may lag behind the trade date. *See, e.g.*, https://www.webull.com/hc/categories/fq898-What-is-the-settlement-period-for-crypto-trades ("Crypto trades settle T+1"). The plan of allocation includes those terms to provide clarity in the rare instances when claimants may have used a third-party digital asset trading platform that do not provide for immediate settlement of trades.

Very truly yours,

/s/ Daniel L. Berger

cc: All Counsel of Record (via ECF)