

Grant & Eisenhofer P.A.

485 Lexington Avenue  New York, NY 10017  Tel: 646-722-8500  Fax: 646-722-8501

123 Justison Street
Wilmington, DE  19801
Tel: 302-622-7000
Fax: 302-622-7100

30 N. LaSalle Street, Suite 2350
Chicago, IL  60602
Tel: 312-214-0000
Fax: 312-214-0001

WRITER'S DIRECT DIAL NUMBER: +1-646-722-8523

E-MAIL: dberger@gelaw.com

November 24, 2021

**Via ELECTRONIC MAIL**

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007
KaplanNYSDChambers@nysd.uscourts.gov

Re:  *Williams et al. v. Block.one et al.*  (1:20-cv-2809)

Dear Judge Kaplan,

We represent Plaintiff Crypto Assets Opportunity Fund LLC ("CAOF" or "Lead Plaintiff") in the above-referenced action. As the Court permitted, we write to supplement the record concerning the fairness of the settlement and allocation plan, in particular to further support the adequacy and typicality of claims of Lead Plaintiff. We supply additional evidence (1) that CAOF made **domestic** purchases of EOS Tokens during the Class Period; and (2) that the breakdown of CAOF's purchases between domestic and foreign is 50%-50%.

**I.      THE SETTLEMENT AMOUNT IS FAIR TO DOMESTIC PURCHASERS**

  **A.  CAOF Made Domestic Purchases During the Class Period.**

   **1.  CAOF Purchased EOS Tokens on Tagomi, an Exchange Located in the United States.**

Exhibit B to the Declaration of Daniel L. Berger, dated November 24, 2021, submitted herewith ("Berger Decl.") is a printout of CAOF's transactions in EOS Tokens beginning on May 29, 2019 through May 18, 2020, the last day of the Class Period. This Excel spreadsheet demonstrates that CAOF made the follow purchases of EOS Tokens on a U.S. Exchange:

The Hon. Lewis A. Kaplan
November 24, 2021
Page 2

- A purchase of 361.40 EOS Tokens on September 24, 2019 on the Tagomi exchange;

- A purchase of 10,000 EOS Tokens on September 24, 2019 on the Tagomi exchange;

- A purchase of 10,000 EOS Tokens on October 23, 2019 on the Tagomi exchange;

- A purchase of 1 EOS Tokens on November 7, 2019 on the Tagomi exchange;

- A purchase of 4,000 EOS Tokens on March 13, 2020 on the Tagomi exchange.

2. **Tagomi Is a Domestic Exchange Under the *Poloniex* Framework.**

The SEC recently issued a Cease-and-Desist Order against the web-based digital asset trading platform Poloniex, in which it devised a framework for ascertaining whether a digital asset trading platform is an "exchange" under the U.S. federal securities laws. *See* Cease-and-Desist Order, *In re Poloniex*, SEC Rel. No. 92607 (Aug. 9, 2021). In its determination that Poloniex was a U.S.-based digital asset trading platform, the SEC considered that (a) the platform was operated by individuals located in the United States, and (b) it was accessible to users in the United States. *Id.* at 3.

Similarly, Tagomi, the platform on which CAOF purchased EOS Tokens, was located in the United States; was operated primarily out of New York and New Jersey; and its founding principals were U.S. domiciles. Rachel McIntosh, *Tagomi Co-Founder: Big Tech will Bring Institutionals to Crypto*, Finance Magnates (Nov. 22, 2019), https://www.financemagnates.com/cryptocurrency/news/tagomi-co-founder-big-tech-will-bring-institutionals-to-crypto/ (attached as Exhibit B to the Declaration of Ievgeniia P. Vatrenko, dated November 24, 2021, submitted herewith) ("Vatrenko Decl."). As such, Tagomi is a U.S.-based digital asset trading platform under the factors the SEC considered in its action against *Poloniex*.

Further, Tagomi is an "exchange" under the *Poloniex* framework. Under that framework, a digital asset trading platform is an exchange if it (a) brings together orders of securities from multiple buyers and sellers; and (b) uses established, non-discretionary methods under which such orders interact with each other. *In re Poloniex,* SEC Rel. No. 92607 at 7. Like Poloniex, Tagomi takes buy and sell orders from users and connects them with other buy and sell orders. *See* Laura Shin, *Tagomi: A One-Stop Solution for Large Crypto Trades*, Unchained: Big Ideas From the World of Blockchain and Cryptocurrency (May 7, 2019), https://unchainedpodcast.com/tagomi-a-one-stop-solution-for-large-crypto-trades/. Vatrenko Decl., Exhibit C. In addition, Tagomi's platform "uses advanced routing tactics and execution algorithms to analyze real-time and historical data to decide where and when to trade," thus satisfying the second prong of the Poloniex test. *See Coinbase Customer Support*, https://www.crunchbase.com/organization/tagomi-systems. Vatrenko Decl., Exhibit D.

Separately, CAOF's trades made on Tagomi also meet the *Absolute Activist* standard for trades of domestic securities because traders interacting with the platform "only have one counter

party, which is Tagomi," a U.S. entity.  Laura Shin, *Tagomi: A One-Stop Solution for Large Crypto Trades,* Unchained: Big Ideas From the World of Blockchain and Cryptocurrency (May 7, 2019), https://unchainedpodcast.com/tagomi-a-one-stop-solution-for-large-crypto-trades/.  Vatrenko Decl., Exhibit C.  Irrevocable liability for the trades, therefore, incurs where Tagomi is located, *i.e.*, in the United States.  *Absolute Activist Value Master Fund Ltd.*, 677 F.3d 60, 67-68 (2d Cir. 2012); *see infra* §I.B.

### B. Lead Plaintiff's Purchases Render It Adequate to Negotiate a Fair Settlement Amount.

It was in Lead Plaintiff CAOF's interest to negotiate the greatest possible Settlement amount.  Regardless of where its transactions occurred, CAOF's interests aligned with every other Class Member's in achieving the highest possible recovery.  Further, the fact that CAOF had purchased EOS Tokens on a U.S. exchange – thus, domestic transactions under *Morrison* – demonstrates that it was not incentivized to settle for a lesser amount due to perceived weaknesses in those claims.  Rather, a significant portion of its transactions (nearly 50%) carried minimal risk of dismissal on *Morrison* grounds, and thus CAOF was incentivized to – and did – bargain for a settlement amount that minimized any risks associated with *Morrison*.  Its interests, therefore, were not "antagonistic to the interest of other members of the class."  *Hill v. City of New York*, 136 F. Supp. 3d 304, 356 (E.D.N.Y. 2015) ("[N]othing in the record suggests an improper motive on the part of any named Plaintiff or a fundamental conflict with members of the proposed class.")  *Cf. In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *12 (S.D.N.Y. Feb. 22, 2001) (noting a risk that inadequate representation could lead to class members' rights being "sold out too cheaply").

### C. No Class Member Has Objected to the Settlement Amount.

No Class Member has objected to the Settlement amount.  This is strong evidence of fairness and reasonableness.  *In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468, at *6 (S.D.N.Y. July 21, 2020) ("The absence of any objections and the small number of requests for exclusion support a finding that the Settlement is fair, reasonable, and adequate."); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15CV1249, 2018 WL 6333657, at *2 (S.D.N.Y. Dec. 4, 2018) ("[T]he absence of objections by the class is extraordinarily positive and weighs in favor of settlement.").

## II. THE PLAN OF ALLOCATION IS FAIR TO ALL MEMBERS OF THE CLASS

### A. Almost 50% of Lead Plaintiff's Token Purchases Were Made on Domestic Exchanges, Making Lead Plaintiff an Adequate Class Representative.

The breakdown of CAOF's purchases is 49.5% domestic and 50.5% foreign. *See* Berger Decl. CAOF purchased a total of 49,241.02 EOS Tokens during the Class Period. Berger Decl., Exhibit A, previously filed as Exhibit C to the Declaration of Daniel L. Berger dated June 8, 2020 (certification of CAOF pursuant to the PSLRA, attaching Class Period EOS transactions) (ECF No. 23-3).  To calculate the domestic/foreign breakdown of CAOF's purchases, we assumed that any transaction that we could not conclusively determine was domestic under *Morrison* was a

The Hon. Lewis A. Kaplan
November 24, 2021
Page 4

foreign transaction. Using this conservative assumption, CAOF purchased 24,362.40 EOS Tokens domestically, or 49.5%, of the total number of EOS Tokens that CAOF purchased during the Class Period; and purchased 24,878.62 EOS Tokens, or 50.5% of the total, in non-domestic transactions. *See* Berger Decl., ¶7.

In approving the Plan of Allocation, Lead Plaintiff acted as an adequate class representative. Because the breakdown of Lead Plaintiff's domestic and foreign purchases is 50-50, Lead Plaintiff had no personal incentive to prefer foreign transactions over domestic, or vice versa. In fact, Lead Plaintiff had every interest in ensuring that purchasers with both domestic and foreign transactions were treated fairly under the Plan of Allocation. Its claims are typical of the claims of other class members, many of whom likely also had a mix of domestic and foreign transactions. Lead Plaintiff is therefore adequate to serve as a class representative, and its claims are typical of the claims of other class members. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.").

### B. Claimants Who Purchased ERC-20 Tokens from Block.one in the Token Sale Have Domestic Purchases.

Exhibit A to the Vatrenko Declaration, submitted herewith, is a copy of the EOS Token Purchase Agreement, which block.one required investors to sign prior to purchasing their ERC-20 EOS Tokens. Amended Complaint ¶ 9, 57, 117 (ECF No. 66). As explained below, it demonstrates that all investors who purchased ERC-20 Tokens in the Token Sale directly from block.one have transactions that qualify as domestic under *Morrison*.

*Morrison* holds that "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities" qualify for the protection of the U.S. securities laws. For transactions involving securities not listed on a domestic exchange, we look to *Absolute Activist Value Master Fund Ltd.*, 677 F.3d 60 (2d Cir. 2012). In *Absolute Activist*, the Second Circuit held that for transactions that are not listed on a U.S. exchange, "domestic transactions" are those in which "(1) irrevocable liability is incurred in the United States or (2) title passes within the United States." *Giunta v. Dingman*, 893 F.2d 73, 79 (2d Cir. 2018) (citing *Absolute Activist*, 677 F.3d at 62). With respect to the first prong, "it is sufficient for a plaintiff to allege facts leading to the plausible inference that . . . the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68. Irrevocable liability occurs "when the parties become bound to effectuate the transaction," that is, when "the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 67-68.

Article One of the Purchase Agreement is titled "Acceptance of Agreement and Purchase of EOS Tokens." Section 1.1 states:

> This Agreement shall be effective and binding when Buyer: (a) ***clicks the check box on the official https://eos.io/ website (the "Website")*** to indicate that Buyer

> has read, understands and agrees to the terms of this Agreement; or, if earlier (b) Company's receipt of payment from Buyer.

(Vatrenko Decl., Exhibit A, emphasis added). The question of when the Agreement becomes binding arose during the Settlement Hearing. On this question, the Purchase Agreement explains that the check box that purchasers click is *on the website*. The "website" is located in the United States where the https://eos.io website servers are located. *See* Complaint ¶ 72 (explaining that block.one's EOS.IO website is located on a server in California). Thus, under the first prong of *Absolute Activist*, irrevocable liability from the standpoint of both the buyer and the seller occurred in California, where the eos.io server registered the investor's clicking of the check box. Similar facts persuaded the *Tezos* court that the token sale at issue there occurred in the United States. *See In re Tezos Sec. Litig.*, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) (noting that the plaintiff "participated in the transaction from [the United States]" . . . by "using an interactive website that was: (a) hosted on a server in Arizona and (b) run primarily . . . in California").

The Token Sale purchases also qualify as domestic transactions under the second prong of *Absolute Activist*, which looks at the location where the transfer of title occurred. 677 F.3d at 66. Here, the transfer of title occurred in the United States when block.one distributed the coins that investors purchased.

### C. Claimants with Foreign Transactions Are Entitled to a Settlement Distribution in Exchange for the Release They Are Providing to Defendants.

Although their claims are arguably weaker, claimants who might have difficulty proving domestic transactions under *Morrison* are still entitled to a share of the Settlement proceeds in exchange for the release that they are providing to Defendants. The Settlement Agreement defines the Settlement Class as "all persons or entities who, directly or through an intermediary, purchased or otherwise acquired ERC-20 Tokens and/or EOS Tokens at any time during the period of June 26, 2017 through May 18, 2020, inclusive." *See* Declaration of Daniel L. Berger dated October 17, 2021, Exhibit A (Amended Stipulation of Settlement) at ¶ 1.36 (ECF No. 117). It is these individuals, which include investors whose transactions are non-domestic under *Morrison*, who released any claims that "could have [been] asserted or could in the future assert in any forum that concern, arise out of, refer to, are based upon, or are related in any manner to the allegations, transactions, facts, matters, occurrences, representations, statements alleged, involved, set forth, or referred to in any of the Action[s]." *Id.* at ¶ 1.38.

This Court examined a similar issue in *In re Auction Houses Antitrust Litigation*, 2001 WL 170792, at *12 (S.D.N.Y. Feb. 22, 2001), in analyzing whether a settlement that expanded a release to include individuals with claims not asserted in the action was required to compensate those individuals. The Court stated that "an expanded release requires the allocation of at least some of the settlement consideration to the holders of the claims prejudiced by the expansion unless the class action judgment would bar the released claims by application of principles of former adjudication." Here, Defendants made clear that "a global settlement with this class is an essential condition to getting this done." *See* Transcript of Hearing Before the Hon. Lewis A. Kaplan dated November 17, 2021 ("Hearing Tr."), at 21-22; *see also id.* at 21 (noting that the defendants wish to resolve "uncertain[ies]" with regard to *Morrison* in this settlement). Thus, it is appropriate

The Hon. Lewis A. Kaplan
November 24, 2021
Page 6

that the Allocation Plan compensate class members for their non-domestic purchases of EOS tokens.

### D.  The Plan of Allocation Does Not Discount Claims on the Basis of Any Risk.

The Settlement does not distinguish between domestic and foreign purchases, and the Settlement will release all claims for purchases of ERC-20 and EOS Tokens during the Class Period, whether made domestically (as defined in *Morrison*) or non-domestically.  Because class members are releasing all claims for all purchases, whether domestic or foreign, the Plan of Allocation does not distinguish between purchases based on their location.  This approach is fair because Lead Plaintiff did not think it was appropriate to attempt to quantify the risks associated with demonstrating domestic purchases, particularly because the law concerning the location of cryptocurrency transactions with respect to domesticity is evolving.  *See* Hearing Tr. at 21 ("[T]he law is developing, still developing as to *Morrison* particularly as it's applied in this context.").

The Court expressed concern about the fairness of the Plan of Allocation because it does not discount claims of investors that might fail at trial under *Morrison*.  Included in this submission is the Declaration of Frank Torchio, Plaintiffs' damages expert who constructed the Plan of Allocation.  As explained therein, the Plan of Allocation does not distinguish between foreign or domestic purchasers and instead provides each claimant the highest possible amount it could recover.  *See* Declaration of Frank C. Torchio dated November 22, 2021 at ¶¶ 7-8.

The Supreme Court has explained that the requirement that transactions be domestic to recover at trial for violations of U.S. Securities laws is an element of the claim, and not a prerequisite for the Court's jurisdiction.  *See Morrison*, 561 U.S. at 254 (noting that it was error for the Second Circuit to consider the extraterritorial reach of § 10(b) to be one of subject-matter jurisdiction, because "to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question").

While it is true that investors whose transactions could conclusively be demonstrated to be foreign would not be able to recover at trial, their ability to prove the domesticity element is simply a risk, just as there are risks associated with proving loss causation or actionable false statements.  As explained during the Settlement Hearing, Lead Plaintiff did not discount any investors' claims based on any risks associated with the merits of the claims.  *See In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *4 ("[A] settlement court must assess the fairness of a proposed settlement in a practical way on the basis of reasonably available information.  It should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another.").

Most notably, Lead Plaintiff did not discount the '33 Act claims of investors who clearly made domestic purchases even though those claims faced a very serious risk of dismissal because of defendants' argument that they are time-barred under the applicable statute of limitations. Here, after the defendants' motion to dismiss was fully submitted, two courts in this District dismissed '33 Act claims essentially identical to plaintiffs' claims on statute of limitations grounds, rejecting the very arguments Lead Plaintiff made in its opposition to Defendants' Motion (*see* Crypto Assets

The Hon. Lewis A. Kaplan
November 24, 2021
Page 7

Opportunity Fund LLC's Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 13-17 (ECF No. 92). *See Holsworth v. BProtocol Foundation*, 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) ("Plaintiff's efforts to stretch the period by alleging concealment fails"); *In re Bibox Group Hldgs. Ltd. Sec. Litig.*, 2021 WL 1519328, at *9-11 (S.D.N.Y. April 16, 2021) (holding no discovery rule applies to statute of limitations for cases arising under Section 12(a)(1) of the '33 Act, and as to Section 12(a)(2), plaintiffs did not allege fraudulent concealment under similar facts as those presented here).

Lead Plaintiff's Plan of Allocation gives a recognized loss to '33 Act claimants that is the full amount of damages they could recover at trial, without discounting for the statute of limitations defense or any other defense that defendants advance such as, for example, a negative causation defense. Thus, under the Plan of Allocation, the '33 Act Recognized Loss Amounts were either (1) the difference between the purchase price and the sale price of the Tokens or (2) the difference between the purchase price and $2.66, which is the closing price of the Tokens on May 18, 2020, on the last day of the Class Period. *See* Plan of Allocation of Net Settlement Fund (ECF No. 112-2); Torchio Decl. at ¶ 5.

As explained *supra*, the transactions of investors who purchased directly from block.one in the Token Sale qualify as domestic transactions under *Morrison*. Thus, if Lead Plaintiff had determined to discount claims based on perceived weaknesses of their merits, it would have appropriately discounted the claims of Token Sale purchasers, which were domestic transactions, as well as foreign purchasers.

### E. There Were No Objections to the Plan of Allocation.

As with the Settlement amount, no class member has objected to the plan of allocation, which is strong evidence of its fairness. *See supra* Section I.C. This is particularly true where class members were on notice of the terms of the Settlement and the Plan of Allocation and had an opportunity to object. *See Denney*, 443 F.3d at 269 (approving settlement whose members had potential, non-fundamental conflicts, where there was sufficient notice and opportunity to object). Here, the notice process was robust and extensive and resulted in 114,011 hits to the Settlement Website. *See Supplemental Declaration of Joseph Mahan in Support of Lead Plaintiff's Motion for Final Approval of Settlement*, ECF No. 130, ¶ 7.

### III. CONCLUSION

For the foregoing reasons, as well as the reasons explained in CAOF's previous submissions supporting its Motion for Final Approval of Class Action Settlement Agreement (ECF Nos. 118-120, 129-130, 132, 134), we respectfully request that the Court grant final approval of the Settlement and the Plan of Allocation.

Respectfully submitted,

/s/   Daniel L. Berger
Daniel L. Berger

The Hon. Lewis A. Kaplan
November 24, 2021
Page 8

*Lead Counsel for the Class and Counsel for Attorney for Crypto Assets Opportunity Fund LLC*

Electronic Copies to: All counsel of record.